# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NNN 400 CAPITOL CENTER 16, LLC, *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 16-12728 (JTD)<br><br>(Jointly Administered) |
| NNN 400 CAPITOL CENTER, LLC, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>WELLS FARGO BANK, N.A. AS TRUSTEE FOR THE REGISTERED HOLDERS OF COMM 2006-C8 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES; LNR PARTNERS, LLC, *et al.*,<br><br>Defendants. | Adv. Proc. No. 18-50384 (JTD) |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1] The debtors in these cases are: NNN 400 Capitol Center, LLC, Case No. 17-11250 (KG); NNN 400 Capitol Center 1, LLC, Case No. 17-11251 (KG); NNN 400 Capitol Center 2, LLC, Case No. 16-12741 (KG); NNN 400 Capitol Center 3, LLC, Case No. 16-12750 (KG); NNN 400 Capitol Center 4, LLC, Case No. 16-12752 (KG); NNN 400 Capitol Center 5, LLC, Case No. 16-12753 (KG); NNN 400 Capitol Center 6, LLC, Case No. 16-12754 (KG); NNN 400 Capitol Center 7, LLC, Case No. 17-11253 (KG); NNN 400 Capitol Center 8, LLC, Case No. 17-11254 (KG); NNN 400 Capitol Center 9, LLC, Case No. 16-12755 (KG); NNN 400 Capitol Center 10, LLC, Case No. 16-12730 (KG); NNN 400 Capitol Center 11, LLC, Case No. 16-12731 (KG); NNN 400 Capitol Center 12, LLC, Case No. 16-12732 (KG); NNN 400 Capitol Center 13, LLC, Case No. 16-12733 (KG); NNN 400 Capitol Center 14, LLC, Case No. 16-12735 (KG); NNN 400 Capitol Center 15, LLC, Case No. 16-12736 (KG); NNN 400 Capitol Center 16, LLC, Case No. 16-12728 (KG); NNN 400 Capitol Center 17, LLC, Case No. 16-12737 (KG); NNN 400 Capitol Center 18, LLC, Case No. 16-12738 (KG); NNN 400 Capitol Center 19, LLC, Case No. 16-12739 (KG); NNN 400 Capitol Center 20, LLC, Case No. 16-12742 (KG); NNN 400 Capitol Center 21, LLC, Case No. 16-12743 (KG); NNN 400 Capitol Center 22, LLC, Case No. 16-12744 (KG); NNN 400 Capitol Center 24, LLC, Case No. 16-12746 (KG); NNN 400 Capitol Center 25, LLC, Case No. 17-11258 (KG); NNN 400 Capitol Center 26, LLC, Case No. 16-12747 (KG); NNN 400 Capitol Center 27, LLC, Case No. 16-12748 (KG); NNN 400 Capitol Center 28, LLC, Case No. 16-12749 (KG); NNN 400 Capitol Center 30, LLC, Case No. 17-11255 (KG); NNN 400 Capitol Center 32, LLC, Case No. 16-12751 (KG); NNN 400 Capitol Center 35, LLC, Case No. 17-11256 (KG); and NNN 400 Capitol Center 36, LLC, Case No. 17-11257 (KG).

I.      **INTRODUCTION**

This consolidated litigation and trial consists of:

a)      the secured creditor's bankruptcy Claim No. 5 in Case No. 16-12728, now owned by Little Rock-400 West Capitol Trust (LR 400) as the assignee and Debtors' Objection to said Claim, and

b)      The Plaintiffs'/Debtors' claims in this adversarial proceeding Case No. 18-50384 against multiple defendants including Wells Fargo Bank as Trustee for the Registered Holders of Comm 2006-C8 Commercial Mortgage Pass-through Certificates ("Wells" - the secured lender at the time of the bankruptcy filing); Berkadia Commercial Mortgage LLC ("Berkadia"), its regular servicer; LNR Partners, LLC, ("LNR"), its special servicer; Little Rock-400 West Capitol Trust ("LR-400") as the current holder of the Note secured by the property in Debtors' estates; Taconic Capital Advisors, LP ("Taconic"), the beneficial owner and manager of LR-400 (collectively known as "the Lender Defendants"); and Somera Road, Inc. ("Somera"). The Plaintiffs'/Debtors' claims in the adversarial proceeding are stated in the Plaintiffs'/Debtors' Second Amended Complaint filed September 5, 2019. (Adv. D.I. 268, Jt. Trial Ex. 83). The responses and defenses to the Plaintiffs'/Debtors' allegations asserted by the Lender Defendants are stated in their collective Answer and Affirmative Defenses filed October 18, 2018. (Adv. D.I. 68). The responses and defenses to Plaintiffs'/Debtors' allegations asserted by Somera are stated in its Answer and Affirmative Defenses filed October 19, 2018. (Adv. D.I. 69)

After six days of trial, and after consideration of the trial testimony and exhibits and deposition testimony admitted into evidence, this Court should make the following Findings of Fact:

II.     **FINDINGS OF FACT**

A.      **THE PARTIES**

1

1.     The Plaintiffs/Debtors are thirty-two (32) Delaware-incorporated limited liability companies created to acquire and own an undivided interest in an office tower located at 400 W. Capitol Ave., Little Rock, Arkansas ("the Property") as an investment in connection with an Internal Revenue Code Section 1031 tax deferred exchange. This 547,000 square foot commercial office building known as "Regions Center" serves as collateral for a 10-year commercial mortgage backed security loan ("the CMBS Loan") with a maturity date of September 1, 2016. (Adv. D.I. 268, Jt. Trial Ex. 83, ¶6).

2.     Wells Fargo is a national banking association having its principal place of business in Columbia, Maryland.

3.     LNR is a commercial mortgage special servicer acting on behalf of Wells Fargo, having its principal place of business in Miami Beach, Florida.

4.     Berkadia is a commercial mortgage servicer acting on behalf of Wells Fargo with its principal place of business in Ambler, Pennsylvania.

5.     LR-400 is a Statutory Trust formed in Delaware.

6.     Taconic is the beneficial owner of Little Rock-400, having its principal place of business in New York, New York.

7.     Somera is a commercial real estate investment firm, having its principal place of business in New York, New York. (Adv. D.I. 268, Jt. Trial Ex. 83, ¶¶17-22)[2]

**B.     THE LOAN**

The Plaintiffs/Debtors are thirty-two (32) Tenant in Common ("TIC") entities who purchased the Regions Center from the organizing party, Triple Net Properties, LLC ("Triple Net") in 2006 using commercial financing through a $32 Million loan through Bank of America, N.A.

---

[2] Wells Fargo, LNR, Berkadia, and LR-400 are referenced herein as "Lender Defendants".  Wells Fargo, LNR and Berkadia are also referenced herein as "Prior Lenders".

LEGAL\46956559\1

(hereinafter referred to as "the Loan") (Tr. Transcript 93:5-9, 161:6-13; Jt. Trial Ex. 263, 264, 1590 and 1593). On September 25, 2006, Bank of America assigned the Mortgage and Note to LaSalle Bank, N.A. (Jt. Trial Ex. 1407). LaSalle Bank then assigned the Mortgage and Note to a CMBS Trust managed by Wells Fargo, effective January 2, 2008. (Jt. Trial Ex. 1592)

As part of the original financing, the Plaintiffs/Debtors also obtained a mezzanine loan as part of the initial loan package with Bank of America, which was satisfied in 2006. (Jt. Trial Ex. 469, 742).

Since 2013, the Loan was serviced by Berkadia, as sub-sub-servicer to Master Servicer Key Bank pursuant to the Subservicing Agreement between Keycorp Real Estate Capital Markets, Inc. and Berkadia. (Tr. Transcript 1358:5-10, Jt. Trial Ex. 271). LNR was the special servicer for this Loan pursuant to the Pooling and Servicing Agreement ("the PSA") dated December 1, 2006 between Deutsche Mortgage & Asset Receiving Corporation, Midland Loan Services, Inc. and LNR. (Jt. Trial Ex. 1501)

The PSA is a 333-page contract, plus over 450 pages of exhibits, between the original CMBS Trustee lender, Lasalle Bank, Midland Bank as Master Servicer, and LNR as Special Servicer. The PSA sets forth the contractual rights and obligations between those parties. The Plaintiffs/Debtors are not party to the PSA. (Tr. Transcript 1390:13-1391:13; Deposition of Siobhan O'Keefe as representative of Berkadia ("O'Keefe Dep.") 46:10-17; Jt. Trial Ex. 1501).

On June 13, 2017, LR-400, through its principal Taconic Opportunity Fund, L.P. (an *owner/affiliate* of Taconic) purchased the Loan from Wells Fargo through its attorney-in-fact, LNR. (Jt. Trial Ex. 277).

1.     **The Loan Documents**

On August 18, 2006, the Plaintiffs/Debtors and Bank of America entered into the Loan Agreement, Promissory Note and Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (together "the Loan Documents"). (Jt. Trial Ex. 263, 264, 1590).

Berkadia and LNR, as servicers of the loan, were agents of Wells Fargo. (Jt. Trial Ex. 1501).

The Loan documents together created an obligation for Wells Fargo and its servicing agents, LNR and Berkadia, to deal fairly with Borrowers and to use their reasonable discretion in the release of reserve funds and approval of leases. (Jt. Trial Ex. 263, §9.5, §9.7(e), §9.7(k), §13.6).

**2.     Change of Asset and Property Management.**

In February 2014, the Plaintiffs/Debtors retained FGG, Inc. ("FGG"), an asset manager, to replace former asset manager Daymark. (Jt. Trial Ex. 886, P. 29). Beginning March 3, 2014, Moses Tucker Real Estate, Inc. ("MTRE") managed the Regions Center for Plaintiffs/Debtors pursuant to the Sub-Property Management Agreement between FGG (asset manager) and MTRE. (Tr. Transcript 255:11-15, 257:17-23, 501:21-22; Jt. Trial Ex. 256).

In early April 2014, Plaintiffs/Debtors, through FGG, submitted a request to Berkadia for formal approval of FGG as replacement asset manager. (Jt. Trial Ex. 372). Thereafter, FGG provided Berkadia with documentation, information and fees of $2,000.00 as requested in furtherance of the approval process. (Jt. Trial Ex. 274 and 372). The request for approval was then transferred to LNR, as special servicer, who requested Plaintiffs/Debtors pay $29,000 in fees for the approval process. (Polcari Dep. 291:24-293:17; Jt. Trial Ex. 281).

On October 14, 2014, LNR issued a "pre-negotiation letter" ("PNL") to FGG requesting, among other things: (a) financial statements from each Borrower prepared within 30 days of the date of the pre-negotiation letter; (b) three (3) years of certified financial statements from the key principals of the proposed asset manager; (c) federal tax returns for the past three (3) years from

the key principals of the proposed asset manager; (d) references and a list of all loans in which the key principals of the proposed asset manager had an interest; and (e) consent to credit background checks for the key principals of the proposed asset manager. (Polcari Dep. 290:16-291:12; Jt. Trial Ex. 280).

On November 19, 2014, the Plaintiffs'/Debtors' former counsel, Greg Fisher, responded to LNR, providing an acceptable version of LNR's proposed PNL agreeing to the majority of requests, save for some items deemed unreasonable and impossible to satisfy, and requesting feedback on whether it was acceptable to LNR. (Polcari Dep. 297:12-298:24; Jt. Trial Ex. 274 and 282).  There does not appear to have been any response to this letter. (Polcari Dep. 298:25-299:7)

Thereafter, the Plaintiffs/Debtors and FGG provided LNR with the requested information, documentation and requested fees amounting to $29,750.00 for processing the request for approval.  (Tr. Transcript 326:12-14, 328:12-329:5, 330:19-20, 331:5-10; Jt. Trial Ex. 268 and 274).

On February 25, 2016, the Plaintiffs'/Debtors' former counsel, Robert Dyess, attempted to address the nearly two-year old change of management application by sending a letter to LNR counsel Steve Simon. (Polcari Dep. 76:25-77:13; Jt. Trial Ex. 274).  Mr. Dyess pointed out to Mr. Simon that "Section 5.14(d) of the Loan Agreement says that lender approval shall not be unreasonably withheld, conditioned or delayed." (Polcari Dep. 86:14-25; Jt. Trial Ex. 274).

From early 2014 through mid-2016, FGG was treated by Berkadia and LNR as the asset manager.  (Deposition of P. Getty, 194:6-16, Tr. Transcript 332:21-333:4). On June 5, 2016, LNR issued a Retroactive Consent to Change Property Manager and Addition of a Guarantor; however, there is no evidence the consent was ever transmitted to the Plaintiffs/Debtors.  (Jt. Trial Ex. 272, Deposition of J. Polcari as 30(b)(6) Representative of LNR ("Polcari Dep.") 13:11-14).

This Retroactive Consent was first produced to the Plaintiffs'/Debtors' counsel in this litigation the night before the deposition of Mr. Polcari. (Polcari Dep. 23:13-18)

Berkadia admits it had no record of the approval of FGG as replacement asset manager in its files. (O'Keefe Dep. 78:24-79:11). Berkadia's client relations manager assigned to the Loan when the approval was issued also had never seen the approval. (Tr. Transcript 1404:14-23)

In early 2016, even before the September 1, 2016 maturity date, LNR, in its role as Special Servicer and agent of Wells, used the non-approval of FGG as a reason to declare a default of the CMBS Loan. (Jt. Trial Ex. 274).

Mr. Polcari admitted that even though LNR/Berkadia asserted that the Plaintiffs/Debtors were in default on three different grounds, he saw no indications in the LNR file suggesting that was true. (Polcari Dep. 124:9-19).

Mr. Polcari also testified that LNR could not explain why it took from October 2014 until 2016 for LNR to act on the request to approve FGG as replacement asset manager. (Polcari Dep. 66-67, 69:3-18, 70:10-14; Jt. Trial Ex. 272)

Mr. Polcari had no recollection of ever seeing the Retroactive Consent to Change Property Manager in LNR's official files he reviewed in preparation for his 30(b)(6) deposition. (Polcari Dep. 326:13-328:17; Jt. Trial Ex. 272) Neither did Mr. Polcari see a letter to the Plaintiffs/Debtors advising them of any approval of FGG, conditional or otherwise. (Id.)

**3.      Lease Approvals**

The Loan Documents required the Plaintiffs/Debtors to submit proposed leases deemed to be "major leases" to Lender for approval prior to execution.  (Jt. Trial Ex. 263, §5.13).

Berkadia and LNR, as servicers for Wells Fargo, were responsible for review of such leases.  (Jt. Trial Ex. 271, §2.03(a)(viii) and Jt. Trial Ex 1501).

Berkadia and LNR have no contractual privity with the Plaintiffs/Debtors.

The Plaintiffs/Debtors are responsible for the reimbursement of lender expenses in connection with lease approvals pursuant to Section 17.5 of the Loan Agreement.

Pursuant to the PSA and the SA, the lender is not obligated to pay any expenses related to the servicer services or expenses related to lease approval requests by the Plaintiffs/Debtors. The servicers earn their compensation for servicing the Loan as set forth in the PSA and the SA.

Nevertheless, the servicers regularly required the payment for their servicing fees from the Plaintiffs/Debtors and conditioned lease approvals and TI releases on payment of these fees. The servicers claim they are entitled to these fees pursuant to Section 17.5 of the Loan Agreement.

During the course of the Loan, LNR declared defaults against the Plaintiffs/Debtors for non-payment of these servicing fees.

These servicing fees demanded from the Plaintiffs/Debtors were determined by the servicers' employees holding the title "asset manager" based on an amount they determined was reasonable in their sole discretion.

If borrowers such as the Plaintiffs/Debtors knew to object to the fees demanded, the servicers would negotiate.

Berkadia and LNR took more than a commercially reasonable period of time to approve certain leases for the Plaintiffs/Debtors. (Tr. Transcript, 290:2-291:11, 525:20-526:1, 526:10-17, 597:9-22; Jt. Trial Ex. 274).

Neither LNR nor the Loan Documents provided the Plaintiffs/Debtors with any rules or guidelines showing the proper way to submit leases for Special Servicer approval.  (Tr. Transcript 295:1-7, 318:8-19; Jt. Trial Ex. 263) .

LNR had no internal guidelines for processing and turning borrower requests around other than "to do it as quickly as possible and provide service to the borrower." (Polcari Dep. 216:8-10).

LNR acknowledged that the only recourse a borrower has in the event of unreasonable delays would be for the borrower to take legal action. (Polcari Dep. 216:11-24).

**a.**        **The Regus Lease**

In August 2015, the Plaintiffs/Debtors entered into a lease agreement with tenant RGN-Little Rock I, LLC (commonly known as "Regus") for an eleven (11) year lease of the Property's 17th floor executive suite operation, which stood to net the Property three times the prior net income for that space.  (Jt. Trial Ex. 392).

Prior Lenders delayed approval of the Regus lease for a period of time far beyond what would be considered commercially reasonable.   (Tr. Transcript 339:1-341:1, 354:12-355:16, 528:13-23, 529:19-530:4, 530:13-22, 532:3-17, 532:22-533:2, 533:1-19; McGhee Dep. 215:3-7; Jt. Trial Ex. 269, 392, 396, 1521, 1536, 1582).

Berkadia was put on notice by the Plaintiffs'/Debtors' agents of the deal that would culminate in the Regus lease in May 2015. (Tr. Transcript 339:10-15).

The lease was submitted to Berkadia for approval several weeks before September 26, 2015.  (Tr. Transcript 340:7-11, 487:15-189:16; Jt. Trial Ex. 228, 269).

Berkadia determined the lease had to be reviewed by LNR as special servicer. (Tr. Transcript 317:18-318:318:7; Jt. Trial Ex.  229).

The lease was not approved by special servicer LNR until April 20, 2016, almost 7 full months after its submission. (Tr. Transcript 359:9-17; Jt. Trial Ex. 1477, 1582).

LNR could not provide any reasons for the delay in approval of the Regus lease. (Polcari Dep. 218:8-221:25).

After the lease was approved, the Plaintiffs/Debtors were required to pay LNR a $2,000.00 fee for the approval. (Tr. Transcript 1394:21-1395:4, 1396:9-1397:7; Jt. Trial Ex. 1477).

**b.**        **The Friday Firm Lease**

8

On August 14, 2014, the Regions Center Lease with Twentieth Floor Corporation ("the Friday Firm Lease") was submitted by the Plaintiffs/Debtors and received by the Prior Lenders for approval. (Tr. Transcript 270:19-24; 314:1-315:8; Jt. Trial Ex. 1511).

The Lease required special servicer approval by LNR.  (Jt. Trial Ex. 1511).

The Friday Firm Lease was not approved by LNR until November 5, 2014.  (Tr. Transcript 290:2-291:11, 292:7-21; Jt. Trial Ex. 382).

**c.**      **The Wilson & Associates Lease**

On September 14, 2016, the Plaintiffs/Debtors entered into a lease agreement with Wilson & Associates. ("the Wilson Lease") (Jt. Trial Ex. 500).

The Plaintiffs'/Debtors' refinancing by a specific date was a condition of the Wilson Lease. (Tr. Transcript 892:17-893:3; Jt. Trial Ex. 500).

**4.**      **Requests for Releases of Reserve Funds**

The Prior Lenders held and controlled reserve accounts for payment of tenant improvements and leasing commissions pursuant to the Loan Documents and servicing agreements. (Tr. Transcript 278:21-279:1; Jt. Trial Ex. 263, Art. 9).

These accounts were actually held and controlled by the Master Servicer, Key Bank, in accounts at Key Bank.

Pursuant to the SA, Berkadia agreed to be paid for its servicing of the Loan solely from the interest earned on certain of the Plaintiffs'/Debtors' custodial escrow accounts at Key Bank.

Timely transfer of funds from the reserve accounts to the Plaintiffs/Debtors was essential to maintaining adequate cash flow for the property. (Tr. Transcript 156:5-13, 156:21-157:1, 279:2-20, 284:21-287:3; Jt. Trial Ex. 238, 383, 401, 492, 1461, 1538).

MTRE, as property manager of the Regions Center, was involved in obtaining reserve funds for tenant improvements and leasing commissions. (Tr. Transcript 156:5-13, 156:21-157:1, 278:4-13, 279:21-281:15, Jt. Trial Ex. 229).

The Prior Lenders did not process requests for transfers of reserve funds in a commercially reasonable time period of thirty (30) days or less. (Tr. Transcript 279:10-20, 281:14-15, 289:8-24; 316:3-15, 317:1-11; Jt. Trial Ex. 229, 238, 383, 401, 492, 1461, 1538).

This delay in release of reserve funds hurt the property's cash flow. (Tr. Transcript 151:18-152:5, 293:7-22, 349:15-350:14, 350:22-351:9, 353:3-13, 491:11-492:4, 492:19-494:8; Jt. Trial Ex. 492, 1461, 1538).

The delay in release of funds for leasing commissions negatively impacted the property's reputation and future leasing prospects in the local community. (Tr. Transcript 351:2-352:2, 352:3-13, 354:12-355:16, 517:4-22, 518:7-16, 519:19-521:13, 521:21-522:6, 557:19-558:5; Jt. Trial Ex. 279, 401, 1521, 1538).

For example, due to the Prior Lenders' delay in approving the Friday Firm Lease, the request for payment of leasing commissions and tenant improvements in the amount of $423,388.67 were not released until almost four months after the lease was submitted for approval. (Tr. Transcript 290:2-291:11, 292:7-21, 315:15-316:2, 321:2-11; O'Keefe Dep. 191:7-15; Jt. Trial Ex. 238, 383, 1511).

Further, there was a delay of almost one month between approval of the Friday Firm Lease and release of the reserve funds for payment of commissions, which negatively impacted the property's cash flow. (Tr. Transcript 293:7-22, 322:14-324:7).

On November 21, 2014, MTRE employee Lori McGhee ("McGhee") advised Siva Boddepalli ("Siva"), a Berkadia reserve request processor in India, that despite Lender and Special

Servicer approvals, the Plaintiffs/Debtors had not received the tenant improvement ("TI") reserve payment. McGhee told Siva, "Our cash flow is really tight, and we have a loan payment due a week from Monday. This needs to be a priority for Berkadia." (Jt. Trial Ex. 238).

Berkadia could not explain the disconnect between why its processor was refusing to withhold these reserves and the acknowledgement by Berkadia's client relations manager, Ed Schmon. (O'Keefe Dep. 195:24-198:3; Jt. Trial Ex. 238).

McGhee advised Siva and Berkadia's reserves department that the delayed approvals were crippling cash flow. (O'Keefe Dep. 200:24-202:7; Jt. Trial Ex. 238)

Berkadia admitted this delay was caused by its offshore employee Siva missing an "LE" note to which she had database access; ("It appears that there was an LE note on the system that was not read by Siva.") (O'Keefe Dep. 206:20-207:17; Jt. Trial Ex. 238).

The Prior Lenders also delayed releasing reserve funds for leasing commissions and tenant improvements in connection with the Regus Lease.  (Tr. Transcript 522:7-13, 532:3-17, 532:22-533:2, 533:1-19; Jt. Trial Ex. 1521).

LNR could not provide any reasons for the delay in the release of Regus tenant improvement escrow funds. (Polcari Dep. 218:8-221:25).

The Prior Lenders refused to consider any requests for the release of reserve funds to pay TI costs and real estate taxes in the month prior to maturity.  (Tr. Transcript 366:3-367:4, 367:13-368:4, 368:16-20, 369:5-11; Jt. Trial Ex. 1480).

The Loan Agreement does not contain a provision that it will not consider any requests for the release of reserve funds to pay TI costs and real estate taxes in the month prior to maturity. *See generally* the Loan Agreement, Jt. Trial Ex.  263.

**5.      Fees Assessed by Berkadia and LNR**

Midland Bank continued to act as Master Servicer until the loan was sold to LR-400. (O'Keefe Dep. 52:20-24, 168:5-10).

This allowed Midland to be paid a percentage of the annual interest payments. (Jt. Trial Ex. 1501, Pg. 54 ("Master Servicing Fee Rate"), Pg. 67 ("Primary Servicing Fee Rate"), Pg. 80 ("Servicing Fee Rate"), Pg. 83 ("Special Servicing Fee"), Pg. 83 ("Special Servicing Fee Rate"), and (Exhibit B-2).

Key Bank acted as both the Primary Servicer and the Subservicer, entitling it to two fees from the Plaintiffs'/Debtors' annual interest payments. (O'Keefe Dep 42:21-43:1).

### a. Berkadia

Effective June 24, 2013, Berkadia became a servicer of the Loan through the execution of a Subservicing Agreement with Keycorp Real Estate Capital Markets, Inc. ("KeyBank"). (O'Keefe Dep. 95:17-24; Jt. Trial Ex. 271).

Under the terms of the Subservicing Agreement, all of the Plaintiffs'/Debtors' escrow deposits had to be deposited into Key Bank custodial accounts. (O'Keefe Dep. 236:4-14).

Pursuant to Section 9.7(a)(ii) of the Loan Agreement, the Plaintiffs/Debtors were entitled to all interest on escrow funds that Berkadia collected as its fee for servicing the CMBS loan. (Jt. Trial Ex. 263).

Berkadia acknowledged, "In this particular loan, the loan did pay interest on escrows." (O'Keefe Dep. 73:10-23, 100:18-23).

That included interest on all of the Plaintiffs'/Debtors' reserve accounts as defined in Section 1.1 of the Loan Agreement. ("Interest-bearing reserve account shall mean collectively the replacement reserve account, the required repair account, the excess cash reserve account, the operating expense reserve account, the extraordinary expense reserve account, the leasing reserve account, and the Blue Cross Blue Shield reserve account. Interest-bearing reserve funds shall mean

12

collectively the replacement reserve funds, the required repair finds, the excess cash reserve funds, the operating expense reserve funds, the extraordinary reserve funds, the leasing reserve funds and the blue cross blue shield reserve funds.") (O'Keefe Dep. 109:4-110:13)

These funds are the property of the Plaintiffs/Debtors. (O'Keefe Dep. 107-108)

Under the terms of the Subservicing Agreement, Berkadia had no entitlement to servicing fees as a percentage of annual interest paid on the loan by Debtors like Key Bank and Midland Bank.

Rather, Berkadia was limited to compensation as provided in Section 4.01 of The Subservicing Agreement which states:

> SUBSERVICER'S COMPENSATION AND EXPENSES
> Section 4.01. Subservicing Compensation.
>
> As the Subservicer's sole consideration under this Agreement, the Subservicer shall be entitled to retain interest or other investment earnings on the deposit amounts in the Moody's CMBS Accounts (but only to the extent of net investment earnings and to the extent not required to be paid to the Borrower under applicable law or the related loan documents). Subject to KeyBank National Association being an eligible depository institution under the PSA relating to the SSA, KRECM, or its affiliate KeyBank National Association, shall be entitled to retain interest or other investment earnings on the deposit amounts in the Non-Moody's CMBS Accounts (but only to the extent of net investment earnings and to the extent not required to be paid to the Borrower under applicable law or the related loan documents). Notwithstanding anything to the contrary in this Agreement or otherwise*, the Subservicer shall not be entitled to collect or retain any consideration in connection with the performance of its duties and obligations under this Agreement other than any interest or other investment earnings on the deposit amounts in the Moody's CMBS Accounts as described in this Section 4.01*. (emphasis added).

This restricted Berkadia's servicing compensation to the same interest required to be paid to Debtors under Section 9.7(a)(ii) of the Loan Agreement.

Despite the restrictive language in Section 4.01 of The Subservicing Agreement, Berkadia charged, and requiring payment of, servicing fees from the Plaintiffs/Debtors. (O'Keefe Dep. 244:1-5).

And in addition to those fees it charged the Plaintiffs/Debtors, it also paid itself 100% of the interest on Debtor's escrow funds. (O'Keefe Dep. 163:14-24).

Berkadia received servicing revenues on all of the Plaintiffs'/Debtors' interest-bearing reserve accounts. (O'Keefe Dep. 108:22-109:9).

Berkadia profited from the interest earned on the Plaintiffs'/Debtors' reserve funds held in interest bearing accounts.  (Jt. Trial Ex. 263; O'Keefe Dep. 99:20-100:6, 109:4-9, 109:13-110:13, 244:1-5).

As to the fees it demanded and charged to the Plaintiffs/Debtors, Berkadia claims it had a "legal basis" to charge the Plaintiffs/Debtors these servicing fees pursuant to the Loan Agreement. (O'Keefe Dep. 233:7-13).

Berkadia's corporate representative admitted she could find no such language in the Loan Agreement. (O'Keefe Dep. 235:19-236:2).

Likewise, at trial, Berkadia's representative Noelle Nichols ("Nichols") could not recall seeing any listing of the amounts that would be charged to borrowers for processing approvals. (Tr. Transcript 1389:23-1390:5).

The Loan Agreement does not include a provision for the payment of servicing fees generally or Berkadia's entitlement to servicing fees paid in the form of interest on the Plaintiffs'/Debtors' banks custodial accounts. (O'Keefe Dep. 11:15-18).

14

In Section 17.5 of The Loan Agreement, the Plaintiffs/Debtors agreed to pay or reimburse the lender for "all reasonable costs and expenses … reasonably incurred by Lender" in connection with the loan. (Jt. Trial Ex. 263).

However, pursuant to the Subservicing Agreement, the Lender specifically incurred no costs or expenses in connection with servicing the Loan.

Per the Subservicing Agreement, all costs and expenses of servicing the Loan were to be advanced by Berkadia. And, as previously noted, under Section 4.01 of the same contract, Berkadia was specifically prohibited from collecting or retaining any consideration related to the performance of its servicing duties. (Jt. Trial Ex. 271).

**b.** **LNR**

LNR's business model is to collect money from servicing fees including default interest and processing fees. (Polcari Dep. 149:25-150:11, 150:16-22).

No money is directly paid from the Lender to LNR in the servicing of CMBS loans, including the one at issue in this case. (Polcari Dep. 168:18-24).

All LNR revenues generated in connection with a CMBS loan come from the borrower. (Polcari Dep. 169:4-171:18).

As stated above, LNR, through Berkadia, demanded $29,750.00 from the Plaintiffs/Debtors in connection with its request for approval of FGG, its replacement property manager.

The fees for lease approvals and consent to change the asset manager to FGG were set arbitrarily and without consent of the Plaintiffs/Debtors. (Polcari Dep. 63:20-66:4).

The change in the management processing fee charged to the Plaintiffs/Debtors by LNR was based upon an unwritten policy. (Polcari Dep. 291:24-293: 17).

15

The agents of the Plaintiffs/Debtors agents understood their request to change the asset manager to FGG would not be processed if the fees were not paid.  (Tr. Transcript 330:11-331:4).

There is no provision in the Loan Agreement allowing for the assessment of fees by the special servicer for the approval process. (Polcari Dep., 58:15-17, 59:13-18, 112:16-114:9, 122:3-17).

There are no parameters or internal guidelines at LNR for assessment of fees in connection with requests for lease approvals. (Polcari Dep. 34:3-35:24).

There are no guidelines setting forth how requested fees are determined – it is solely determined by LNR. (Polcari Dep. 114:21-115:8, 115:16-116:8).

Processing fees are decided on a case-by-case basis without any standardized, written or agreed-upon process and arrived upon by the LNR asset manager and their supervisors "and that's what's put on the letter." (Polcari Dep. 292:13-293:17, 294:2-13). It is based on "the asset manager's judgment of the file at the time." (Polcari Dep. 295:15-24).

The PSA governs the relationship between Wells Fargo and LNR and provides for  these types of fees and who gets to retain them. (Polcari Dep. 60:4-61:22; 116:9-117:3, 149:25-150:11).

The Plaintiffs/Debtors incurred these processing fees under the apparent authority of LNR acting on behalf of Wells Fargo.  (Polcari Dep. 60:11-61:4).

Borrowers, including the Plaintiffs/Debtors here, are not a party to the PSA between Lender and LNR.  (Polcari Dep. 59:19-60:10, 64:21-65:9).

LNR's 30(b)(6) representative Polcari was not aware of any contractual basis for this charge. (Polcari Dep. 57:5-59:18).

When asked why LNR has right to make such a demand, Mr. Polcari stated, "I'm not sure there is a contract that says it has the right. It is practice that Special Servicers -- I've seen Special

Servicers -- I know that we've asked for processing fees in the past, it's not usual. So where it gets its right to do that? I can't answer that. I'm not sure." (Polcari Dep. 64:6-15) "The Special Servicer charges consent fees or processing fees just as a matter of practice …. There's nothing in the loan documents but it's a standard -- it's a practice of the Special Servicer." (Polcari Dep. 113:2-3).

Neither LNR nor Berkadia were contractually permitted to charge these amounts for processing the approval of a property manager replacement since the Lender never incurred nor could be required to incur these charges under the PSA or the Subservicing Agreement.

LNR receives special servicer fees as income and profits from those fees.  (Polcari Dep. 114:10-13, 114:17-20, 148:19-149:7, 149:25-150:11, 150:16-22, 151:4-9).

These processing fees go to LNR, not to the lender, as revenue. (Polcari Dep. 114:10-20)

These fees demanded of the borrower, in this case the Plaintiffs/Debtors, are completely within the discretion of LNR, not the lender. (Polcari Dep. 115-116)

Mr. Polcari further testified that the Plaintiffs/Debtors could "either not pay it or pay it." (Polcari Dep. 66:2-3).

The Plaintiffs/Debtors did not consent to servicers profiting from this interest.  (O'Keefe Dep. 110:15-18, 111:2-20, 121:2-6).

LNR, as the Controlling Class Representative (CCR) of the CMBS that this Note was a part of, had the contractual option rights, under the PSA, to buy the Note after a declared default at "fair value," which LNR itself had the right to determine.  (Polcari Dep. 134:15-19, 135:17-136:6).

LNR set the value of the loan higher than par value; that is, higher than the principal due and accrued interest. (Polcari Dep. 135:9-138:8).

17

LNR determined the fair value of the Note sold to LR-400 without doing any analysis. (Polcari Dep. 211:21-212:6).

Upon sale of the Loan to Taconic, LNR was also paid default interest, even though none had been collected from the Plaintiffs/Debtors, which it retained as profit pursuant to the PSA. (Polcari Dep. 323:23-324:8; Jt. Trial Ex. 862 at Pg. 200).

## 6.    Loan Maturity and Default

The Loan maturity date was September 1, 2016.  (Jt. Trial Ex. 389) The Plaintiffs/Debtors began efforts to refinance the property well in advance of that date.  (Tr. Transcript 104:9-12. 261:18-262:13, 355:23-356:22, 877:1-878:4; Jt. Trial Ex. 442, 444, 446, 451, 1227, 1415, 1416).

The Plaintiffs/Debtors attempted to obtain refinancing through Berkadia but were never contacted to begin the application process. (Tr. Transcript 360:11-362:3, 375:24-376:9; Jt. Trial Ex. 240, 444, 445, 446, 448).

The Plaintiffs/Debtors retained the law firm Rubin & Rubin ("the Rubin Firm") to assist them in refinancing the property and reorganizing their corporate structure.  (Tr. Transcript 91:14-92:3, 95:24-96:11, 153:154:18, 161:14-22, 162:12-163:22, 852:20-853:9, 858:13-860:21; Jt. Trial Ex. 1718).

Prior to the maturity date, the Plaintiffs'/Debtors' cash flow was negatively impacted by the actions and inactions of Wells Fargo, LNR and Berkadia. (Tr. Transcript 279:2-20, 284:21-287:3, 293:7-22).

The Prior Lenders declared the Loan to be in default on September 2, 2016. (Tr. Transcript 887:23-888:5; Jt. Trial Ex. 530, 1608).

On September 2, 2016, Berkadia referred the Loan to LNR for servicing due to maturity default. (Jt. Trial Ex. 1483).

LEGAL\46956559\1

The Rubin Firm, on behalf of the Plaintiffs/Debtors, requested that Berkadia not transfer the Loan to LNR as Special Servicer.  (Tr. Transcript 884:6-885:3, 886:13-887:3; Jt. Trial Ex. 479, 489).

To do so, Master Servicer required that the Plaintiffs/Debtors provide "a statement indicating that it is diligently seeking a refinancing commitment" and to continue making monthly loan payments. (Jt. Trial Ex. 484).

On August 31, 2016, the Rubin Firm provided Berkadia with the UBS term sheet and UBS representative Conrad Wicker informed Berkadia employee Nichols  that "CMBS lenders do not issue firm commitments." (Tr. Transcript 1420:19-1421:1; Jt. Trial Ex. 479, 1470).

Berkadia and Master Servicer refused the request, because they did not believe the term sheet provided by the Plaintiffs/Debtors was a firm commitment letter. (Tr. Transcript 1421:7-12, 1426:6-1427:5; Jt. Trial Ex. 487, 1470).

On September 12, 2016, the Plaintiffs/Debtors advised Nichols they were willing to continue monthly loan payments upon assurance that the Loan would not be transferred to the special servicer. (Tr. Transcript 1427:7-1428:8; Jt. Trial Ex. 1459).

On September 13, 2016, the Loan was transferred to LNR for servicing. (Jt. Trial Ex. 506, 1554).

The Plaintiffs/Debtors obtained a refinancing approval from UBS.  (Tr. Transcript 856:13-23; Jt. Trial Ex. 479), but UBS withdrew their term sheet and offer to finance the Plaintiffs/Debtors. (Tr. Transcript 882:7-13).

The Plaintiffs/Debtors then arranged bridge financing with Calmwater Capital ("Calmwater") by September 19, 2016 and were provided a term sheet on September 21, less than

a week after UBS withdrew. (Tr. Transcript 548:13-549:12, 888:14-23, 890:15-21; Jt. Trial Ex. 40, 56, 193, 194).

Calmwater issued its commitment letter to the Plaintiffs/Debtors on October 6, 2016. (Deposition of Calmwater representative Tristine Lim ("Lim Dep.") 71:16-24; Jt. Trial Ex. 203).

Up to and through September 30, 2016, any unresolved issues in connection with the refinancing could have been resolved. (Tr. Transcript 895:22-897:1, 1124:10-1124:19; Deposition of Seth Denison, Oct. 2019 ("Denison Oct. Dep.") 234:8-237:2, 237:10-24; Lim Dep. 80:8-13, 81:7-25, 82:4-9).

Despite the retroactive approval document produced by LNR the night before its corporate representative's deposition indicating the FGG management change request was approved in June 2016, on October 28, 2016 LNR's counsel, Ms. Meagan Leary, stated that the Plaintiffs/Debtors were in default for failure to get approval of the asset and property manager.  (Polcari Dep. 325:9-4; Jt. Trial Ex. 283).

Ms. Leary also demanded, "Borrower shall reimburse Lender for legal fees and expenses incurred in connection with the review and processing of the Wilson Lease". Id.

As stated *supra*, under the PSA, Lender could not be reimbursed since it was never obligated to pay these legal fees and expenses.

Taconic principal James Jordan ("Jordan") stated it is not unusual for closings to be deferred so that conditions of closing can be satisfied. (Tr. Transcript 724:12-16).

Mitchell Williams, a major Arkansas law firm, entered into a significant Lease Agreement with the Plaintiffs/Debtors in August 2016.  (Tr. Transcript 534:9-23, 535:7-11, 535:22-536:16, 538:16-21, 541:23-542:4, 872:15-873:2; Jt. Trial Ex.  3).

The Mitchell Williams Lease was a condition of the Plaintiffs'/Debtors' refinancing with Calmwater Capital such that termination of that lease would cause the refinancing to fail. (Tr. Transcript 534:9-23, 537:2-538:4, 539:3-9, 551:1-11, 872:15-873:9).

Similarly, the Plaintiffs'/Debtors' refinancing by a specific date was a condition of the Mitchell Williams Lease. (Tr. Transcript 876:10-21; Jt. Trial Ex. 3).

**7.      The Payoff Statement**

The Plaintiffs/Debtors, through Mark Rubin ("Rubin") of the Rubin Firm, first requested a Payoff Statement from Berkadia on June 29, 2016 (Jt. Trial Ex. 454).

In response, on July 8, 2016, Berkadia provided the Plaintiffs/Debtors with an Estimated Payoff Statement.  (Jt. Trial Ex. 456).

On July 12, 2016, Nichols advised Rubin the loan could not be paid off until August 29th pursuant to the Loan Agreement. (Tr. Transcript 881:10-20; Jt. Trial Ex. 457).

Rubin then sent several emails over the next month or so following up with Berkadia on his request for a final Payoff Statement.  (Tr. Transcript 882:1-6; Jt. Trial Ex. 459, 474, 475, 498, 513, 518, 527).

Lender Defendants claimed they were unable to provide the Plaintiffs/Debtors with a payoff statement by August 31 due to their inability to determine if a mezzanine loan issued in 2006 had been satisfied ("the Mezz Loan").  (Tr. Transcript 369:16-370:19, 1207:7-17, 1410:15-1411:16; Jt. Trial Ex. 270, 464, 468, 474, 475, 479, 1481, 1499).

As stated above, this mezzanine loan had been part of the initial loan package with Bank of America, from whom the Prior Lenders purchased the Note, and was satisfied in 2006, which information was in the possession of both Berkadia and LNR prior to August 31, 2016.  (Tr. Transcript 369:16-370:19; 370:22-371:15, 1412:4-13; Jt. Trial Ex. 468, 513, 597, 742, 1565, 1579, 1587, 1592).

21

Berkadia admitted that it was not allowed to provide the Plaintiffs/Debtors with a Payoff Statement without the Master Servicer (Key Bank) being "content" that the mezzanine loan was satisfied. (O'Keefe Dep. 223:15-22).

Ultimately, LNR confirmed from its own files that the mezzanine loan had been satisfied long prior. (O'Keefe Dep. 226:10-17; Jt. Trial Ex. 1579).

After the Loan was declared to be in default and transferred to LNR as special servicer, Rubin redirected his requests for a Payoff Statement to LNR. (Tr. Transcript 888:8-13, 1259:5-24; Jt. Trial Ex. 543).

Lender Defendants delivered the Payoff Statement to the Plaintiffs/Debtors after the close of business on Friday, September 30, 2016. (Tr. Transcript 1264:18-1265:7, 1292:11-19, 1300:20-1301:5; Jt. Trial Ex. 539, 1614).

The Payoff Statement included a late payment charge in excess of $1.2 million. (Jt. Trial Ex. 539).

The Prior Lenders had knowledge of the Lease Agreement between the Plaintiffs/Debtors and Mitchell Williams, and that termination of the lease would cause the Plaintiffs'/Debtors' refinancing attempts to fail. (Tr. Transcript 534:9-23, 537:2-538:4, 539:3-9, 551:1-11; Jt. Trial Ex. 3, 543).

## 8.    The Late Payment Charge

LNR, as Special Servicer, is allowed under the PSA to retain any late payment charges as additional compensation. (Jt. Trial Ex. 1501, P. 136, §3.05).

LNR, through its agent Nicola Hudson, dictated that a late fee on the principal balance be added to the Payoff Statement. (Jt. Trial Ex. 531). However, on August 30, 2016 Berkadia representative Nichols informed Rubin that the Plaintiffs/Debtors "will be charged late fees and default interest for each day that the loan does not pay off after that date." (Jt. Trial Ex. 479).

LEGAL\46956559\1

LNR also dictated that attorneys' fees it claimed be included in the Payoff Statement and in the Creditor's Proof of Claim in the amount of $7,992. (Jt. Trial Ex. 463, 539, 1257).  Mr. Polcari could not provide any detail to substantiate those charges. (Polcari Dep. 273:11-274:12).

There is no evidence in the record that Wells, the lender, as opposed to LNR or Berkadia, as servicers, expended attorneys' fees in connection with the maturity default in this case. (Tr. Transcript 1425:13-23).

Likewise, Mr. Polcari could not shed any light on the nature of any element of the line item on the Payoff Statement listed as "other expenses" in the amount of $25,686.68.  (Jt. Trial Ex. 539).

Asked if he had any idea what that number stood for, Mr. Polcari stated, "I'm saying, as I sit here, I trust that the Master Servicer and our shadow servicing as the Special Servicer got the number right. I can't tell you the components of it." (Polcari Dep. 282:7-9).

Further, Mr. Polcari could not shed any light on the nature of any element of the line item on the Payoff Statement listed as "miscellaneous fees" in the amount of $4,250. (Polcari Dep. 285:9-25).

In her August 30 email referencing late fees, Nichols, on behalf of Berkadia, made no reference to a one-time 4% charge on the principal amount, in excess of $1.2 million.  (Tr. Transcript 1416:15-1417:11; Jt. Trial Ex. 479).

All the default interest charged by LNR would have been paid to LNR as special servicer under the PSA. (Polcari Dep. 320:7-321:1).

The Late Payment Charge referenced in the Note does not refer to maturity default.  Article 8 of the Note states, "If any principal or interest payment is not paid by Borrower before the fifth (5th) day after the date the same is due  . . .  Borrower shall pay to Lender upon demand an amount

equal to the lesser of four percent (4%) of such unpaid sum . . . in order to defray the expense incurred by Lender in handling and processing such delinquent payment." (Jt. Trial Ex. 264, Art. 8).

Berkadia and LNR claim there is no five (5) day grace period upon loan maturity. (O'Keefe Dep. 136:10-137:11; Polcari Dep. 288:6-15).

When asked about the expenses referenced in the language of the Note, Article 8, Mr. Polcari could not identify any of the lender's expenses associated with "handling and processing the delinquent payment." (Polcari Dep. 262:12-263:5; Jt. Trial Ex. 264). Neither could he comment on the elements of such expenses or the amounts. (Polcari Dep. 263:22-25; Jt. Trial Ex. 264). Mr. Polcari also did not have any information on the cost to "compensate the lender for the loss of the use of the delinquent payment." (Polcari Dep. 264:2-24; Jt. Trial Ex. 264).

Mr. Polcari stated that reference to lender in Article 8 refers only to the REMIC trust, not to LNR as special servicer. (Polcari Dep. 265:25-268:18; Jt. Trial Ex. 264).

Upon receipt of the Payoff Statement containing the Late Payment Charge, the Plaintiffs/Debtors contacted LNR requesting it be removed. (Tr. Transcript 1265:12-1266:24, 1300:12-16; Jt. Trial Ex. 551, 1614).

The Late Payment Charge was reduced after negotiations between counsel for the parties. (Tr. Transcript 1267:17-1268:9, 1314:15-1315:19, 1317:18-1318:6, 1320:7-19, 1322:24-1323:19; Jt. Trial Ex. 1614, 1615, 1616, 1621).

LNR then agreed conceptually to remove the Late Payment Charge altogether, but never committed to doing so in a signed document. (Tr. Transcript 1211:13-1212:11, 1267:17-1268:9, 1270:1-2, 1270:8-14, 1323:20-1324:11, 1337:24-1338:4; Jt. Trial Ex. 569, 576, 1564,1623).

LNR acknowledged the Late Payment Charge was removed from the amount due from the Plaintiffs/Debtors on the CMBS Loan (Polcari Dep. 184:14-24)

LR-400, the Secured Lender by assignment from Wells, continues to assert the Late Payment Charge in its Claim. (Jt. Trial Ex. 1257)

LNR also acknowledges it is within the discretion of LNR to remove the fee, not the Note owner. (Polcari Dep. 191:20-192:18).

LNR, as special servicer of the Loan, was to receive all default interest. (Polcari Dep. 206:13-17).

LNR was paid default interest, which it retained as profit pursuant to the PSA, upon sale of the Note to LR-400.  (Jt. Trial Ex. 862 at Pg. 200).

## C.      The Somera/Debtors Master Confidentiality Agreement

On December 15, 2016, Ian Ross ("Ross"), on behalf of Somera, contacted the Plaintiffs/Debtors, through their bankruptcy attorney Thomas Francella, to discuss "potential resolutions as… an extremely helpful capital partner" (Deposition of Ian Ross ("Ross Dep.") 12:14-22; Jt. Trial Ex. 310).

Somera and the Plaintiffs/Debtors did not begin any substantive communications until January 11, 2017, when Ross emailed Mark Rubin after having been informed by the Plaintiffs'/Debtors' bankruptcy counsel that Rubin, his co-counsel, was the lawyer working on refinancing for the Regions Center.  (Ross Dep. 74:12-19, 85:5-8; Jt. Trial Ex. 310).

Ross made contact with Rubin over the next month, and they ultimately spoke in late February 2017. (Ross Dep. 74:25-75:13, 75:22-23; Jt. Trial Ex. 311).

Ross, on behalf of Somera, pursued a deal for the Regions Center "to work with those TICs to provide capital to the TICs through a third-party capital providing source, acquire their notes, pay off the loan -- acquire their note, excuse me. Pay off the loan, recapitalize the equity, and

25

create value for ourselves, our equity, and the TICs, rather than them being in litigation, foreclosure, and bankruptcy." (Ross Dep. 79:16-80:10).

Rubin, on behalf of the Plaintiffs/Debtors, agreed to work collaboratively with Somera, which represented itself as a lender, to acquire the Note at a discount to the amount then sought by lender Wells Fargo, through its special servicer, LNR.  (Ross Dep. 131:12-23; Deposition of Jonathan Reeser ("Reeser Dep.") 14:19-24); Deposition of I. Mark Rubin ("Rubin Dep.") 318:5-320:15).

To that end, Somera counsel Michael Fralin ("Fralin") sent Rubin a draft confidentiality agreement on March 2, 2017.  (Ross Dep. 91:16-21; Jt. Trial Ex. 91).

Rubin revised the document to reflect he was executing it on behalf of his clients for deals to be defined pursuant to a schedule to the agreement.  (Jt. Trial Ex. 92).

Somera and the Plaintiffs/Debtors entered into the Master Confidentiality Agreement ("the 2017 MCA") on March 6, 2017.  (Jt. Trial Ex. 159, 160).

A Schedule to the 2017 MCA, including the Regions Center as a proposed transaction, was executed on March 10, 2017.  (Ross Dep. 92:11-93:14, 93:18, 93:21-23; Jt. Trial Ex. 160).

Ross confirmed he read and understood the terms of the MCA. (Ross Dep. 37:20-38:4).

Somera admitted the Plaintiffs/Debtors never breached the 2017 MCA. (Ross Dep. 185:21-186:3).

## 1.    The Parties to the 2017 MCA

The Rubin Firm signed the 2017 MCA and its Schedule on behalf of its clients, the Plaintiffs/Debtors. (Tr. Transcript 109:24-110:7, 110:16-111:1, 143:4-13, 146:8-14, 146:22-147:6, 148:6-13; Jt. Trial Ex. 92, 159).

The Schedule signed by Somera and the Rubin Firm made it clear that those clients included the owners of "Regions Center – Little Rock." (Jt. Trial Ex. 160).

26

Ross, as CEO and representative of Somera, was aware that Rubin signed the 2017 MCA as representative for the Plaintiffs/Debtors.  (Ross Dep. 79:16-80:10, 88:13-22; 131:12-23).

Ross acknowledges Rubin never represented he was acting in any capacity other than as counsel for the Plaintiffs/Debtors. (Ross Dep. 83:4-7).

Ross told Taconic he was "confident we can get this done with Rubin," regarding a deal with the Plaintiffs/Debtors and the Note purchase. (Ross Dep. 116:17-24; Jt. Trial Ex. 171). Ross said he made this remark because he trusted Mark Rubin. (Ross Dep. 117:2-6).

**2.      Terms of the 2017 MCA**

Paragraph 1 of the 2017 MCA states that Confidential Information includes "any written memoranda, notes, analyses, reports, compilations, or studies prepared by Recipient or any Representative (in whatever form or medium) that contain, or are derived from, such documents or other information furnished or made available by or on behalf of Provider." (Jt. Trial Ex. 159)

The 2017 MCA requires Recipient (Somera) to inform its Representative (Taconic) "of the confidential nature of the Confidential Information and the restrictive terms of [the] Agreement and direct such Representative to abide by the terms hereof."  (Jt. Trial Ex. 159, §3(a).

Section 3(b) requires Recipient "to be liable subject to and in accordance with the terms hereof in the event that any such Representative discloses Confidential Information in breach of the permitted methods of disclosure under this Agreement." (Jt. Trial Ex. 159, §3(b)).

The 2017 MCA further states, "Recipient further agrees that it and each of its Representatives will use the Confidential Information exclusively for the purpose of evaluating the Proposed Transaction, and shall not use the Confidential Information (a) for its own benefit, (b) for the benefit of any third party, or (c) to Provider 's detriment. (Jt. Trial Ex. 159, §3).

Section 8 of the MCA requires "For a period of eighteen (18) months from the date of the applicable Schedule (unless provided otherwise in the applicable Schedule), Recipient agrees it

will not, directly or indirectly, without Provider's written consent, (a) enter into any oral or written agreement or arrangement of any kind for or in connection with a Proposed Transaction, (b) initiate, maintain or respond to any contact with the owner of the underlying property or any note secured thereby the underlying property relation to the Proposed Transaction, any obligor or borrower related to the Proposed Transaction, or any of the respective employees or representatives of the foregoing (except in the ordinary course of business unrelated to the Proposed Transaction), or (c) otherwise circumvent or undermine the Provider's opportunity with respect to the Proposed Transaction." (Ross Dep. 154:13-22, 177:13-21, 177:22-178:3; Jt. Trial Ex. 159, §8).

Section 8 of the MCA further requires Recipient to "instruct its Representatives to similarly restrain themselves and act accordingly under this Section 8." (Jt. Trial Ex. 159, §8).

**3.      The Plaintiffs/Debtors Provided Confidential Information to Somera**

The Confidential Information, as defined in the 2017 MCA, that Rubin provided to Somera, at Somera's request, consisted of:

- Annual Income Statement 2014 and 2015 -Regions Center
- 2017 Budget, Rent Roll, TI, LC and Capex Requirements-Regions Center.xlsx
- CO-Star Office Report-Regions Center
- Pictures of the Regions Center (from CBRE Appraisal)
- Appraisal Summary-Regions Center (from CBRE Appraisal)
- Comparable Sales-Regions Center (from CBRE Appraisal)
- 2016 Operating Statement-Regions Center
- LNR Settlement Offer Letter - Sent March 21, 2017
- Regions Center Argus information
- Regions Center Appraisal from CBRE - Sent April 4, 2017
- LNR Payoff Statement dated October 1, 2016 - Sent April 24, 2017
- LNR Payoff Statement (reflecting balance as of 5/1/2017)

(Tr. Transcript 1577:6-20, 1579:5-23, 1589:17-21, 1606:4-7; Ross Dep. 101:10-14; 110:12-17; Jt. Trial Ex. 54, 127, 168, 146, 169, 313, 1294).

28

The Plaintiffs/Debtors also provided Somera access to non-public areas of the property via their agents MTRE.  (Tr. Transcript 509:23-510:17, 512:19-513:20, 566:2-22, 567:8-23, 574:20-575:17. 1641:4-5, 1641:15-1642:1, 1642:15-1644:10; Ross Dep. 282:5-284:11).

Joe LeMense ("LeMense") performed underwriting for the Regions Center for Somera. (Tr. Transcript 1481:23-1482:2). LeMense stated he used the Plaintiff's/Debtors' Confidential Information in his underwriting for the Regions Center. (Tr. Transcript 1579:19-23, 1589:5-11, 1591:11-15, 1594:3-9, 1597:17-22, 1629:10-20) LeMense further stated that the Confidential Information received from the Plaintiffs/Debtors is the type of financial documentation typically reviewed in his underwriting. (Tr. Transcript 1589:13-16, 1591:16-19, 1594:10-13, 1594:14-1595:21, 1598:3-1599:1, 1599:12-1600:6).

LeMense also stated he treated the Plaintiffs'/Debtors' documents as confidential and that they were marked as confidential. (Tr. Transcript 1600:7-11, 1601:15-17).

LeMense stated he did not see any of the bankruptcy filings also containing some of the Plaintiffs'/Debtors' Confidential Information while underwriting the Regions deal, that he did not use any of those bankruptcy documents in his underwriting, he did not see any of these materials until after the instant litigation began. (Tr. Transcript 1543:4-1544:1).

LeMense could not explain how to pull bankruptcy filings from the Court's online system ("Pacer"), nor whether there was a cost to do so, nor whether a person would have to be a registered user to do so. (Tr. Transcript 1547:15-1548:3).

LeMense stated he did not search for other publicly available sources of the Plaintiffs'/Debtors' Confidential Information because it already had been given to him by the Plaintiffs/Debtors. (Tr. Transcript 1589:22-1590:14, 1591:20-1592:5)

LeMense also stated he made additional requests to the Plaintiffs/Debtors for more Confidential Information after reviewing the initial batch he received on March 10, 2017. (Tr. Transcript 1610:7-16, 1615:13-1616:5, 1616:21-1617:22; Jt. Trial Ex. 170).

In responding to one of these requests, Rubin specifically reminded LeMense that the materials are confidential and asked him to "not distribute these or any other materials relative to this property to anyone that is not covered under the NDA;" LeMense acknowledged this request and agreed by return email. (Tr. Transcript 1618:19-1619:16; Jt. Trial Ex. 170).

Andrew Lam ("Lam") was primarily in charge of the underwriting process for Taconic. He began working on the Regions deal in April or May of 2017 at the instruction of James Jordan, a then high-ranking principal at Taconic. (Tr. Transcript 668:24-669:10; Deposition of Andrew Lam ("Lam Dep.") 42:4-5, 56:20-25; Jordan Dep. 211:21-212:3).

Lam stated he did not know what information provided to him by Somera was considered public or confidential.  (Lam Dep. 99:8-12, 100:10-14, 101:5-16, 105:12-20).

**a.**      **2017 Budget, Rent Roll, TI, LC and Capex Requirements-Regions Center.xlsx**

Some parts of the Confidential Information were available through the Bloomberg subscription service.  (Tr. Transcript 1511:6-13; Ross Dep. 103:8-9).

Bloomberg reports are available only to those paying a subscription fee of $25,000 per year.  (Tr. Transcript 1545:7-1546:14).

LeMense stated he used the worksheets from the Confidential Information in his due diligence and underwriting of the Regions Center along with information from Bloomberg. (Tr. Transcript 1579:19-1580:6, 1592:6-20).

LeMense also stated that although he accessed Bloomberg information, it did not contain the exact information as contained in the budget worksheets provided by the Plaintiffs/Debtors. (Tr. Transcript 1580:8-1583:7, 1584:19-1588:7, 1588:10-14, 1593:9-16, 1595:23-1597:10)

LeMense also stated the level of "granularity" in the Plaintiffs'/Debtors' Confidential Information is not contained in the bankruptcy filings. (Tr. Transcript 1588:23-1584:4, 1597:11-16).

**b.**    **Appraisal**

On April 4, 2017, Debtors emailed to LeMense and Ross the CBRE Appraisal commissioned by the Plaintiffs/Debtors in 2016. (Tr. Transcript 1619:17-22; Jt. Trial Ex. 169).

This Appraisal was commissioned and paid by the Plaintiffs/Debtors. (Tr. Transcript 862:8-10, 863:9-13; Deposition of Lori Adcock-McGhee ("McGhee Dep.") 280:19-281:12; Jt. Trial Ex. 169).

LeMense acknowledged appraisals generally contain proprietary information.    (Tr. Transcript 1605:17-1606:2).

LeMense further stated appraisals were not in the bankruptcy filings he reviewed after commencement of this litigation. (Tr. Transcript 1550:12-1551:4).

The Appraisal provided to Somera as part of the Confidential Information states its intended use is for "internal decision making purposes and no other use is permitted," and that the intended user of the report is "Enterprise Financial Group and such other parties and entities (if any) expressly recognized by CBRE as "Intended Users" (as further defined herein) and no other user may rely on our report unless as specifically indicated in the report. (Jt. Trial Ex. 169 at Pg. 22).

LeMense stated he reviewed the Appraisal, including its Executive Summary, in connection with his underwriting.  (Tr. Transcript 1603:18-22, 1604:17-1605:4).

LeMense also stated at least portions of the Appraisal were not available on Bloomberg or in the bankruptcy filings. (Tr. Transcript 1608:11-19).

**c.**    **2016 Operating Statement-Regions Center**

LeMense stated he received the 2016 Operating Statement from the Plaintiffs/Debtors, and that Bloomberg also did not have the same identical information as this document. (Tr. Transcript 1608:21-1609:12).

**d.** **Settlement Communications with Prior Lender**

Settlement communications are by their very nature confidential, and as such, are rarely, if ever, publicly available. (Jt. Trial Ex. 127, 694).

Taconic admitted it did not have access to settlement communications between the Plaintiffs/Debtors and LNR from any other source. (Tr. Transcript 653:5-9; Jt. Trial Ex. 127).

The settlement communications provided by the Plaintiffs/Debtors were used by Somera and Taconic to evaluate the Regions Center Loan.

**e.** **Payoff Statements**

The Plaintiffs/Debtors sent the LNR Payoff Statements to Somera upon request by Ross, who wanted to "understand how much debt is on the property in the lender's eyes." (Tr. Transcript 1632:14-24; Ross Dep. 108:20-109:10; Jt. Trial Ex. 178).

Only an interested party to a CMBS trust may obtain Payoff Statements such as those provided by the Plaintiffs/Debtors to Somera. (Jordan Dep. 190:2-10, 190:21-23, 191:2-191:11).

Only those with access to the Trepp database would have access to the information contained within the Payoff Statements. (Tr. Transcript 785:17-24).

The LNR Payoff Statements provided by the Plaintiffs/Debtors to Somera, and then by Somera to Taconic, were useful in determining the total debt on the property from the Prior Lender's perspective. (Ross Dep. 108:20-110:2, Lam Dep. 126:11-127:17).

**4.** **Somera Received Confidential Information from the Plaintiffs/Debtors and Transmitted it to Taconic**

Somera stated it received the Confidential Information from Mark Rubin, on behalf of the Plaintiffs/Debtors, pursuant to the 2017 MCA. (Ross Dep. 32:4-10).

Somera also stated it shared the Confidential Information with Taconic. (Tr. Transcript 1555:2-12; Ross Dep. 33:22-34:2; 34:19-35:2).

Somera stated the Confidential Information provided by the Plaintiffs/Debtors was helpful to its analysis of the Regions Center. (Ross Dep. 103:14-19, 104:9-21).

Taconic stated it did not receive any information directly from the Plaintiffs/Debtors. (Lam Dep. 212:3-8)

On March 10, 2017 at 1:13 PM, the Plaintiffs/Debtors emailed confidential Regions Center financial information, including an Appraisal, 2017 Budget, Rent Roll, TI, LC and Capex Requirements to Somera. (Ross Dep. 101:10-14; Jt. Trial Ex. 1294).

On March 10, 2017, at 1:32 PM, Somera forwarded the email with the Plaintiffs/Debtors attached Confidential Information, including the Appraisal, to Taconic. (Tr. Transcript 664:4-23; Ross Dep. 101:10-14, 101:20-102:4; Jt. Trial Ex. 164 (TAC0009771-9832)).

This March 10, 2017 at 1:32 PM document was in Taconic's possession as demonstrated by the TAC Bates numbers even though Taconic is not shown as copied on the email.

On March 21, 2017, Ross emailed Jordan a confidential settlement letter from the Plaintiffs/Debtors to Lender. (Tr. Transcript 650:10-651:1; Jt. Trial Ex. 127).

On March 29, 2017, Ross emailed Jordan further confidential financial information regarding the Plaintiffs'/Debtors' settlement offer to Lender, suggesting a strategy for Taconic's purchase of the Note. (Tr. Transcript 653:10-654:3; Jt. Trial Ex. 128). Neither this email nor any other between Somera and Taconic regarding Regions Center were copied to counsel for the Plaintiffs/Debtors.

33

On April 3, 2017, Ross emailed Jordan, requesting that he "get color from LNR ASAP." (Tr. Transcript 658:10-660:8, 660:9-20; Jt. Trial Ex. 129, 130).

On April 24, 2017 at 1:46 PM, counsel for the Plaintiffs/Debtors counsel emailed to Ross a confidential settlement letter to Prior Lenders' bankruptcy counsel and an updated LNR Payoff Statement.

Pursuant to the 2017 MCA, this was Confidential Information.

Ross then immediately forwarded this Confidential Information to Taconic employee Andrew Lam ("Lam"), at 2:27 PM, stating "Couple things to get you up to speed." (Tr. Transcript 667:8-668:2; Lam Dep. 129:18-130:14; Jt. Trial Ex. 138, 313).

Lam confirmed receipt of Ross' email with the Confidential Information at 2:29 PM the same day.  (Tr. Transcript 666:21-667:7; Ross Dep. 110:19-24; Jt. Trial Ex. 314).

Later on April 24, 2017, at 8:49 AM, Ross emailed Taconic counsel Erin Rota ("Rota"), asking for the Regions Center to be added to the Somera/Taconic Master Confidentiality Agreement. (Ross Dep. 111:22, 112:4-8, 112:14; Jt. Trial Ex. 131, 703).

On April 25, 2017, Rota emailed Ross and Somera counsel Michael Fralin a fully executed Schedule to the Somera/Taconic Master Confidentiality Agreement, adding the Regions Center, as requested by Ross.  (Ross Dep. 112:20-24; Jt. Trial Ex. 706).

The same day,  Ross emailed Jordan a spreadsheet with calculations for the purchase of the Regions Center Note. Ross sent a similar email the next day to Jordan, Lam and Eric Sitman ("Sitman"), stating, "We should be spending real time on the Regions deal if we believe we can get it from LNR at par. 30% can be bought from TICs at discount, 30% can be created through dilution…", describing the potential deal as a "screaming IRR." (Tr. Transcript 670:7-12, 671:14-673:8; Lam Dep. 186:2-13; Ross Dep. 114:5-115:10, 117:23-118:7; Jt. Trial Ex. 171, 317, 707).

34

Ross had no way of knowing 30% of the Plaintiffs/Debtors were willing to sell at a 30% discount, or that they might accept a 30% dilution of their interests, other than from his communications with their counsel Mark Rubin. This is Confidential Information as defined by the 2017 MCA. (Tr. Transcript 675:1-13; Jt. Trial Ex. 155 (TAC0007812).

On the following day, April 27, 2017, at 5:57 AM, Lam emailed Ross and LeMense requesting "everything thing you have," including "rent roll/stacking, historical financials, recent thirds, leasing activity report, etc." (Tr. Transcript 676:21-677:23, 679:3-9; Lam Dep. 189:24-190:21; Jt. Trial Ex. 712).

In response, 33 minutes later, LeMense emailed Lam a Dropbox link, containing the Plaintiffs'/Debtors' Confidential Information, stating "you should have access now." (Tr. Transcript 1628:1-19; Jt. Trial Ex. 175).

Lam confirmed receipt of that Dropbox link at 7:18 AM the same day. (Tr. Transcript 681:10-19, 1629:3-20; Ross Dep. 120:14-20; Jt. Trial Ex. 319).

Somera continued to work in concert with Taconic on a Regions Center deal on April 30, 2017. That day, Ross emailed Jordan, Sitman, and Lam a draft Somera Term Sheet for Regions Center, stating "FYI this is what we are preparing *to send the TICs via Mark Rubin*. Let's discuss appropriate timing tomorrow." (Tr. Transcript 681:20-682:1; Ross Dep. 120:21-121:10; Jt. Trial Ex. 714).(emphasis added). This document further confirms that Somera knew that Rubin was acting in a legal representative capacity for the Plaintiffs/Debtors.

Taconic continued to request information about the Regions Center from Somera; on May 1, 2017, Lam emailed LeMense requesting information about the property manager at the Regions Center, information Taconic admits it did not possess at the time. (Tr. Transcript 690:15-691:2; Jt. Trial Ex. 141).

LEGAL\46956559\1

Lam also emailed Ross and LeMense on May 1, and again on May 2, requesting the "latest Argus."  (Tr. Transcript 690:6-14, 694:4-9; Lam Dep. 205:12-207:2, 207:19-208:10, 218:2-25; Ross Dep. 122:3-11; Jt. 132, 717).

Ross responded to this request on May 2, stating "will send this morning."  (Tr. Transcript 1630:7-1631:10, 1632:4-6; Jt. Trial Ex. 144, 1298).  Later that day, LeMense sent the updated Argus file to Lam.  (Tr. Transcript 1638:10-15; Lam Dep. 226:4-227:6; Jt. Trial Ex. 147).

That same day, Rubin emailed Ross an updated confidential LNR Payoff Statement, which Ross then forwarded to the Taconic team, summarizing his financial analysis. (Tr. Transcript 694:10-695:14, 1188:4-16; Jt. Trial Ex. 98, 146).

Also on May 2, Ross emailed Jordan asking, ""CAN WE GET THIS DEAL!?!?!?!" (Tr. Transcript 691:3-18; Jt. Trial Ex. 133).

The following day, May 3, Ross emailed Lam and Sitman his schedule for a planned trip to the Regions Center in Little Rock.  (Tr. Transcript 697:9-698:2; Jt. Trial Ex. 125).

On May 4, Ross emailed the Taconic team again, stating "…So we would be buying at ~$27,850,000…".  (Tr. Transcript 696:16-24, 1527:15-24, 1632:14-24; Ross Dep. 122:21-23, 133:24-134:9; Jt. 134, 178).

On May 5, Ross, for Somera, and Lam, for Taconic, together visited the Regions Center in Little Rock. (Lam Dep. 47:17-24; Ross Dep. 125:11-21; Jt. Trial Ex. 320, 321).

Lam stated he was there as part of his due diligence on the Regions Center. (Lam Dep. 47:25-49:9, 51:9-52:6, 52:17-24).

On May 8, LeMense sent another Argus file to Lam for review. (Lam Dep. 233:9-19, 234:11-21; Jt. Trial Ex. 150).

Somera obtained permission from Rubin, as counsel for the Plaintiffs/Debtors, to walk through the Regions building on a private tour with the property manager. Unbeknownst to the Plaintiffs/Debtors, the Somera representative toured the building with Taconic employee Lam, visiting areas not available to the general public. (Tr. Transcript 697:9-698:2; Ross Dep. 138:9-139:2, 139:25-140:9, 140:19-24, 141:9-13; Jt. 125, 321).

From the signing of the 2017 MCA until this May 5th site visit, and continuing until the June 13, 2017 Note purchase, Somera never disclosed to Rubin that Taconic was involved in the Regions deal in any way. (Ross Dep. 106:25-107:22, 152:20-153:13, 176:15-177:12).

In early June 2017 Ross represented to counsel for the Plaintiffs/Debtors that Somera (not Taconic) would be closing on the Note purchase soon. On June 11, 2017 counsel for the Plaintiffs/Debtors wrote an email to Ross reminding him of Somera's obligations under the 2017 MCA, and further warning him that without participation of the Plaintiffs/Debtors, a purchase of the Note by Somera might be at a price too high to make a deal after the fact. (Ross Dep. 149:6-13, 151:9-152:19, 152:20-153:13, 154:13-155:2, 155:3-156:10, 156:20-24, 156:25-158:3, 160:2-19, 160:23-161:8; Jt. Trial Ex. 121).

## 5.    Taconic Is Also Bound by the 2017 MCA

Somera had an affirmative duty under the 2017 MCA to inform its Representatives, including Taconic, of the confidential nature of the information provided to help evaluate any potential deal pursuant to the 2017 MCA.  (Jt. Trial Ex. 159, ¶3).

Somera and Taconic have taken conflicting positions as to whether or not the 2017 MCA was provided by Somera to Taconic. (Tr. Transcript 641:20-642:5; Ross Dep. 35:12-19).

Somera, at the very least, informed Taconic that the Confidential Information came from the Plaintiffs/Debtors or their representatives. (Ross Dep. 36:11).

37

Taconic treated the documents it received from Somera as confidential. (Tr. Transcript 644:14-22; Lam Dep. 76:14-23, 77:20-78:14).

Taconic acknowledges it was a "financing source" of Somera. (Tr. Transcript 757:20-758:1).

Taconic, as Somera's financing source, was included as a bound party to the terms of the 2017 MCA as a "Representative" of Somera. (Ross Dep. 36:16-22; Jt. Trial Ex. 159).

Somera understood that Taconic was equally bound by the terms of the 2017 MCA. (Ross Dep. 38:5-10).

The 2017 MCA requires any recipient of Confidential Information to "use the Confidential Information exclusively for the purpose of evaluating the Proposed Transaction . . . [and not] (a) for its own benefit, (b) for the benefit of any third party, or (c) to Provider's detriment." (Jt. Trial Ex. 159, ¶3; Ross Dep. 38:18-25).

The Plaintiffs/Debtors never consented to the purchase of the Note by Somera or Taconic, its Representative. (Ross Dep. 154:23-155:2).

The 2017 MCA also prohibits Somera and its Representatives from contacting the owners of the Regions Center (Tr. Transcript 750:20-751:19; Jt. 159 (¶8)).

Somera and Taconic were aware that the Plaintiffs/Debtors were represented by counsel, both before and after the Note purchase. (Tr. Transcript 751:15-19; Ross Dep. 186:4-19, 187:9-13; Jt. Trial Ex. 326).

Somera and Taconic circumvented counsel for the Plaintiffs/Debtors by contacting them directly, in violation of the 2017 MCA. Somera retained third-parties Hart Advisors and William White for this purpose. (Tr. Transcript 750:20-751:19, 752:22-753:4, 753:10-754:17; Ross Dep. 224:7-19, 226:3-7, 226:22-227:2, 227:5-20, 228:12-229:3, 244:15-22, 246:10-16, 247:10-248:7,

250:2-5, 250:12-15, 257:3-15, 258:23-259:8; Reeser Dep. 72:15-73:5, 77:11-78:6, 81:10-82:7, 83:3-9, 91:18-92:8, 104:9-105:11, 120:13-121:10, 121:22-122:11, 122:25-123:4; Jt. Trial Ex. 290, 291, 297, 302, 304, 336, 338, 1701).

Hart Advisors employee Josh Garcia did, in fact, call several Plaintiffs/Debtors directly and not through their counsel Mark Rubin. (Ross Dep. 256:6-10, 258:8-12; Reeser Dep. 99:5-100:3; Jt. Trial Ex. 297).

**6.     The Taconic/Somera Joint Venture**

Taconic and Somera have worked together on at least five joint venture equity deals, including one which occurred during the same time period as the events described herein. (Ross Dep. 27:12-28:16; Reeser Dep. 140:11-141:2, 141:5-142:14, 142:20-143:4, 143:8-12).

Michael Fralin, the general counsel of Somera, stated that prior Taconic/Somera joint venture agreements were called either "a letter of intent or a term sheet." (Fralin Dep. 65:5-66:6, 66:23-67:11).

Ross defines a joint venture as "an agreement where two principals agree to work together to accomplish a goal. It's a partnership." (Ross Dep. 29:13-15).

Taconic and Somera signed a Master Confidentiality Agreement on August 18, 2016 ("the 2016 MCA").  (Tr. Transcript 615:11-15, 632:18-633:17, 636:17-21; Ross Dep. 30:2-4, 94:19-95:6; Jt. Trial Ex. 703).

They added the Regions Center to the 2016 MCA via the Schedule signed April 24, 2017. (Tr. Transcript 637:5-12; Ross Dep. 97:3-12, 112:20-24; Jt. Trial Ex. 706).

Somera stated that it approached Taconic to purchase the Note. (Ross Dep. 88:23-89:11; 98:16-99:11).

Somera also stated Taconic was the only financing source it approached regarding the Regions Center. (Ross Dep. 106:12-24).

Somera first approached Taconic about the Regions Center on December 13, 2016.  (Jt. Trial Ex. 652).

Taconic acknowledged Somera was the source of the deal; that, as of January and February 2017, Taconic was not focused on the Regions Center as an acquisition.  (Tr. Transcript 820:17-821:6, 824:2-17; Jordan Dep. 59:12-60:11).

Somera and Taconic first discussed the Regions Center before the 2017 MCA was executed. (Ross Dep. 99:18-24; 100:5-13).

On February 22, 2017, before the 2017 MCA was signed, Somera, through its President, Ian Ross, asked Taconic, through its employee, James Jordan, to "reach out to LNR as discussed," to see if they would sell the Note.  (Jt. Trial Ex. 126).

Taconic was informed of the 2017 MCA by Somera prior to the Note purchase. (Ross Dep. 35:12-19).

Analysts from both Taconic and Somera discussed the potential Regions Center deal, and Taconic employees requested information on the Regions Center from Somera. (Tr. Transcript 680:9-18, 1620:20-1621:16, 1622:6-1623:13, 1625:22-1626:24, 1627:13-18, 1628:1-19; Ross Dep. 119:7-120:10; Jt. 172, 173, 174, 175).

Taconic admitted that Somera was helping it vet the deal. (Jordan Dep. 162:21-164:10)

Jordan transmitted financial analysis information received from Somera via Ross to the Taconic CRE team because Taconic was interested in a deal regarding the Regions Center. (Tr. Transcript 675:21-676:18; Ross Dep. 113:17-20; Jt. 318).

Somera and Taconic worked together towards this goal, both before and after purchase of the Note, as they have done with other real estate investments.  (Tr. Transcript 772:11-18, 1639:6-

16, 1640:3-11; Ross Dep. 19:24-20:22, 21:10-15, 23:7-22; LeMense Dep. 29:12-22; Jt. Trial Ex. 148).

On May 6, 2017, Ross and LeMense discussed invoicing Taconic for Ross's trip to Little Rock. (Jt. Trial Ex. 179).

From May 3 through May 24, 2017, Ross communicated with CBRE broker William Callahan regarding a potential "partnership" for property management and/or lease brokering for the Regions Center. (Ross Dep. 137:13-138:8; Jt. Trial Ex. 322) Then, after the Note purchase, LeMense met with Callahan while visiting Little Rock "to understand the overall market." (Ross Dep. 187:14-188:10; Jt. Trial Ex. 326).

Ross and Jordan were communicating via text message about the Regions Center as close to the Note purchase as June 11, 2017 only hours after the Rubin to Ross email warning against the unauthorized note purchase. (Ross Dep. 168:9-12).

Somera denied facilitating the Note purchase outside of the 2017 MCA, but states it was not surprised by the Note purchase. (Ross Dep. 171:19-24).

After the Note purchase, Somera, which had known prior to June 13 that the Note was going to be purchased, acted as a representative of Taconic in negotiations between the Plaintiffs/Debtors and Taconic. (Tr. Transcript 725:20-726:1, 730:20-731:21, 732:10-733:20, 747:3-748:2, 748:17-749:2, 750:20-751:19, 1200:23-1201:4, 1648:6-17; Ross Dep. 151:15-152:6, 181-18-183:3, 183:12-23, 194:2-8; Jt. Trial Ex. 285, 296, 304, 1438, 1702).

Somera denied acting on the authority of Taconic after the Note purchase, while stating Taconic needed "operators" to potentially get a deal together with the TICs. (Ross Dep. 174:12-176:14; Jt. Trial Ex. 1438).

Somera employee Jonathan Reeser ("Reeser") worked on the Regions Center deal post-Note purchase "in deciphering a way to acquire the asset and work with the owners." (Reeser Dep. 25:23-26:6, 26:13-17).

Reeser stated Somera remained involved with Taconic in the Regions Center deal after the Note purchase because Somera was still "attempting to acquire this deal." (Reeser Dep. 108:22-109:4, 115:18-116:4).

The post-Note purchase communications between Somera and Taconic excluded the Plaintiffs/Debtors and their counsel while discussing Taconic strategy for negotiations with the Plaintiffs/Debtors, including how to overcome Plaintiffs'/Debtors' concerns and to get Rubin "away from the claims that are interfering with *us* agreeing to a restructuring."  (Tr. Transcript 1647:16-1648:1, 1653:20-21, 1654:21-22, 1655:5-20, 1656:10-12, 1657:1-2, 1657:11-13, 1657:21-24, 1658:13-15, 1658:23-1659:8; Lam Dep. 280:18-22, 287:25-288:21, 311:7-9, 312:5-314:7; Ross Dep. 183:12-23, 197:2-15, 201:8-12, 202:2-5, 203:22-204:3, 209:9-15, 209:22-210:9, 211:3-4, 211:16-212:5, 231:19-232:9, 239:14-240:11, 257:3-9, 266:25-267:6, 276:9-23, 278:18-279:14; Jt. Trial Ex. 107, 136, 155, 182, 184, 185, 302, 330, 332, 333, 337, 1719). (emphasis added).

Somera and Taconic actively worked against the interests of the Plaintiffs/Debtors after the Note purchase. (Reeser Dep. 94:18-95:11, 95:19-96:5, 96:9-18, 98:5-7, 107:10-108:3, 109:8-15, 109:19-110:5, 116:17-117:7, 128:23-130:20, 133:14-22; Jt. Trial Ex. 296, 299, 300, 301, 302, 337, 1658).

On the day of the Note purchase, but before it was publicly disclosed, Ross sent Rubin a proposal for a recapitalization of the investment that included many of the confidential key metrics first discussed between Rubin and Ross (covered under the 2017 MCA as Confidential

Information) and then incorporated into a Somera spreadsheet for the benefit of Jordan in April. The proposal assumed the Note Purchase and outlined a transaction that, by its terms, would have to include Somera, Taconic and the TIC owners as joint venture partners. (Tr. Transcript 717:18-24; Ross Dep. 113:3-14, 174:8-15; Jt. Trial Ex. 317, 1438).

The day after the Note purchase, Somera sent Taconic a proposal for a new financing arrangement it would broker with the Plaintiffs/Debtors, including a statement that it would obtain information as to the expenses of the Plaintiffs/Debtors, while such information was still subject to the restriction of the 2017 MCA. (Ross Dep. 180:20-182:3, 184:25-185:14; Jt. Trial Ex. 325).

On June 19, 2017, Michael Fralin discussed with Taconic, with the authority of Somera, using a Motion to Dismiss in the underlying bankruptcy action to this case as "leverage against the Debtor." (Tr. Transcript 1649:2-6; Ross Dep. 189:9-190:6; Jt. Trial Ex. 327).

Ross also requested that Taconic allow it to speak with Taconic's bankruptcy counsel at Duane Morris because he had "a few questions on the BK budget that [he] would like to understand before we start making decisions on the approvals." (Ross Dep. 193:20-25; Jt. Trial Ex. 329) Lam, on behalf of Taconic, authorized Ross "to ask questions on our behalf." (Jordan Dep. 216:23-218:4; Jt. Trial Ex. 136).

Somera also committed itself to invest its own funds in the Regions Center deal by retaining Hart Advisors and William White to engage in third-party communications to the Plaintiffs/Debtors after the Note purchase. (Reeser Dep. 94:6-17, 123:17-124:2).

The 2016 MCA contained a non-circumvention clause for a period of 12 months after execution of the attached Schedule. (Tr. Transcript 636:17-638:3; Ross Dep. 95:20-96:4; Jt. Trial Ex. 703, 706).

43

Taconic was aware of the restrictions against circumvention, undisclosed agreements and arrangements, and use of the information for its benefit to the determinant of the "Provider" of the information. (Tr. Transcript 636:17-638:3, 716:1-9; Jordan Dep. 113:23-114:4).

Somera never released Taconic from the non-circumvention clause in connection with the Regions Center. (Ross Dep. 96:5-10).

Taconic stated that it knew the information was coming from the Plaintiffs/Debtors via their attorney Mark Rubin. (Tr. Transcript 650:10-653:9, 682:2-17, 690:10-14, 691:3-18; Ross Dep. 124:4-19; Jt. Trial Ex. 127, 133, 164/687, 178).

Taconic stated that it used that same information in its own due diligence. (Jordan Dep.96:14-97:8, Lam Dep. 225:18-24).

Taconic stated that it knew the Regions Center deal was subject to the Taconic/Somera MCA. Transcript 669:17-670:3).

Taconic stated that it could not purchase the Note without Somera's consent. (Tr. Transcript 703:5-16).

Somera collaborated with Taconic to use the Confidential Information from Plaintiffs/Debtors to circumvent the Plaintiffs'/Debtors' opportunity by purchasing the Note from Wells Fargo. (Jordan Dep. 96:4-97:17, 97:24-25, 98:3; Tr. Transcript 620:24-623:1).

Somera induced and persuaded Taconic to first look at the Plaintiffs'/Debtors' materials to get Jordan/Taconic interested in pursuing a purchase of the Note. (Tr. Transcript 611:18-24, 612:5-14, 630:2-18, 631:19-632:8, 646:11-13,647:18-24; Ross Dep. 88:23-89:11, 124:4-125:7; Jt. Trial Ex. 126, 128, 129, 133, 173, 652, 707).

Taconic benefited from the information provided to Somera pursuant to the 2017 MCA, in being able to purchase the Note without the Late Payment Charge included in the purchase price,

removing ¾ of the default interest and including all escrow and reserve accounts in the purchase. (Tr. Transcript 698:22-699:1, 699:15-700:6, 700:7-702:13).

Taconic and Somera had a joint venture agreement for the Regions Center transaction. Taconic and Somera exchanged emails discussing and agreeing to a split of financial proceeds of the anticipated Regions transaction.  (Jt. Trial Ex. 135, 181).

On May 12, 2017, after Lam's site visit facilitated by Somera, Ross, Erin Rota (Taconic in-house counsel), Fralin, Jordan and LeMense discussed "Taconic Somera Key JV Terms" via email, including the Regions Center deal. (Tr. Transcript 703:20-705:18, 706:11-20; Ross Dep. 135:22-136:20, 143:17-144:13; Jordan Dep. 207:2-8, 207:13-18, 208:2-18; Jt. Trial Ex. 181).

Somera knew Taconic was purchasing the Note outside of any deal brokered with the Plaintiffs/Debtors under the 2017 MCA prior to the Note closing and did not object to the purchase. (Tr. Transcript 629:2-24; 702:22-703:4; Ross Dep. 151:9-17; 153:2-9, 170:24-171:8, 171:11-18).

Somera and Taconic continued their discussions regarding the joint venture financial arrangement after the June 13, 2017 Note purchase; on November 8, 2017, Ross and Jordan discussed the Regions "promote." (Tr. Transcript 818:10-819:22; Jt. 135).

While Somera may not have ultimately benefited from Taconic's purchase of the Note, a deal and compensation were agreed upon.  (Tr. Transcript 704:6-705:18; Ross Dep. 31:6-18, 144:4-13, 148:12-17).

Somera still considered Taconic to be a "potential investor" in the Regions Center deal after the Note purchase. (Reeser Dep. 75:3-9)

Neither Taconic nor Somera ever disclosed to the Plaintiffs/Debtors the existence of the 2016 MCA and the addition of the Regions Center to that agreement or the joint venture agreements discussed in emails between Jordan, Ross, Rota and Fralin, which specifically

45

identifies the Regions Center and discusses financial terms regarding Regions.  (Ross Dep. 106:25-107:22, 162:9-16; Jt. Trial Ex. 161, 162, 181).

These "arrangements" are prohibited under the 2017 MCA.

On June 22, 2017, after the Note purchase, Somera and Taconic entered into a "Schedule Termination Letter," attempting to remove the Regions Center from their earlier confidentiality agreement. (Fralin Dep. 209:16-210:20; Ross Dep. 97:13-16; Jt. Trial Ex. 103).

**7.      Taconic's Circumvention of the Plaintiffs/Debtors.**

Taconic began negotiations with LNR to purchase the Note in April 2017.

Jordan emailed LNR requesting "any thoughts" "on Regions in Little Rock" on May 1, 2017 (Tr. Transcript 683:1-24; Jt. Trial Ex. 715).

On May 8, 2017, Jordan emailed LNR's Job Warshaw ("Warshaw") setting terms for Taconic's purchase of the Note.  (Tr. Transcript 698:9-15, 702:14-19; Jt. 720).

Between May 1 and May 8, Jordan and Warshaw had a conversation wherein they negotiated the deal for Taconic to purchase the Note. 698:16-21).

On May 15, 2017, Taconic signed an LNR Confidentiality Agreement for Mortgage Loan in order to obtain property information and loan documents for the Regions Center. (Tr. Transcript 706:22-707:9; Jt. 726, 1668).

The following day, LNR's Don Kerr ("Kerr") shared property and loan information with Jordan, beginning Taconic's formal due diligence period for the Note purchase.  (Tr. Transcript 707:10-22; Jt. Trial Ex. 733, 1686) By this date, Plaintiffs' had already shared with Somera, and Somera had already forwarded to Taconic, Plaintiffs' Confidential Information. (Tr. Transcript 664:4-23, 650:10-651:1, 653:10-654:3, 666:21-667:7, 667:8-668:2, 670:7-12, 671:14-673:8, 675:1-13, 676:21-677:23, 681:10-19, 690:15-691:2, 694:10-695:14, 1188:4-16, 1555:2-12, 1577:6-20, 1579:5-23, 1589:17-21, 1606:4-7, 1628:1-19, 1629:3-20; Ross Dep. 33:22-34:2;

34:19-35:2, 101:10-14, 101:20-102:4, 110:12-17, 114:5-115:10, 117:23-118:7, 120:14-20; Jt. Trial Ex. 54, 98, 127, 128, 138, 141, 146, 164, 168, 169, 171, 175, 313, 314, 317, 319, 707, 712, 1294).

LNR exercised the option to purchase the loan from the CMBS Trust and sold it to Taconic for an undisclosed sum. (Tr. Transcript 628:4-10, 854:22-755:9, 759:5-760:5; Jt. Trial Ex. 862 at Pgs. 109, 127 and 207).

Less than one month later, on June 13, 2017, LR-400 closed on its purchase of the Note. (Tr. Transcript 638:4-8, 854:22-755:9; Jt. Trial Ex. 862).

Included in the terms of the Note purchase was total indemnification of LNR by Taconic. (Tr. Transcript 711:14-20, 755:10-756:14; Jt.277 (Art. VI, §6.4), 1698).

Taconic is the owning and controlling partner of LR-400, a single-purpose entity set up solely to own the subject Note. (Tr. Transcript 720:23-721:9, 721:11-14; Jt. Trial Ex. 277, 862)

Fralin stated that Taconic did that which would have been a violation of the 2017 MCA if Somera had acquired the Note without the prior consent of Plaintiffs/Debtors. (Fralin Dep. 140:4-12, 140:19-141:11).

At the time that the Plaintiffs'/Debtors began providing Confidential Information to Somera, the Plaintiffs/Debtors had a loan arranged with Ladder Capital to quickly emerge from bankruptcy.

Somera convinced Rubin that working with Somera provided a much better opportunity for the Plaintiffs/Debtors than a straight bridge financing. (Tr. Transcript 912:9-913:17, 1204:15-17; Ross Dep. 131:12-23, 156:25-158:3, 160:2-19; Jt. Trial Ex. 121, 1057, 1145).

At this time, Plaintiffs/Debtors were involved in settlement negotiations with the Prior Lenders. (Jt. Trial Ex. 804).

LEGAL\46956559\1

After Somera informed the Plaintiffs/Debtors that a deal was imminent, Plaintiffs/Debtors temporarily stopped the Ladder Capital refinancing process and ceased settlement communications with the Prior Lenders based upon Somera's representations they could obtain a better deal with Ladder Capital. (Tr. Transcript 912:9-913:17).

Later, the Plaintiffs/Debtors reengaged Ladder, but they could not move forward because of this litigation.  (Tr. Transcript 1194:18-1195:8, 1199:10-1200:3, 1200:13-15, 1202:20-1204:2; Jt. Trial Ex. 1122).

Somera acknowledged that the Proposed Transaction as defined in the 2017 MCA with the Plaintiffs/Debtors was to include them in the Note purchase. (Ross Dep. 177:2-178:3).

**a.**     **Taconic Used the Confidential Information Provided by the Plaintiffs/Debtors to Somera In Its Underwriting**

As a financing source of Somera, pursuant to the terms of the 2017 MCA, Taconic was required to "not use the Confidential Information (a) for its own benefit…or (c) to Provider's detriment."  (Jt. Trial Ex. 159).

Taconic was aware of the restrictions against circumvention, undisclosed agreements and arrangements, and use of the information for its benefit to the detriment of the "Provider" of the information in its own 2016 MCA with Somera. (Tr. Transcript 618:11-619:16, 628:11-22).

Taconic used the Confidential Information provided by Somera (obtained from the Plaintiffs/Debtors) in its underwriting process for the Note Purchase. (Tr. Transcript 612:15-613:18, 614:7-18, 666:21-667:7, 664:24-665:665:12; 676:21-677:23, 679:3-9, 679:13-680:8, 681:10-19, 690:6-14, 690:15-691:2, 694:4-9, 694:10-695:14, 1188:4-16, 1629:3-20; Lam Dep. 47:17-24, 67:5-21, 124:10-15, 126:11-127:17, 137:6-138:4, 139:5-14, 144:8-15, 144:17-145:16, 211:8-21; Ross Dep. 110:19-24, 120:14-20, 122:3-11, 125:11-21; Jt. Trial Ex. 98, 132, 138, 141, 146, 314, 319, 320, 321, 712, 717)).

Taconic acknowledged that it knew the information was coming from the Plaintiffs/Debtors. (Tr. Transcript 644:24-645:9, 650:10-653:4; Jt. Trial Ex. 127, 164, 178).

Taconic underwrote the Note Purchase for the purpose of making a profit. (Tr. Transcript 614:7-615:10).

There is no record evidence to show Taconic obtained information contained within the items provided to Somera by the Plaintiffs/Debtors from other sources prior to Taconic receiving Regions Center information from LNR. (Tr. Transcript 822:6-823:10).

**8.     LR-400'S Obligations to the Plaintiffs/Debtors.**

Pursuant to Section 9.7 (ii) of the Loan Agreement, assigned to LR-400 Trust, Lender is required to place the Debtors' reserves, including TI reserves, leasing commission reserves, capital improvement reserves and other, into an interest-bearing account with the interest accruing to the Borrower. (Jt. Trial Ex. 263).

In order to allow Borrower a method to verify the interest on the reserves, under 9.7(ii)(d), Lender is required to provide Borrower with an annual accounting of such reserve account showing the detail of all credits and debits.  (Jt. Trial Ex. 263).

After the Note purchase, LR-400, through its owner and controlling partner Taconic, worked against the interests of the Plaintiffs/Debtors. (Fralin Dep. 192:2-194:16)

**III.     CONCLUSIONS OF LAW**

**LR-400 Claim and Plaintiffs'/Debtors' Objection**

Based upon the findings of fact and the application of the relevant law to those facts, this Court makes the following conclusions of law:

Pursuant to Section 502 of the Bankruptcy Code, a properly filed proof of claim is *prima facie* evidence of the claim.  In re Allegheny Intern., Inc., 954 F.2d 167, 173-174 (3d Cir. 1992); In re Sampson Resources Corp., 569 B.R. 605, 615 (Bankr. D. Del. 2017).

A party objecting to the claim has the burden to rebut the *prima facie* case, and once rebutted, the ultimate burden of persuasion for allowance of the claim is on the claimant.  Allegheny Intern., 954 F.2d at 173-174.

**LR-400 Has Unclean Hands In Asserting the Secured Lender Claim.**

As a threshold matter, LR-400 has unclean hands in asserting the Secured Lender Claim in any amount.

This is so due to LR-400's complicity in the impermissible conduct by Defendant Somera in violating the MCA (as more specifically addressed *infra*) as well as LR-400's assumption of the liabilities of and/or the indemnification of Defendants Wells Fargo, LNR and Berkadia.

The United States Supreme Court has explained that the unclean hands doctrine "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with the inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814–15, (1945).

To prevail on the defense of "unclean hands" then, a party defending must show fraud, unconscionability, or bad faith on the part of the plaintiff.  Sonowo v. United States, No. Civ.A. 03–1122–GMS, 2006 WL 3313799, at *3 (D. Del. Nov. 13, 2006) (citing S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 377 n. 7 (3d Cir. 1992)).

The Third Circuit has recognized that "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, i.e., have a relationship, to the matters before the court for resolution."  United States v. State Street Bank & Trust Co., 520 B.R. 29, 69  (Bankr. D. Del. 2014) (citing New Valley Corp. v. Corporate Prop. Assoc. 2 and 3 (In re New Valley Corp.), 181 F.3d 517, 525 (3d Cir. 1999).

LEGAL\46956559\1

With its foundation as an equitable doctrine, the "application of unclean hands rests within the sound discretion of the trial court." *Id.*

The Third Circuit has described the type of conduct that represents unclean hands as conduct "not necessarily hav[ing] been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character.  Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause . . . ." Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, 598 (3d Cir. 1972) (citing Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. at 814–16)

Courts in the Third Circuit have often considered the "unclean hands" doctrine in determining whether all or part of a party's claim should be barred on account of inequitable conduct engaged in by the party.  *See e.g.*, New Valley Corp. v. Corporate Property Assocs. (In re New Valley Corp.), 181 F.2d 517 (3d Cir. 1999) (holding that the Bankruptcy Court applied the correct legal standard for unclean hands and determining that the creditor's bad acts were not sufficiently related to its claim against the debtor to bar its claim based on unclean hands); In re Stone & Webster, Inc., 547 B.R. 588 (Bankr. D. Del. 2016) (finding that surety's inadvertent failure to attach a promissory note to its claim did not rise to the requisite level of nefarious conduct to bar the surety's claim); Mente Chevrolet Oldsmobile Inc. v. GMAC, 728 F. Supp. 2d 662, 673 (E.D. Penn. 2010) (finding that the court was entitled to use its equitable powers to decline to enforce a forbearance agreement under the law of unclean hands); Saudi Basic Indus. Corp. v. ExxonMobil Corp., 401 F. Supp. 2d 383, 397-98 (D. N.J. 2005) (finding that plaintiff "engaged in unconscionable conduct directly related to the matter at issue that has injured [defendant] and affected the balance of equities" and thus granting defendant's motion to dismiss plaintiff's amended complaint with prejudice).

Here, Wells Fargo and its servicers, Berkadia and LNR, engaged in inequitable and unconscionable conduct directly relating to the claims purchased by Defendant LR-400, which LR-400 now seeks to enforce against the Plaintiffs'/Debtors' estates.

These Defendants knowingly and intentionally interfered with, among other things, the Plaintiffs'/Debtors' refinancing efforts, ability to enter into leases with new tenants, fulfillment of the Plaintiffs'/Debtors' obligations under existing tenants and the general operation of the Property, all in an effort to deplete the value of the Plaintiffs'/Debtors' Property and force the Plaintiffs/Debtors to capitulate on their efforts to refinance the Loan by paying an exorbitant and unfounded $1.2 million fee.

Further, Defendants Taconic and Somera engaged in a fraudulent scheme whereby they engaged in unfair competition by misappropriation of confidential and proprietary information belonging to the Plaintiffs/Debtors, in contravention of the MCA, for the purpose of securing a windfall for themselves.

Specifically, Somera used the Confidential Information provided by the Plaintiffs/Debtors to negotiate and procure a sale of the Loan to LR-400 for the benefit of Taconic.

Defendants Somera and Taconic's fraudulent conduct compromised the Plaintiffs'/Debtors' ability to finalize a settlement with Defendant Wells Fargo, and Defendant LR-400's assertion of the Secured Lender Claim in an amount that is approximately $4 million more than the claim as originally filed, while increasing the "Late Payment Charge" has hampered the Plaintiffs'/Debtors' ability to refinance the Loan.

This has cost the Plaintiffs/Debtors an excessive amount of fees and expenses in these bankruptcy cases.

Accordingly, the Plaintiffs/Debtors object to the Secured Lender Claim not only on the specific grounds set forth below, but also on the equitable grounds that Defendant LR-400 should not enjoy a windfall at the expense of the Plaintiffs/Debtors for not only its bad acts, but also the bad acts of the Lender Defendants, as predecessors-in-interest.

The Third Circuit has recognized that the bankruptcy court sits in equity and "in the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." In re Laskin, 316 F.2d 70, 73 (3d Cir. 1963) (additional citations omitted).

## The Approximately $1.2 Million "Late Charge" is Neither Allowable Under the Loan Documents Nor Under Applicable Law.

Defendant LR-400 includes in its Secured Lender Claim a line item entitled "Late Charges" in the amount of $1,208,848.86 (in whatever amount asserted by LR 400, the "Late Fee").  It appears that this portion of the Secured Lender Claim is the same asserted fee set forth in the Rider to Proof of Claim No. 5 filed by Defendant Wells Fargo, entitled "Late Fees," which was asserted in the amount of $1,202,411.71.

LR-400 has provided no basis for the increase of approximately $6,400 to the fee sought.

The provision of the Note LR-400 apparently relies upon for the assertion of the Late Payment Charge (the "Late Payment Charge Provision"), Article 8, entitled "Late Payment Charge," cannot be reasonably read to add an additional approximately $1.2 million to the balloon payment due on the maturity of the Loan, rather the only reasonable interpretation of the provision is that it relates to the monthly installment payments.  The provision provides:

> If any principal or interest payment is not paid by Borrower before the fifth (5th) day after the date the same is due (or such greater period, if any, required by applicable law), Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent

payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

By the clear language of the Late Payment Charge Provision, the "Late Payment Charge" is not only acknowledged under the Note as being capped under applicable law by the inclusion of the language "or the maximum amount permitted by applicable law," it is also clear that the purpose of the provision is to "defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment."

Despite this clear language, Defendant LR-400 and the rest of the Lender Defendants have asserted an approximate $1.2 million fee based on the amount of the outstanding principal of the Note.[3]

The plain reading of the Late Payment Charge Provision contradicts LR-400's position that it is entitled to an approximately $1.2 million windfall.

First, the expenses incurred by LR-400 are separately asserted in the Secured Lender Claim, as presently set forth in the Payoff Statement. The Payoff Statement includes line items for "Noteholder Expenses at Acquisition" ($810,067.64) and "Lender Expenses" ($169,830.00), for a total of $979,897.64.[4] Thus, Defendant LR-400 is already asserting as part of the Secured Lender Claim, separate and apart from the Late Payment Charge, amounts to defray its expenses in dealing with the non-payment of the principal.

Second, Defendant LR-400 is receiving monthly interest payments on the principal amount of the Loan, which is compensating LR-400 for the non-payment of the principal. Defendant LR-400's

---

[3]    The amount asserted in the Rider to the Secured Lender Claim appears to be calculated by multiplying the principal amount of the Loan by 4%. The higher amount asserted by the Payoff Statement is without explanation; thus, it appears that LR 400 has added yet an additional improper and unfounded amount.

[4]    The Rider lists the expenses as of December 2, 2016 as totaling $84,954.94, and include the following line items: "Inspection" ($150), "Legal Fees" ($51,431.50), "Other Charges" ($25,686.68), "SPE/Title/Assignments" ($3,022.76), "LNR Admin Fee" ($125), "Misc. Fees, MS Payoff Processing Fee" ($300). The Plaintiffs/Debtors assume that the foregoing amounts are also included in the various fees and other charges sought by Defendant LR-400 in the Payoff Statement.

position that it is entitled to the $1.2 million Late Payment Charge is neither supported by the language of the provision it relies upon for its assertion nor its very own Payoff Statement.

Further, as asserted by Defendant LR-400, the Late Payment Charge is an improper attempt at liquidated damages that is impermissible.

Under applicable Arkansas law, "[a] contract will be construed as properly stipulating for liquidated damages where, from a prospective view of the contract, it appears (1) that the parties contemplated that damages would flow from a failure to perform the contract; (2) that such damages would be indeterminate or difficult to ascertain; and (3) that the sum bears some reasonable proportion to the damages which the parties contemplated might flow from a failure to perform the contract." Alley v. Rodgers, 269 Ark. 262, 599 S.W.2d 739 (1980).

This is not the case here.  Although the Lender and the Plaintiffs/Debtors may have generally contemplated that damages could flow from a failure to perform, such damages are adequately addressed in the Loan Agreement, as discussed below, and are not difficult to ascertain.

LR-400 submitted no evidence to support any other specific contemplation by the parties who were involved during the inception of the Loan that would support LR-400's contention that the Late Payment Charge applies to the entire payment of principal due at maturity.

Further, the $1.2 million sought does not bear any reasonable resemblance to actual allowable damages; rather it is an impermissible "double-dipping," as "an injured party cannot collect both actual damages and liquidated damages because liquidated damages serve as a contractual substitute for actual damages." So. Bldg. Servs., Inc. v. City of Fort Smith, 2013 Ark. App. 306, 427 S.W.3d 763 (2013). See also W & G Seaford Assocs., L.P. v. Eastern Shore Markets, Inc., 714 F. Supp. 1336, 1347 (D. Del. 1989) ("Parties to a contract may agree to a fixed amount of damages as the exclusive remedy for the non-breaching party in the event of a breach."); Leeseberg v. Converted Organics, Inc., No. 08-926,

2009 WL 3232778, at *3 (D. Del. Oct. 7, 2009) (citing Stone, Sand, & Gravel Co. v. United States, 234 U.S. 270 (1913) for the proposition that actual damages and liquidated damages are mutually-exclusive remedies).

Actual damages are provided for in the Loan Documents under Section 17.5 of the Loan Agreement.  Section 17.5 of the Loan Agreement provides for the reimbursement of certain reasonable costs and expenses of the lender in relation to enforcing certain of the lender's rights under the Loan Documents.[5]

Such costs must at a minimum be actual and reasonable.  *See* Section 17.5 of Loan Agreement, p. 92.

The inclusion of this provision in the Loan Agreement further supports the assertion of the Late Payment Charge as impermissible liquidated damages.

Put differently, the clear overreach of LR-400's position on this issue is exemplified by the fact that in order for the Late Payment Charge to be permissible in accordance with the terms of the Note and under the law, Defendant LR-400 must show that an additional approximately $1.2 million is necessary to defray the costs of handling and processing the yet to be received payment of principal from the Plaintiffs/Debtors and to compensate LR-400 for the loss of the use of such principal.

---

[5]    Section 17.5 of the Loan Agreement provides in relevant part for the reimbursement by the Plaintiffs/Debtors to Defendant LR-400 for "all reasonable costs and expenses (including reasonable, actual attorneys' fees and disbursements and the allocated costs of internal legal services and all actual disbursements of internal counsel) reasonably incurred by Lender in accordance with this Agreement in connection with . . . (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents, or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings, provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud, willful misconduct of Lender."

This additional approximately $1.2 million fee would be over and above the asserted approximately $1 million in expenses set forth in the Payoff Statement and the interest payments LR-400 continues to receive on a monthly basis, of which, the payments during these bankruptcy cases totaled approximately $2.28 million as of February 21, 2018.

As of the date of the Rider, the asserted expenses of LR-400's predecessor were approximately $85,000. Thus, even though the amount asserted now in the Payoff Statement is closer to the $1.2 million Late Payment Charge (some 20 months later), at the time the Late Payment Charge was originally asserted, the actual asserted expenses bore absolutely no resemblance to the amount of the Late Payment Charge.

To allow the Late Payment Charge to stand under these circumstances would be unconscionable as it does not bear any relationship to actual costs and expenses, which are already being asserted by LR-400 separately in its claim.

The concludes that the Late Payment Charge cannot be allowed as part of the Secured Lender Claim. *See* Davis v. City of Blytheville, 2011 Ark. App. 651, *4 (Ark. Ct. App. Nov. 2, 2011) (late fees and penalties were deemed unreasonable and unconscionable because they did not bear any rational relationship to the actual costs and expenses incurred in collecting the delinquent accounts at issue.); *see also* Coffelt v. Arkansas Power & Light, 248 Ark. 313 (1970).

Put slightly differently, where the sum agreed upon bears no reasonable relationship to the damages which likely would result following a breach, the amount agreed upon will be held to be an impermissible penalty. Johnson v. Jones, 33 Ark. App. 149, 151-153 (Ark. Ct. App. 1991); McIlvenny v. Horton, 227 Ark. 826 (1957); Muradian v. Haley, 12 Ark. App. 138 (1984); *see also* In re Route One West Windsor Ltd. Partnership, 225 B.R. 76, 92 (Bankr. D.N.J. 1998) ("Oversecured creditors cannot receive both interest at default rates *and* late charges. . . .") (emphasis added); *see*, *e.g.*, Sheet Metal

<u>Workers Local 19 v. Genesio Co.</u>, No. 94-4632, 1995 WL 60016, at *3 (E.D. Pa. Feb. 8, 1995) (in the event that there is a liquidated damages clause coupled with a requirement for the payment of interest in a separate provision, the liquidated damages clause is an impermissible penalty).

As the party asserting the $1.202 million Late Payment Charge, Defendant LR-400 has the burden to prove the <u>Alley v Rogers</u> elements from a prospective view; those are (1) that the parties contemplated that damages would flow from a failure to perform the contract; (2) that such damages would be indeterminate or difficult to ascertain; and (3) that the sum bears some reasonable proportion to the damages which the parties contemplated might flow from a failure to perform the contract." <u>Alley v. Rodgers</u>, 269 Ark. 262, 599 S.W.2d 739 (1980). LR-400 has proffered no evidence regarding the contemplations and perspectives of the original signatories to the Note, nor has any been admitted in evidence in these consolidated proceedings. Accordingly, the Court finds that Defendant LR-400 has failed to meet its burden of proof and persuasion in connection with the Late Payment Charge.

Thus, regardless of what creative moniker Defendant LR-400 attempts to place on the Late Payment Charge, this Court concludes the imposition of that fee impermissible under the terms of the Note and applicable law.    Whatever damages LR-400 may be entitled to, if any at all under the circumstances, are covered by other portions of its asserted Secured Lender Claim.

## LR-400's Sought-After Legal Fees and Expenses Must be Proven to be Reasonable and Appropriate.

LR-400 asserts as part of its claim in the Payoff Statement "Noteholder Expenses at Acquisition" in the amount of $810,067.64 and "Lender Expenses" of $169,830.00, for a total of $979,897.64.

This represents an $895,942.70 increase from the expenses asserted by LR-400's predecessor in interest at the start of these cases.

Despite this extraordinary amount, LR-400 provides no detail as to what the almost $1 million in claimed expenses represents.

Section 506(b) of the Bankruptcy Code does provides for attorneys' fees and costs for over-secured creditors, provided that such fees are provided for under the applicable agreement or state statute, provided such fees and costs are reasonable.[6]

Section 17.5 of the Loan Agreement provides for the costs and expenses, including actual attorneys' fees and disbursements incurred by the lender in dealing with certain collection issues and bankruptcy matters involving the Plaintiffs/Debtors;

As set forth in the Loan Agreement and under applicable law, such expenses must be reasonable and actual as well as reasonably incurred.

Further, under the Loan Agreement, such costs and expenses must not have arisen by reason of the gross negligence, illegal acts, fraud or willful misconduct of LR-400 or its predecessor in interest, Wells Fargo, Trustee and their respective agents. *See* Section 17.5 of Loan Agreement.

Reasonableness is also required under Arkansas law regarding the awarding of attorneys' fees. Across a broad spectrum of factual and legal circumstances, Arkansas courts have consistently held that where attorneys' fees are or can be awarded, they must be reasonable. Perry v. Baptist Health, 368 Ark. 114, 120 (2006) (prevailing party in breach of contract and implied warranty case could recover "reasonable attorney's fees based upon expenses incurred even during its prosecution of unsuccessful arguments and endeavors in case."); Chrisco v. Sun Industries, Inc., 304 Ark. 227, 229-230 (1990) (holding that where attorney's fees were awarded to prevailing party in breach of contract case,

---

[6]     Section 506 (b) of the Bankruptcy Code provides: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

attorney's fees awarded must be reasonable, and establishing factors to consider in assessing reasonableness); U.S. Fidelity and Guaranty Co. v. Love, 260 Ark. 374, 376 (1976) (in action to recover attorneys' fees by surety bringing suit on an indemnity agreement, "the attorneys' fees must be reasonable, proper, necessary and incurred in good faith and with due diligence."); Southern Farm Bureau Cas. Ins. Co. v. Krouse, 2010 Ark. App. 493, (Ark. App. June 16, 2010) (in underinsured motorist coverage action where insured prevailed against insurance company in declaratory judgment, insured was entitled to "reasonable attorneys' fees.").

In their Objection, Plaintiffs/Debtors question the reasonableness of the fees and expenses asserted in the Secured Lender Claim in the amount of $979,897.64.

LR-400 has submitted no evidence detailing the components of these amounts, rendering it difficult for the Plaintiffs/Debtors to lodge a specific line item objection, and making it impossible for this Court to determine if the claims amounts are reasonable.

The Court concludes that LR-400 has not met its burden of proving the reasonableness of this part of its Claim.

**Defendant LR 400's Claim for Default Rate Interest Should be Disallowed.**

This Court has previously refused to give effect to contractual default interest rate provisions where the lender has engaged in wrongdoing or other inequitable conduct.

In In re Coram Healthcare Corp., 315 B.R. 321, 347 (Bankr. D. Del. 2004), this Court held that a lender who had engaged in bad acts could receive neither the default interest rate provided for under the loan documents *nor* the note's ordinary interest rate and would have to accept only the federal judgment interest rate.

The Court's power to equitably reduce or even eliminate default rate interest on claims based on the bad acts of a creditor has also been recognized by both the District Court of Delaware and the Third Circuit. *See* In re Desa Holdings Corp., No. 02-11672, 2004 WL 316451, *1-2 (D. Del. Feb. 9,

2004) (upholding the bankruptcy court's decision to disallow post-petition default interest based on the equities of the case); In re Nixon, 404 Fed. Appx. 575, *3-4 (3d Cir. 2010).

The Third Circuit recognizes a bankruptcy court's power to modify the default rate of interest. Nixon, 404 Fed. Appx. at *3-4.

In Nixon, the creditor's claim for default interest was not allowed in full due to the acts of the creditor that delayed the bankruptcy process. *Id*. The District Court affirmed the bankruptcy court's default interest modification, and the claimant appealed to the Third Circuit. *Id*. The Third Circuit upheld the default interest modification, noting that other courts "have used equitable considerations to modify the interest awarded over-secured creditors within the parameters of the code." *Id*. at *3 (noting that "the presumption in favor of applying a contractual default rate of interest has been subject to equitable considerations in situations where there has been misconduct by the creditor . . . .") (citations omitted). Affirming the bankruptcy court's equitable authority to modify the default rate of interest, the Third Circuit stated that "[t]he [b]ankruptcy [c]ourt's modification of the interest awarded . . . under § 506(b) was within its discretion and the parameters of the Code." *Id*.

This Court concludes that LR-400's claim for post-petition interest should be disallowed. LR-400 claims approximately $4 million in post-petition interest through February 28, 2018, including approximately $2.28 million in interest payments that have been paid by the Plaintiffs/Debtors, but are being held in a "Suspense" account. That number is likely much higher at the present time.

Based on the wrongdoing of LR-400 and the Lender Defendants, as predecessors-in-interest, the default interest asserted in the Secured Lender Claim is disallowed and the portion of the interest already paid by the Plaintiffs/Debtors above the Federal Judgment Rate must be returned to the Plaintiffs/Debtors.

## COUNT I - BREACH OF CONTRACT v. WELLS FARGO, as TRUSTEE

61

On the Plaintiffs'/Debtors' claim of breach of contract against Wells, the Court concludes as a matter of law, as follows:

Defendant Wells had a duty under the Loan Documents to cooperate with the Plaintiffs/Debtors in the performance of their obligations thereunder and to not hinder, delay or impede the Plaintiffs/Debtors in the performance of their obligations.

Defendant Wells also had a duty under the Loan Documents to deal fairly with the Plaintiffs/Debtors and in good faith in all aspects of the loan relationship.

The duties of Defendant Wells included without limitation the duty not to intentionally hinder the Plaintiffs'/Debtors' ability to pay off the loan or refinance the loan, the duty not to unreasonably withhold from the Plaintiffs/Debtors an accurate payoff statement and the duty not to unreasonably impede the Plaintiffs/Debtors in their efforts to secure leases for the Property.

Defendant Wells repeatedly breached its duties under the Loan Documents by knowingly and intentionally thwarting the Plaintiffs/Debtors in their efforts to pay off and refinance the loan, refusing to timely provide a payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, intentionally providing an inaccurate payoff statement for the loan containing an illegal penalty of $1,200.000.00, and knowingly causing the Mitchell Williams lease to be terminated.

Defendant Wells is also responsible under breach of contract theory for the unreasonable and improper acts of its agents, LNR and Berkadia, in delayed approvals for leases, approval of FGG as asset manager, for delayed release of leasing commissions impacting the Regions Center community status among local leasing brokers and for delayed release of TI escrow funds belonging to the Plaintiffs/Debtors.

The Plaintiffs/Debtors were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the Note.

Defendant Wells, through LNR and Berkadia as its agents, was aware of the time pressures associated with the new loan necessary to pay the Note, as well as the time pressures associated with the new law firm tenant.

The Plaintiffs/Debtors obtained 6 extensions from the Mitchell Williams law firm on a nearly $5 million lease to account for the 30 days beyond maturity and then through October 11, 2016. LNR insisted on adding the $1.202 million Late Fee Charge on the Payoff Statement thereby negatively impacting both the Mitchell Williams lease and the Calmwater Capital bridge loan.

The actions of Defendant, as described herein, caused the resulting damages of the bankruptcy filing and the loss of the Mitchell Williams law firm as a tenant.

### COUNT II – NEGLIGENCE v. WELLS FARGO, LNR AND BERKADIA

On the Plaintiffs/Debtors' negligence claim against Wells, LNR and Berkadia, the Court concludes as a matter of law, as follows:

Defendants LNR and Berkadia regularly charged servicing fees to the Plaintiffs/Debtors that had no foundational basis.  That is, both LNR and Berkadia, as servicers, charged thousands of dollars in servicing fees for the review and processing of the Plaintiffs'/Debtors' requests for lender's approval of leases, for the release of tenant improvement funds in reserve escrow accounts owned by the Plaintiffs/Debtors, but maintained by Berkadia, for the approval of a new asset manager (FGG) and for other approvals required by the Loan Agreement.

However, the servicers, including LNR and Berkadia, were not parties to the Loan Agreement.

Defendants LNR and Berkadia obligated themselves to perform these services related to required approvals as set forth in the Loan Agreement based upon compensation agreements set forth in the PSA and the Subservicing Agreement, respectively.

And while the Lender may have authorized LNR and Berkadia to approve requests submitted by the Plaintiffs/Debtors, the Lender cannot require the Plaintiffs/Debtors to pay for reimbursement of expenses it never incurs.

Furthermore, Defendants LNR and Berkadia, as agents of the Lender, have a duty of reasonable care to timely and competently process requests for approvals from the Plaintiffs/Debtors as required by the Loan Agreement.

The evidence in this case shows that on many occasions, Defendants LNR and Berkadia did not reasonably process these requests or timely act on the requested approvals.

The evidence also shows these servicers had no internal standards for timely responding to requests for approvals, no standards for internally following up on requests, no internal standards for the amounts charged to the Plaintiffs/Debtors for the "services" they performed in the name of, and on behalf of, the Lender.

Without any standards in place, servicing fees demanded of  the Plaintiffs/Debtors by Defendants LNR and Berkadia to comply with their obligations under the Loan Agreement were arbitrarily and capriciously determined, without any reasonable or rational connection to the services they were performing.

All such payments of servicing fees to Defendants LNR and Berkadia were improper, and harmed the Plaintiffs'/Debtors' collective business enterprise.

The unreasonable delays also caused financial stress on the Plaintiffs/Debtors.  Whether these stresses can be quantified is a question for another day in this bifurcated proceeding.

LEGAL\46956559\1

Further, by a preponderance of the evidence, the Plaintiffs/Debtors have proven that Defendant Berkadia took for itself, all of the interest earned on the custodial reserve accounts belonging to the Plaintiffs/Debtors.  These are the exact same funds that, pursuant to Section 1.1 of the Loan Agreement, Berkadia's Ms. O'Keefe acknowledged are to be credited to the Plaintiffs/Debtors and accounted for by a monthly statement of interest earned on those accounts.[7]

Based on the terms of the Subservicing Agreement, it appears Berkadia limited itself to being paid for its sub-sub-servicing from money belonging to the Plaintiffs/Debtors. But the Plaintiffs/Debtors never agreed to that arrangement.  It appears that Berkadia made a really bad deal for itself with the Lender.  But Berkadia cannot use its position as gatekeeper of approvals required under the Loan Agreement as agent for the Lender to foist the ramifications of its bad deal on the Plaintiffs/Debtors by: a) taking the interest that belongs to the Plaintiffs/Debtors, and b) demanding servicing fees from the Plaintiffs/Debtors to which Berkadia is not entitled.

This Court will use its equitable and legal authority to reverse these improprieties.

Defendant Wells is responsible for the improperly charged fees and any unpaid interest on the Plaintiffs'/Debtors' interest-bearing reserve accounts since Defendants LNR and Berkadia were acting upon the explicit authority of Wells, and controlled these escrow accounts only because of their agency relationship with Wells.

As stated *supra*, the damages in this regard is a question for another day in this bifurcated proceeding.

---

[7] Monthly interest on the interest-bearing reserve account. ("Interest-bearing reserve account shall mean collectively the replacement reserve account, the required repair account, the excess cash reserve account, the operating expense reserve account, the extraordinary expense reserve account, the leasing reserve account, and the Blue Cross Blue Shield reserve account. Interest-bearing reserve funds shall mean collectively the replacement reserve funds, the required repair finds, the excess cash reserve funds, the operating expense reserve funds, the extraordinary reserve funds, the leasing reserve funds and the blue cross blue shield reserve funds.")

Defendants Wells, Berkadia and LNR each owed the Plaintiffs/Debtors a duty of reasonable care in connection with the loan and the Plaintiffs/Debtors' efforts to secure leases for the Property and to pay off the loan.

Defendants Wells, Berkadia and LNR repeatedly breached their respective duties of reasonable care to the Plaintiffs/Debtors by unreasonably thwarting them in their effort to pay off and refinance the loan, unreasonably refusing to provide a timely payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, unreasonably providing an inaccurate payoff statement for the loan containing an illegal late charge of $1.202 million and unreasonably causing the Mitchell Williams lease to be terminated.

Even though some of the delay in the refinancing process was caused by Defendants Wells and Berkadia, the Plaintiffs/Debtors were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the note.

Defendant Wells was aware of the time pressures associated with the new loan necessary to pay its Note, as well as the time pressures associated with the new law firm tenant, Mitchell Williams.

The Plaintiffs/Debtors obtained extensions of time to account for the 30 days beyond maturity, and Wells' acts as described above caused the resulting damages of the bankruptcy filing and loss of the tenant, the Mitchell Williams law firm.

## COUNT III - TORTIOUS INTERFERENCE v. WELLS FARGO, LNR AND BERKADIA

On the Plaintiffs'/Debtors' tortious interference claim against Defendants Wells, LNR and Berkadia, the Court concludes as a matter of law, as follows:

Defendants Wells, Berkadia and LNR had actual knowledge of the advantageous contractual relationship and business expectancy between the Plaintiffs/Debtors and Mitchell Williams in connection with the Mitchell Williams lease.

Defendants Wells, Berkadia and LNR, acting in concert, knowingly and intentionally interfered with such contractual relationship and business expectancy by refusing to provide a timely payoff statement for the loan despite receiving multiple requests and despite having the ability to provide a payoff statement upon request, by providing an inaccurate payoff statement for the loan containing an illegal Late Fee Charge of $1.202 million and by thwarting the efforts of the Plaintiffs/Debtors to refinance the loan

Defendants Wells, Berkadia and LNR knew and intended that these acts of interference would directly result in the termination of the Plaintiffs'/Debtors' contractual relationship and business expectancy with Mitchell Williams.

The Plaintiffs/Debtors were ready, willing and able to pay the reasonable default interest and associated legal fees caused by the delayed closing on the refinancing in the initial 30 days after maturity of the Note. Wells was aware of the time pressures associated with the new loan necessary to pay off its Note, as well as the time pressures associated with the new law firm tenant, Mitchell Williams.

The Plaintiffs/Debtors obtained extensions of time to account for the 30 days beyond maturity, and Wells' acts, as described herein, caused the resulting damages of the bankruptcy filing and loss of the tenant, Mitchell Williams.

The actions of Defendant LNR in insisting on the payment of the Late Fee Charge on the entire principal at maturity, which by its explicit terms are to compensate the Lender for the expenses of a default and the loss of use of a payment, is particularly egregious inasmuch as the

67

undisputed testimony of LNR's Mr. Polcari  is that those fees, if paid, would go exclusively to LNR, not the Lender. Mr. Polcari further testified LNR's business model was to make its fees from default interest and other borrow-paid fees even though LNR has no contractual privity with borrowers it special services.

These acts of interference were improper, unlawful and unjustified.

## COUNT IV - AIDING AND ABETTING TORTIOUS INTERFERENCE v. BERKADIA AND LNR

On the Plaintiffs/Debtors' aiding and abetting claim against LNR and Berkadia, the Court concludes as a matter of law, as follows:

For the same reasons as set for in the conclusions of law related to Count III, to the extent Berkadia or LNR assisted the Lender in the interference with the Plaintiffs/Debtors' business relationships as set forth in the Second Amended Complaint, Defendants Berkadia and LNR are responsible for damages caused by these acts.

These acts of interference were improper, unlawful and unjustified and caused damages to the Plaintiffs/ Debtors.

## COUNT V - DECLARATORY RELIEF v. LITTLE ROCK-400

On the Plaintiffs/Debtors' declaratory relief claim against Defendant LR-400, the Court concludes as a matter of law, as follows:

A bona fide dispute exists between the Plaintiffs/Debtors and LR -400 regarding the $1.202 million Late Fee Charge that Wells and LNR attempted to add to the loan while the Plaintiffs/Debtors were engaged in a refinancing of the loan.

The Plaintiffs/Debtors contend the "Late Fee Charge" is contractually impermissible and illegal under Arkansas law.

An actual controversy exists between the Plaintiffs/Debtors and LR -400 regarding the Late Fee Charge  and the true balance due under the loan.

The controversy is substantial and concrete and touches the legal relations of parties with adverse interests and is subject to specific relief through a decree of conclusive character.

For the same reasons as stated in the conclusions of law in connection with Defendant LR-400's Proof of Claim[8] as successor in interest to, and assigned from, Wells Fargo Bank, N.A., as Trustee and the Plaintiffs'/Debtors' Objection to Claim 5[9], the Plaintiffs/Debtors are granted declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

The Late Fee Charge is hereby declared null and void, and thus, is unenforceable as a matter of law.

## **CLAIMS AGAINST SOMERA/TACONIC – COUNTS VI, VIII, IX**

On December 8, 2019, this adversary action proceeded to the liability phase of a bifurcated trial as stipulated by the parties. Plaintiffs'/Debtors' claims, as set forth in their detailed Second Amended Complaint, were against the Lender Defendants, Taconic and Somera. As to the claims against the Lender Defendants, the claims are as follows:

(1) Breach Of Contract against Wells Fargo;

(2) Negligence against Wells Fargo, LNR And Berkadia;

(3) Tortious Interference against Wells Fargo, LNR and Berkadia;

(4) Aiding And Abetting Tortious Interference against Berkadia and LNR; and

(5) Declaratory Relief against Little Rock-400.

The Plaintiffs'/Debtors' claims against Taconic and Somera consisted of three causes of action with numbered counts and headings, as follows:

---

[8] Trial Exhibit J1257
[9] Trial Exhibit J908

(1) Breach of contract against Somera;

(2) Unjust Enrichment against Taconic and Little Rock-400; and

(3) Breach of contract against Taconic (alleged in the alternative).

The Plaintiffs/Debtors filed their Second Amended Complaint on September 5, 2019 before commencement of defendants' depositions. Indeed, the Second Amended Complaint was based upon the Plaintiffs'/Debtors' information and belief, relying exclusively on what was available through the public record and what was provided through Defendants' production of documents.

The records produced by Defendants Somera and Taconic included redactions and excluded the production of the vast majority of text messaging between the principals and employees of Somera and Taconic, despite their admissions in the adversary litigation that texting was a regular practice in conducting their businesses.

The fundamental command of the Federal Rules of Civil Procedure is "never to exalt form over substance." Id. A defendant is on notice by the substance of the allegations of the complaint, not necessarily by the specific titles or descriptions of the "counts" of the complaint.

In bankruptcy proceedings, courts are not powerless to deal with those who would elevate form over substance. Indeed, courts have "broad discretionary power to fashion equitable remedies which are a special blend of what is necessary, what is fair, and what is workable". Class v. Norton, 376 F. Supp. 496, 501 (D. Conn.)

Based on the italicized language as stated in the Second Amended Complaint, the pleadings placed Defendants Somera and Taconic on notice of the New York unfair competition claim.  But even if that were not the case, this Court has broad discretion to permit the amendment of the

claims as equity requires provided Defendants are not prejudiced.  Federal Rule of Civil Procedure

15(b)(2) states:

> *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by
> the parties' express or implied consent, it must be treated in all respects as if raised
> in the pleadings. A party may move—at any time, even after judgment—to amend
> the pleadings to conform them to the evidence and to raise an unpleaded issue. But
> failure to amend does not affect the result of the trial of that issue.

Federal Rule of Bankruptcy Procedure 7015 expressly adopts Rule 15, which sets out the

standards for allowing amendments to pleadings in adversary proceedings. N.Y.C. Housing Auth.

v. G-I Holdings, Inc. (G-I Holdings, Inc.), 514 B.R. 720, 754-55 (Bankr. D.N.J. 2014).

Amendments to the pleadings are freely given "because the purpose of Fed. R. Civ. P. 15 is

to avoid the elevation of form over substance and 'to facilitate the amendment of pleadings except

whether prejudice to the opposing party would result.' " In re Brown, 159 B.R. 710 (Bankr. D.N.J.

1993) (citing United States v. Hougham, 364 U.S. 310, 316, 81 S. Ct. 13, 5 L. Ed. 2d 8 (I960)).

Fed. R. Civ. P. 15, one of the ordinary liberal rules governing the amendment of pleadings, is

designed to facilitate the amendment of pleadings except where prejudice to the opposing party

would result. United States v. Hougham, 364 U.S. 310, 311, 81 S. Ct. 13, 15 (1960).  The Federal

Rules of Civil Procedure reject the approach that pleading is a game of skill in which one misstep

by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is

to facilitate a proper decision on the merits. Id.

The fact that an amendment to conform the pleadings to the evidence changes a legal theory

of action is immaterial under Bankruptcy Rule 7015, so long as the opposing party has not been

prejudiced in presentation of its case. In re Nett, 70 B.R. 868 (Bankr. W.D. Wis. 1987).

Fed. R. Civ. P. 15(b), made applicable by Bankruptcy Rule 7015, does not require that a conforming amendment be made, rather, the issues actually litigated will determine the outcome in a particular case. In re Sasaki, 71 B.R. 492 (Bankr. D. Haw. 1987).

A party's failure to amend its pleadings to conform to proof at trial does not affect the outcome of a case because the court's judgment may be upheld on any theory supported by facts proved, even if not set forth in pleadings. Salven v. Munday (In re Kemmer), 265 B.R. 224 (Bankr. E.D. Cal. 2001).

Fed. R. Bankr. P. 7015 allows a bankruptcy court to order the pleadings amended to conform to the evidence at trial when issues are tried with express or implied consent of parties. Pereira v. Gardner (In re Gardner), 384 B.R. 654 (Bankr. S.D.N.Y. 2008).

A bankruptcy court is free to amend pleadings to conform to the evidence after trial and has broad discretion to do so when equity requires it. Moon v. Anderson (In re Hixon), 295 B.R. 866, 41 Bankr. Ct. Dec. (LRP) 180, Bankr. L. Rep. (CCH) P78891 (8th Cir. 2003), aff'd, 387 F.3d 695, Bankr. L. Rep. (CCH) P80187 (8th Cir. 2004).

At trial, including during the depositions admitted as trial evidence by Defendants Taconic and Somera, the misappropriation of Plaintiffs'/Debtors' information was widely litigated, and theft of Plaintiffs'/Debtors' information and the opportunity to purchase the Note was identified as an issue in the case by Plaintiffs'/Debtors' counsel in his opening statement[10] and in argument over defense objections.[11] Defense counsel failed to object or move to strike.

Accordingly, the Court finds that the claim of unfair competition by misappropriation of Plaintiffs'/Debtors' information was actually pled but was also tried by consent.

---

[10] at pages 21 and 39.
[11] At page 746

Likewise, the trial and evidence admitted into evidence, mostly through stipulation of the parties, consistently refers to Defendants Somera and Taconic working together to acquire the Note in violation of Plaintiffs'/Debtors rights under the MCA. This is the essence of a conspiracy claim; two parties working in concert toward a common purpose with each acting in furtherance of an underlying tort.

Accordingly, the court also finds the claim of conspiracy to commit unfair competition by the misappropriation of the Plaintiffs'/Debtors' information was actually pled, but was also tried by consent.

The court finds that Defendants Taconic and Somera are not prejudiced by these technical amendments because the material facts supporting the amended claims are alleged in the Second Amended Complaint. In other words, the facts and assertions alleging unfair competition and conspiracy are stated in the Second Amended Complaint, but not by formal numbered counts and titles of these claims. Therefore, these defendants were on notice of these claims and are not prejudiced by an amendment of the claims.

Unfair Competition Claim

New York law clearly governs the relationship of and between Defendants Somera and Taconic, both New York-based businesses. New York is also the location where the acts between them occurred. New York is also the agreed-upon choice of law jurisdiction under both Master Confidentiality Agreements. (Jt. Trial Ex. 159, ¶13; Jt. Trial Ex. 161, ¶13)

New York has long recognized the common law claim of unfair competition as a tort remedy for the proven use of improper methods by a competitor to secure an unfair business advantage.

73

Specifically, "New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown, it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another. The tort is adaptable and capacious." <u>Roy Export Co. Establishment of Vaduz v. CBS</u>, 672 F.2d 1095, 1097 (2d Cir. 1982).

More recently, in <u>Linkco, Inc. v. Fujitsu Ltd.</u>, 230 F. Supp. 2d 492 (S.D.N.Y. 2002), the Southern District of New York, citing <u>Roy Export</u>, wrote, "A claim for unfair competition based on misappropriation generally involves the taking of a property right.  New York courts have found that persons have a protectable property interest in their "labor, skill, expenditure, name and reputation …."

The parties collectively presented a vast amount of evidence and testimony in connection with the confidential nature of the Plaintiffs'/Debtors' information shared on their behalf by their counsel, Mark Rubin, with Somera, which, in turn, shared the information with Taconic. The parties focused on Somera's defense that because the Plaintiffs/Debtors provided internal property and financial information to numerous potential sources for refinancing that such information became, or was transformed into, information "generally available to the public" and therefore excluded from the acts or disclosure that would violate the MCA's non-disclosure prohibitions. Setting aside and irrespective of the outcome of the claims and defenses related to the Plaintiffs'/Debtors' breach of contract actions against Defendants Somera and Taconic, which are

addressed herein, the Plaintiffs/Debtors have proven a claim for unfair competition under New York law despite not setting out a separate count for that claim.

In <u>Linkco</u>, that court held "the central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another. See <u>Saratoga Vichy Spring  Co., Inc. v. Lehman</u>, 625 F.2d 1037, 1044 (2d Cir. 1980). An unfair competition claim must also involve some degree of bad faith. Id.

As the <u>Linkco</u> court pointed out, "Indeed, the doctrine of unfair competition has been applied in various situations, like this, where a plaintiff alleges misappropriation of information that does not rise to the level of misappropriation of trade secrets or ideas." That court cited to other cases where the misappropriation of documents that did not meet the threshold of constituting trade secrets nevertheless amounted to unfair competition. See, <u>Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs.</u>, 871 F. Supp. 709, 729-30 (S.D.N.Y. 1995) (holding that unauthorized [*502] physical taking and exploitation of internal company documents for use in competitor's business constitutes unfair competition, although information taken would not qualify as a trade secret); … <u>Continental Dynamics Corp. v. Kanter</u>, 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978) (holding [**30] that misappropriation of customer lists, although not considered trade secrets, nevertheless states cause of action under unfair competition).

In an even more recent New York case, <u>Salonclick LLC v. SuperEgo Mgmt. LLC</u>, 2017 U.S. Dist. LEXIS 69960 (S.D.N.Y. May 8, 2017), the Southern District Court of New York found "The Second Circuit has described unfair competition as 'misappropriat[ing] for the commercial advantage of one person . . . a benefit or 'property' right belonging to another.' Id. (alterations in original) (quoting Roy Export, 672 F.2d at 1105). It is well established law that 'where the information taken would not otherwise qualify as a trade secret, the unauthorized physical taking

and exploitation of internal company documents for use in a competitor's business constitutes unfair competition.' Fairfield Fin. Mortg. Grp., Inc. v. Luca, 584 F. Supp. 2d 479, 487 (E.D.N.Y. 2008) (quoting Innovative Networks v. Satellite Airlines Ticketing Ctrs., 871 F. Supp. 709, 730 (S.D.N.Y. 1995)).

Here, Defendant Taconic admitted that it received the Plaintiffs'/Debtors' information from Defendant Somera, and also admitted that it knew the origin of such information was from the Plaintiffs/Debtors in the early stages of bankruptcy. Defendant Taconic admitted it was aware of the confidential nature of the information it received from Somera, and also that it was likely the subject of a confidentiality agreement between the Plaintiffs/Debtors and Defendant Somera, with which Taconic had a confidentiality agreement. Taconic also admitted using at least some of this information that came from the Plaintiffs/Debtors in its due diligence related to the purchase of the Note that makes its wholly controlled subsidiary, LR-400, the secured creditor in these proceedings.  Finally, Defendant Taconic, through Mr. Jordan, admitted Taconic purchased the Note with the intent of including Somera and the Plaintiffs/Debtors in an ongoing business relationship.  Yet instead of including the Plaintiffs/Debtors in negotiations to purchase the Note from the lender through LNR, in which case the Plaintiffs/Debtors would be on equal footing in an arm's length negotiation, Taconic decided to purchase the Note first, and then, with the powerful increased leverage of a secured creditor, use that leverage to make a better deal than it otherwise could have negotiated.

Further still, it is obvious from the deal flow and actual joint ventures between Defendants Somera and Taconic, that while they are not technically "affiliates," they have very close business ties over a number of years. It is inconceivable that Defendant Somera was not complicit in the circumvention of its MCA with the Plaintiffs/Debtors by its self-described funding source.

Defendant Taconic clearly violated the terms of its 2016 MCA with Somera, yet Somera appears to be comfortable with that violation. One would expect Somera to have filed a cross-claim against Taconic if it was not engaged in an "end run" in concert with Taconic. This end run is precisely the circumvention prohibited by its MCA with the Plaintiffs/Debtors.  If either Somera or Taconic did not like the best deal they were able to negotiate with the Plaintiffs/Debtors, they could have simply walked away without any liability exposure.  But they chose to proceed, excluding the Plaintiffs/Debtors from the process.

To be sure, Defendant Taconic's access to and use of the Plaintiffs'/Debtor's information, funneled to Taconic by Somera, eliminated Taconic's competition.  The Plaintiffs/Debtors were in a competitive position relative to Taconic.  Both desired and were in the market to purchase the Note, albeit for different reasons. The evidence is undisputed that the Plaintiffs/Debtors possessed alternative financing resources that could have allowed them to refinance, pay off the Note, and exit from bankruptcy quickly. Clearly, the Plaintiffs'/Debtors' collective businesses are viable since they have been paying regular Note rate interest and have remained solvent throughout the more than three years since filing their Chapter 11 Petitions.

Mr. Jordan admits Taconic would not have been interested in, or in pursuit of, the Regions Center deal if Mr. Ross had not been so persistent. Mr. Ross' persistence was obviously motivated by the favorable returns on investment he understood could be made from a friendly deal with the Plaintiffs/Debtors. And Mr. Ross' understanding of the profitability and return on investment potential of the Regions deal is directly connected to the information he was receiving from Plaintiffs/Debtors through their counsel, including insider information regarding negotiations with Wells/LNR, current tenant leasing information, appraisal information commissioned by and paid by the Plaintiffs/Debtors,

current expense information and the expectation of cooperation with the Plaintiffs/Debtors in resolving then existing claims against the lender and its servicers.

Taconic's brazen purchase of the Note, under these circumstances, falls squarely into the definition of unfair competition under New York law; that is, Taconic misappropriated the Plaintiffs'/Debtors' inside information and knowledge for its own commercial advantage. This conduct violates the central principle underlying a claim for unfair competition; that one may not misappropriate the results of the labor, skill, and expenditures of another. Taconic's conduct under these circumstances could not have been incidental or even negligent. Indeed, such conduct could have only been intentional and must have involved "some degree of bad faith."

### Civil Conspiracy

For the same reasons articulated immediately above, the court will consider the Plaintiffs'/Debtors' allegation in the Second Amended Complaint to allege a conspiracy tort claim against Defendants Somera and Taconic.

Under New York law, "to establish a claim of civil conspiracy, the plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury (Abacus Fed. Savings Bank v Lim, 75 AD3d 472, 474, 905 N.Y.S.2d 585 [1st Dept 2010]); Cohen Bros. Realty Corp. v. Mapes, 2020 NY Slip Op 01440, ¶ 3 (App. Div.).

Here, regarding the first element, Plaintiffs/Debtors have produced evidence of the underlying unfair competition through misappropriation (the primary underlying tort) against defendant Taconic as discussed *supra*.

Regarding the second element, the Plaintiffs/Debtors have introduced numerous documents including emails, text messages and testimonial evidence showing agreements between Defendants Taconic and Somera directly relating to the Regions Center deal in early 2017, and then also after acquisition of the Note by Defendant LR-400, Taconic's wholly controlled affiliate. Somera and Taconic were clearly working together toward a common goal consistently from at least April 2017 though 2018.  One must presume an implicit or explicit agreement between these defendants given this lengthy course of acting in concert adverse to the interests of the Plaintiffs/Debtors which is strictly prohibited in the 2017 MCA.

Regarding the third element to prove conspiracy, the admitted evidence also shows overt acts by both Defendants Taconic and Somera endeavoring to use the proprietary information of the Plaintiffs/Debtors in furtherance of acquisition of the Note prior to June 13, 2017, and then also using the same information after the Note acquisition in an attempt to pressure the Plaintiffs/Debtors into a taking a deal favorable to Taconic and Somera. For instance, both before and after Note acquisition, Somera and Taconic discussed among themselves in emails that they knew 30% of the Plaintiffs/Debtors were willing to sell their interests at a 30% diluted value, and that this information came from counsel for the Plaintiffs/Debtors after Somera and counsel for the Plaintiffs/Debtors signed the 2017 MCA effective March, 6, 2017.

Regarding the fourth element, although this is a bifurcated proceeding with the liability phase not yet commenced, the court must presume that the Plaintiffs/Debtors will be able to provide some evidence of damages resulting from the Somera/Taconic conspiracy. But for that conspiracy, the Plaintiffs/Debtors would have either refinanced and resolved their claims with the prior lender and this adversary proceeding would not exist at all, or it would be substantially limited in scope.  If the former, the administrative costs of the bankruptcy would be substantially reduced because the Plan of

Reorganization would have been determined and approved long ago. If the latter, Defendants Taconic and Somera would not be parties to this litigation, again resulting in the Plaintiffs'/Debtors' early exit from bankruptcy protection. Either way, these Plaintiffs/Debtors have likely suffered damages which at a minimum include attorneys' fees, costs, and case-related expenses.

**Breach of Contract ( v. Somera - Master Confidentiality Agreement)**

The 2017 MCA was drafted by Somera's lawyer Michael Fralin.  (Jt. Trial Ex. 91)

It is in all material respects the same format and provisions as the Master Confidentiality Agreement that Somera and Taconic executed in August 2016.

For the purposes of the breach of contract claims in this adversarial proceeding, this Court finds the "Provider" are the Debtors.  The 2017 MCA states that the Rubin Firm is the contracting party acting on behalf of its clients.  Ian Ross admits he contacted Mark Rubin as counsel for the Plaintiffs/Debtors, and that he was aware Mark Rubin was at all times acting in a representative capacity for the Plaintiffs/Debtors.

As used in the 2017 MCA, the "Recipient" is Somera.

In the first unnumbered paragraph, the parties acknowledge and agree that the documentation and content of any such disclosures are proprietary and confidential to Provider.

The 2017 MCA defines the materials covered under its provisions. Accordingly, the meaning of "Confidential Information" is not up for debate, as it is defined in the contract. Id.

As described in Paragraph 1 of 2017 MCA, Confidential Information includes Documents, Financial Statements, Reports, Forecasts, Projections, Surveys, Diagrams, Records, Engineering Reports, and all other written or oral information electronically transmitted data furnished or made

available to Somera as Recipient, its employees, counsel, and its financing sources, including Taconic.[12] By these terms, Taconic is specifically described as Somera's "Representative".

Confidential Information also includes written memoranda, notes, analyses, reports, compilations and studies prepared by Somera or Taconic that "contain or are derived from" documents or other information furnished or made available "by or on behalf of Provider".

It is not in dispute by any party that the Regions Center Loan is a Proposed Transaction as that term is defined in the 2017 MCA since it was specifically made part of a Schedule to the 2017 MCA on March 10, 2017, signed by Somera's Ian Ross, as Recipient, and IM Rubin, under the signature line "Rubin & Rubin, as Provider".

Pursuant to the exceptions in Paragraph 1, there are four types of information excluded from the definition of Confidential Information and the restrictions and prohibitions set forth in the 2017 MCA. They are, in pertinent part:

> Information furnished or made available by or on behalf of Provider, if such information:
>
> (a) is or becomes generally available to the public;
>
> (b) is or becomes available to Somera/Taconic from a source, not bound, to the best knowledge of Somera/Taconic, by any legal, written or other obligation to Plainitffs prohibiting or limiting the disclosure of the Confidential Information;
>
> (c) has been independently developed by Somera/Taconic without reference to Confidential Information; or
>
> (d) is required to be disclosed by law.

***Paragraph 3 of the 2017 MCA contains covenants relating to Confidential Information, as follows:***

---

[12] Both Somera and Taconic admit Taconic is Somera's financing source as used in this agreement.

Somera agreed that neither it nor Taconic, as its financing source/Representative, would disclose Confidential Information to any person or entity except as expressly permitted by this Agreement, however Somera was permitted to disclose Confidential Information to Taconic if it needed to know such Confidential Information for the purpose of evaluating the Proposed Transaction and to provide advice in connection therewith; provided that Somera:

(a) inform Taconic of the confidential nature of the Confidential Information and the restrictive terms of this Agreement and directs Taconic to abide by the terms hereof

and

(b) hereby agrees to be liable subject to and in accordance with the terms hereof in the event that Taconic discloses Confidential Information in breach of the permitted methods of disclosure under this Agreement.

Somera further agreed that it and Taconic would use the Confidential Information exclusively for the purpose of evaluating the Proposed Transaction, and would not use the Confidential Information

(a) for its own benefit,
(b) for the benefit of any third party, or
(c) to Provider ' s detriment. Somera

In Paragraph 6, Somera acknowledged that significant portions of the Confidential Information are proprietary, and that misuse or disclosure of the Confidential Information may cause Debtors to suffer significant and irreparable harm.

***Paragraph 8 of the 2017 MCA contains covenants relating to other restrictions and prohibited acts, as follows:***

For a period of eighteen (18) months from the date of tile applicable Schedule (March 6, 2017 to September 6, 2018), Somera agreed that it would not, directly or indirectly, without Debtors' prior written consent:

(a)     enter into any oral or written agreement or arrangement of any kind for or in connection with a Proposed Transaction,

82

(b)    initiate maintain or respond to any contact with:

- the owner of
    - the underlying property
    - or any note secured thereby the underlying property relating to the Proposed Transaction
- any obligor or borrower related to the Proposed Transaction,
- or any of the respective employees or representatives of the foregoing (except in the ordinary course of business unrelated to the Proposed Transaction)

or

(c)    otherwise circumvent or undermine Debtors' opportunity with respect to the Regions Center Loan.  Somera will instruct Taconic to similarly restrain themselves and act accordingly under this Section 8.

Plaintiffs/Debtors claim that Defendants Somera and Taconic breached the 2017 MCA by using materials they obtained from Debtors in a manner prohibited by Paragraph 3 of that agreement, and also by violating the restrictive covenants contained in Paragraph 8 of that agreement.

The materials alleged to be the subject of improper use are:

- March 10, 2017 email from Mark Rubin to Ian Ross with confidential information regarding Plaintiffs and the Regions Building and the following documents: (1) Annual Income Statement 2014 and 2015 -Regions Center, (2) 2017 Budget, Rent Roll, TI, LC and Capex Requirements-Regions Center, (3) CO-Star Office Report-Regions Center, (4) Pictures-Regions Center, (5) Appraisal Summary-Regions Center, (6) Comparable Sales-Regions Center, and (7) 2016 Operating Statement-Regions Center.  (See Rubin026738-26799).  On March 10, 2017, Ian Ross sent those same materials to Joe LeMense, with a blind copy to an unknown Taconic agent, without informing Plaintiffs or requesting or receiving permission to do so from Plaintiffs or their counsel; (Jt. Trial Ex. 164)

- March 19, 2017, Mark Rubin email to Ian Ross with draft confidential settlement offer to prior lender; (Jt. Trial Ex. 127)

- Confidential information regarding Plaintiffs' settlement discussions; (Jt. Trial Ex. 128)

- Argus file, sent by Mark Rubin to Somera on April 4, 2017; (Jt. Trial Ex. 170)

- Appraisal Report prepared by CBRE for Plaintiffs in April 2016; (Jt. Trial Ex. 1300)

- LNR Payoff Statement dated October 1, 2016, sent to Somera April 24, 2017; (Jt. Trial Ex. 138, 313)

- April 25, 2017 Spreadsheet analysis of the Regions Building prepared by Somera using the confidential information provided by Plaintiffs and their counsel; (Jt. Trial Ex. 317)

- April 26, 2017 Spreadsheet analysis of the Regions Building prepared by Somera using the confidential information provided by Plaintiffs and their counsel; (Jt. Trial Ex. 707)

- All confidential information provided to Somera by Plaintiffs via a Dropbox link sent to Taconic on April 27, 2017; (Jt. Trial Ex. 172, 173, 174, 175, 319)

- May 1st updated Argus file, prepared by Somera using confidential information provided by Plaintiffs and their counsel; (Jt. Trial Ex. 132, 144, 1298)

- LNR Payoff Statement dated May 1, 2017, sent to Somera May 2, 2017 by Mark Rubin; (Jt. Trial Ex. 146, 133)

- Further updated Argus file as of May 2, 2017, prepared using confidential information provided by Plaintiffs and their counsel; (Jt. Trial Ex. 147, 148)

The acts of Defendants Somera and Taconic alleged by the Plaintiffs/Debtors to have violated

the Paragraph 8 covenants are:

1. Somera had an "arrangement" with Taconic in connection with "The Proposed Transaction" identified as in the Schedule to the 2017 MCA as The Regions Loan [JV terms - SOM0005660].

2. Somera entered into a written agreement with Taconic relating to The Regions Loan. [LeMense Ex. 9, including SOM0001185].

3. Taconic and its subsidiary Little Rock 400 Trust entered into written agreements with LNR and the Wells Fargo Trust relating to The Regions Loan.

4. Somera retained Hart Advisors or Tanya Little to contact owners through William White [TAC16637-16643] an "arrangement" relating to The Regions Loan.

5. Somera contacted owners of the Property through Josh Garcia of Hart Advisors. [Reeser Ex. 14]

6. Taconic contacted the owners of the Note secured by the Regions Center through LNR. [Jordan contacted Job Warshaw of LNR Erin Rota of Taconic contacted Don Kerr of LNR "Taconic is in a 10-day diligence period with respect to the Regions Center loan.

Can you please send LNR's loan purchase agreement template so we can review?"] (Tr. Transcript 683:1-24, 698:9-15, 698:16-21, 707:10-22; Jt. Trial Ex. 715, 720, 723, 727, 733, 1668, 1686)

7. Taconic circumvented and undermined Plaintiffs' opportunity by purchasing the Note from Wells Fargo Trust.

8. Somera failed to instruct Taconic not to undermine Debtors and assisted Taconic's circumvention.

In defense, Somera asserts it did not violate the 2017 MCA because all of the materials it provided to Taconic were "generally available to the public."

This Court first reviews the February 6, 2017 Master Confidentiality Agreement (2017 MCA) for its plain meaning. If the terms are unambiguous, the Court will ascribe the plain meaning to its provisions. If terms are defined in the contract, the agreed upon definitions as stated in the MCA will control as terms of art.

The parties do not dispute that New York law applies here. In New York, if a contract is "straightforward and unambiguous," its interpretation presents a question of law for the court to be made without resort to extrinsic evidence. Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005).

Parties are free to contract for mutual protection beyond what the common law allows. sit-up Ltd. v. IAC/Interactive Corp., 2008 U.S. Dist. LEXIS 12017, at 45 n.15 (S.D.N.Y. Feb. 20, 2008). The 2017 MCA is unambiguous.

sit-up Ltd. v. IAC/Interactive Corp., 2008 U.S. Dist. LEXIS 12017, (S.D.N.Y. Feb. 20, 2008 is a case with many similarities to the one at bar. That court examined a number of claims and defenses also similar to those in this case. That court provides insight and guidance as to what kinds of materials are "generally available to the public." Of those materials found to be generally available to the public is information that became public by way of a press release and the public disclosure of sales and profits.

In this case, the materials that Defendants claim are excluded from the MCA as "generally available to the public" do not meet this threshold of being placed into the general public's domain. Rather, the Plaintiffs/Debtors distributed financial information and materials to a limited number of parties in the CMBS finance industry.

Inasmuch as Somera drafted the 2017 MCA, electing to utilize an agreement in which "generally available to the public" is not specifically defined, this court will ascribe a plain meaning to those terms. The public is not a select group of professionals in the CMBS finance industry.  The materials sent to those individuals by Rubin or Denison was not readily available to the general public, other than perhaps several reports in bankruptcy filings.  Even then, it is questionable whether the general public has access to PACER, a paid service. But this court need not determine if PACER is "generally available to the public", because the employees of Somera and Taconic concede at least *some* of the materials that originated from the Plaintiffs/Debtors through their counsel, and provided to Somera under the 2017 MCA, were disclosed to Taconic and *used* other than as permitted for the evaluation of a mutual business opportunity under the 2017 MCA.

Interestingly, the sit-up, Ltd. court also discussed a number of alleged violations similar to the allegations in this case. In that case, the term defining what was protected from disclosure was called "Evaluation Materials."   That court found non-disclosure violations where a) defendants used extrapolations of market data based on the Plaintiff's data; b) defendants used information claimed to be stale and obsolete, finding that even stale and obsolete data is protectable unless the terms of the contract exclude such material; any "use" is a breach of contract; and c) any information disclosed under the NDA was "used" for any purpose other than for the intended purpose of considering the transaction, even incidental use.

These are some of the same reasons that Defendants claim there were no violations in this case. (i.e. extrapolations but no direct use of materials, stale and obsoleteness, and the materials were of little value or could have been replicated from public sources).  However, these justifications are likewise of no avail in defending the breach of contract claims. The evidence clearly and convincingly shows both Defendants Somera and Taconic used the Plaintiffs'/Debtors' Confidential Information, as that term is defined in the 2017 MCA, for a purpose other than that intended by the contract.

The Court finds that Defendant Somera has not proven that **all** of the materials it provided to Defendant Taconic were "generally available to the public." It is of no avail to Somera and Taconic that they used some, but not all, of the Confidential Information (as defined in the 2017 MCA). Any use for a purpose other than that intended by the contract is a breach of contract. The question of damages is reserved for another day in this bifurcated proceeding.

It also makes no difference whether unauthorized *use* of the Confidential Information derived any value to the breaching party; the contract prohibits any use other than to evaluate a deal with the Plaintiffs/Debtors.

This record is replete with emails confirming the *use* of the Plaintiffs'/Debtors' materials and information, including, but not limited to,  Regions Center annual income statements, financial reports of Regions Center budget, rent roll, tenant improvement, leasing commissions, and capital expenditure requirements, Little Rock market reports, a proprietary appraisal, a Regions Center operating statement, settlement communications with prior lender, and payoff statements. (Tr. Transcript 612:15-613:18, 614:7-18, 666:21-667:7, 664:24-665:665:12; 676:21-677:23, 679:3-9, 679:13-680:8, 681:10-19, 690:6-14,  690:15-691:2,  694:4-9,  694:10-695:14,  1188:4-16,  1579:19-1580:6,  1592:6-20,  1589:5-11, 1591:11-15, 1594:3-9, 1597:17-22, 1629:3-20; Jordan Dep.96:14-97:8, Lam Dep. 47:17-24, 67:5-21, 124:10-15, 126:11-127:17, 137:6-138:4, 139:5-14, 144:8-15, 144:17-145:16, 211:8-21, 225:18-24;

87

Ross Dep. 110:19-24, 120:14-20, 122:3-11, 125:11-21; Jt. Trial Ex. 98, 132, 138, 141, 146, 314, 319,

320, 321, 712, 717; Jt. Trial Ex. 128, 132, 133, 138, 144, 147, 148, 164, 172, 174, 175, 317, 319, 707,

1298).

Defendant Somera asserts no cognizable defense and no evidence of any cognizable defense, in

connection with the claims of  the Plaintiffs/Debtors that it directly, or indirectly through Taconic,

violated the restrictive covenants of Paragraph 8. These prohibitions are a different kind of contractual

restrictions than those contained in Paragraph 3.

Somera and Taconic's affirmative defenses, as pled, are vague and non-specific. They provide

no facts in support of affirmative defenses.  Accordingly, this court deems these to be denials of the

Plaintiffs'/Debtors claims.

The Plaintiffs/Debtors have not alleged a common law violation of trade secrets.  Therefore,

any analysis relating as to whether any particular materials are actually confidential is irrelevant because,

in a breach of contract action, the parties are free to contract for mutual protection beyond what the

common law allows. See, <u>Lee v. BSB Greenwich Mortgage. Ltd.</u>, 267 F.3d 172, 180 (2d Cir. 2001).

The Court finds Somera breached the terms of the 2017 MCA in at least 13 ways, as
follows:

Para. 3(a) states "Recipient agrees that neither it nor any of its Representatives shall
disclose Confidential Information to any person or entity except as expressly permitted by this
Agreement, however Recipient may disclose Confidential Information to any of its
Representatives who needs to know such Confidential Information for the purpose of evaluating
the Proposed Transaction and providing advice in connection therewith; provided that Recipient
(a) shall inform each such Representative of the confidential nature of the Confidential Information
and the restrictive terms of this Agreement and direct such Representative to abide by the terms
hereof.

1.     Somera violated this provision by failing to specifically advise Taconic of these
terms. (Tr. Transcript 641:20-642:5)

Para. 3(b) further states "[Recipient] hereby agrees to be liable subject to and in accordance
with the terms hereof in the event that any such Representative discloses Confidential Information
in breach of the permitted methods of disclosure under this Agreement.

2.      Taconic violated this disclosure restriction by contacting LNR and by negotiating using the information related to it by Somera. (Tr. Transcript 683:1-24, 698:9-15, 698:16-21, 707:10-22; Jt. Trial Ex. 715, 720, 723, 727, 733, 1668, 1686)

Para. 3 goes on to require "Recipient further agrees that it and each of its Representatives will use the Confidential Information exclusively for the purpose of evaluating the Proposed Transaction, and shall not use the Confidential Information (a) for its own benefit,"

3.      Taconic violated this section by buying Note for its own benefit, for which Somera is liable.

Para. 3(b) (continued) "for the benefit of any third party"

4.      LR-400 is the third party that purchased the Note, for which Somera is liable.

Para. 3(c) (continued) "or (c) to Provider's detriment"

5.      Taconic and LR-400 usurped Plaintiffs'/Debtors' opportunity to benefit from the "spread" of $3.65M described by Ross in Jt. Trial Ex. 134.

Para. 8(a) states "For a period of eighteen (18) months from the date of the applicable Schedule (unless provided otherwise in the applicable Schedule), Recipient agrees that it will not, directly or indirectly, without Provider's prior written consent, (a) enter into any oral or written agreement or arrangement of any kind for or in connection with a Proposed Transaction"

6.      The applicable period of time here is from March 6, 2017 to September 6, 2018. Somera had an "arrangement" with Taconic in connection with the Regions Center. (Jt. Trial Ex. 181)

7.      Somera entered into a written agreement with Taconic. (Jt. Trial Ex. 162)

8.      Taconic and its subsidiary LR-400 entered into written agreements with LNR and the Wells Fargo Trust.

Para. 8(b) "…initiate maintain or respond to any contact with the owner of the underlying property or any note secured thereby the underlying property relating to the Proposed Transaction, any obligor or borrower related to the Proposed Transaction, or any of the respective employees or representatives of the foregoing (except in the ordinary course of business unrelated to the Proposed Transaction),

9.      Somera retained Hart Advisors and/or Tanya Little to contact owners to discuss an "arrangement" regarding the Regions Center. (Jt. Trial Ex. 304)

10.     Somera actually did contact owners through Josh Garcia at Hart Advisors. (Jt. Trial Ex. 297)

11.    Taconic and Somera jointly contacted the owners of the Note secured by the Regions Center through Hart Associates.

Para. 8(c) "or (c) otherwise circumvent or undermine the Provider's opportunity with respect to the Proposed Transaction."

12.    Taconic circumvented and undermined Plaintiffs'/Debtors' opportunity by purchasing the Note from Wells Fargo Trust.

Para. 8(c)(continued) "Recipient will instruct its Representatives to similarly restrain themselves and act accordingly under this Section 8."

13.    Somera not only failed to instruct Taconic not to undermine Plaintiffs/Debtors, it assisted Taconic's circumvention.

**Breach of Contract (v. Taconic – Master Confidentiality Agreement)**

Plaintiffs/Debtors claim that Taconic bound by the terms of the 2017 MCA because Taconic and Somera engaged in a joint venture, and as such, each are partners capable of binding one another.

Plaintiffs/Debtors produced evidence that Defendants Somera and Taconic discussed The Regions Loan prior to Ian Ross contacting the Plaintiffs/Debtors through their counsel. On February 22, 2017, Ross emailed Jordan and stated, "Please reach out to LNR on this as discussed. Bankrupt TICs. Would they sell note?" At this time, Somera and Taconic were parties to their 2016 MCA.  They were already engaged in an ongoing business relationship centered around Somera finding distressed properties that the two companies could jointly acquire and develop.

1 hour and 24 minutes after Ross's email to Jordan, Somera's general counsel, Michael Fralin, emailed Mark Rubin and Ian Ross with an attachment called "Example Loan Modification LOI.docx."[13]  This document provides an example of deal term structuring suggested by Somera. However the metadata attached to this document, shows the attachment's author as Houdin Honarvar,

---

[13] The Fralin email reflects a time of 5:16 PM, but this is actually 6:16 PM as it was sent in response to an email from Ian Ross at 5:56 PM the same day.

Taconic's Deputy General Counsel.[14] It shows the document was created on February 22, 2017 at 6:11 PM and saved at 6:13 PM. The clear inference here is that Defendants Taconic and Somera were already working together on a plan to approach the Plaintiffs/Debtors to acquire the Note or some other interest in The Regions Center.

Two months later, on April 25, 2017, Defendants Somera and Taconic amended their Schedule to officially add the Regions Center to their 2016 MCA.

And on May 12, 2107, Defendants Somera and Taconic memorialized in wiring, via emails, the terms of their various joint ventures, including The Regions Center as a "Hybrid Transaction" showing the various splits of revenues from the prospective acquisition.

Under New York law, "the indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses. Richbell Info. Servs. v. Jupiter Partners, L.P., 309 A.D.2d 288, 298, 765 N.Y.S.2d 575, 584 (App. Div. 2003).

The intent of the parties, as one of the factors in determining whether a joint venture exists, may be express *or implied*. Mendelson v Feinman (143 A.D.2d 76, 531 N.Y.S.2d 326 [1988]).

A joint venture is defined as a "special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." (Schouler Pers. Prop. [5th ed.] § 167a.) It is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge. Forman v. Lumm, 214 A.D. 579, 583, 212 N.Y.S. 487, 490-91 (App. Div. 1925)

---

[14] As identified by James Jordan in his deposition at P. 90, L. 10-17.  Mr. Honarvar also was Taconic's signatory on the 2016 MCA with Somera.

It is well settled that "[a] joint venture ... is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership," and, as a result, it is proper to look to the Partnership Law to resolve disputes involving joint ventures. <u>Suffolk Cty. Water Auth. v. Hendrickson Bros., Inc.</u>, 2017 NY Slip Op 31224(U), ¶¶ 4-5 (Sup. Ct.).

In a joint venture, as in a partnership, either partner can bind the other, and is the agent for the other in conducting the business of the joint venture.

Regarding the relationship between Defendants Somera and Taconic, the Court finds as follows:

1. Defendants Taconic and Somera entered into a joint venture agreement regarding The Regions Center.

2. They associated to carry out a business enterprise for profit in connection with the Regions Center.

3. This is evidenced by the April 24, 2017 Schedule amendment to their August 2016 MCA.

4. In furtherance of this enterprise they each combined their property, money, effects, skill and knowledge.

5. This business enterprise continued through the date of the purchase of the Note by Taconic through its wholly owned and controlled subsidiary, LR 400 and continued well into this bankruptcy proceeding.

6. This ongoing enterprise is established by:

    a. Defendants Somera and Taconic's actions in concert in communicating with debtors through counsel (Jt. Trial Ex. 108, 155, 285, 286, 287, 296, 299, 330, 332, 333, 335, 895, 1438, 1658, 1702)

    b. Defendants Somera and Taconic's strategizing through the employees of both of these defendants and involving each of their respective in-house counsel as well as Taconic's bankruptcy counsel, Duane Morris in Delaware (Jt. Trial Ex. 101, 103, 105, 107, 110, 111, 112, 136, 137, 184, 187, 303, 327, 329,  ; and

    c. Defendants Somera and Taconic's continued breach the 2017 MCA by working in concert with Hart Advisors to directly contact and solicit the

> Debtors which is specifically prohibited by the 2017 MCA. (Jt. Trial Ex. 289, 290, 291, 292, 293, 294, 297, 298, 304, 338, 1701)

There is no evidence this joint venture was ever terminated. To the contrary, as co-defendants in this adversary, they have continued to work together, even though Somera clearly has legal rights of indemnification and cross-claims against Taconic for breach of the 2016 MCA.

As joint venturers, Somera's execution of the 2017 MCA bound itself and Taconic equally to all of the terms of that agreement.  As such, the court finds Taconic is equally liable and responsible for all damages resulting from each breach of that agreement despite the fact that Taconic neither signed the agreement or was even known to Plaintiffs/Debtors as a joint venture partner of Somera.

### UNJUST ENRICHMENT (V. TACONIC AND LR-400) – COUNT VII

This claim was pled in the alternative by the Plaintiffs/Debtors.

In Opus E., L.L.C. v. Opus, L.L.C.(In re Opus E., L.L.C.), 480 B.R. 561, 573-74 (Bankr. D. Del. 2012), this Court found that in Delaware, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  Citing Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010).

The elements of unjust enrichment include:

(1) an enrichment;
(2) an impoverishment;
(3) a relation between the enrichment and impoverishment;
(4) the absence of justification; and
(5) the absence of a remedy provided by law.

Id.

If there is a contract that governs the relationship of the parties, only the contract may provide the rights of the contracting parties.  In that case, a claim for unjust enrichment should be denied.  BAE Sys. Info. And Elec. Sys. Integration, Inc. v. Lockheed Martin Corp., C.A. No. 3099-VCN, 2009 Del. Ch. LEXIS 17, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

In this case, Defendant Taconic and its wholly controlled affiliate LR-400 purchased the Note from Defendant Wells. The evidence in this case is clear and convincing that Taconic, and therefore Defendant LR-400, violated the terms of the 2016 MCA between Defendants Somera and Taconic. Taconic circumvented Somera by contacting Defendant LNR to purchase the Note without the "papered" financial involvement of Somera. However, Somera is apparently fine with that circumvention, going so far as to congratulate Taconic immediately after the closing of the Note purchase.

And while Taconic is admittedly the "financing source" and "Representative" of Somera vis-à-vis Somera's 2017 MCA with Plaintiffs/Debtors, Taconic is not in express contractual privity with the Plaintiffs/Debtors.

But the evidence is also clear that Taconic knew of the existence of a non-circumvention arrangement between the Plaintiffs/Debtors and Somera, even if it was not provided a written copy of the 2017 MCA.  To be sure, Taconic knew all virtually all of the materials coming from Somera to vet and conduct due diligence on the Regions Loan came from the Plaintiffs/Debtors.  Most of the email transmissions from Somera to Taconic with the Plaintiffs'/Debtors' Confidential Information show the email trail including the originating source of the documents as coming from counsel for the Plaintiffs/Debtors. Additionally, Ian Ross explicitly advised Taconic's James Jordan about what he was learning from the Plaintiffs/Debtors counsel in nearly real time.

The Court concludes then, that Defendants Taconic and LR-400 knew they were benefitting from the Plaintiffs'/Debtors' Confidential Information, the use of which was restricted to evaluating a deal in which the Plaintiffs/Debtors participated in the acquisition of the Note.

Under these circumstances, the Court concludes that Defendants Taconic and LR-400 acquired the Note and the Claim through improper means making it unjust to allow Taconic and

LR-400 to profit from these bad acts.  This is what unjust enrichment under Delaware law is intended to remedy: "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."

Had Defendants Taconic and Somera complied with both the 2016 MCA and the 2017 MCA, the Plaintiffs/Debtors would have participated in the Note acquisition, and presumably would have exited bankruptcy in 2018 at the latest.  The Plaintiffs/Debtors would have shared in the benefits of the Note acquisition by reduced interest expense related to a reduced capitalization structure. They would not have been paying interest at over 6% on the original matured Note, as they have since the petition date. That interest is profit to Defendants Taconic and LR-400.

Accordingly, this Court concludes as a matter of law that Defendants Taconic and LR-400 cannot equitably retain any profit from their acquisition of the Note and the Regions Loan as that would reward those parties for their violations of the spirit and intent of the 2016 MCA and 2017 MCA, justifying such acts because they were not in express contractual privity with the Plaintiffs/Debtors.

Dated:  June 12, 2020

*/s/ Thomas J. Francella*  
Thomas J. Francella, Jr. (No. 3835)  
COZEN O'CONNOR  
1201 North Market Street, Suite 1001  
Wilmington, DE 19801  
(302) 295-2000  
Email:  tfrancella@cozen.com  

Guy B. Rubin, Esq.  
RUBIN & RUBIN, P.A.  
111 SE Osceola St., Suite 200  
Stuart, FL 34994  
Telephone: (772) 283-2004  
Facsimile: (772) 283-2009  
Email:  grubin@rubinandrubin.com  

95