## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NNN 400 CAPITOL CENTER 16, LLC, *et al.*,[1] | Case No. 16-12728 (JTD)<br>(Jointly Administered) |
| Debtors. | |

**Hrg. Date:  November 12, 2020 at 10:00 a.m.**
**Obj. Deadline: October 28, 2020 at 4:00 p.m.**

### SECURED CREDITOR'S MOTION TO CONVERT CHAPTER 11 CASES OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

Little Rock 400-West Capitol Trust, a Delaware statutory trust ("Secured Creditor"), by and through its undersigned counsel, hereby files this motion (the "Motion") respectfully requesting: i) the entry of an order in substantially the form attached hereto as **Exhibit A,** converting the above-captioned Chapter 11 cases to cases under Chapter 7, or in the alternative the entry of an order in substantially the form attached hereto as **Exhibit B**, granting Secured Creditor relief from the automatic stay to exercise its rights to its Collateral (as defined herein); and ii) granting related relief.  In support of this Motion, Secured Creditor asserts as follows.

---

[1] The debtors in these cases (collectively, the "Debtors") are: NNN 400 Capitol Center, LLC, Case No. 17-11250 (JTD); NNN 400 Capitol Center 1, LLC, Case No. 17-11251 (JTD); NNN 400 Capitol Center 2, LLC, Case No. 16-12741 (JTD); NNN 400 Capitol Center 3, LLC, Case No. 16- 12750 (JTD); NNN 400 Capitol Center 4, LLC, Case No. 16-12752 (JTD); NNN 400 Capitol Center 5, LLC, Case No. 16-12753 (JTD); NNN 400 Capitol Center 6, LLC, Case No. 16-12754 (JTD); NNN 400 Capitol Center 7, LLC, Case No. 17-11253 (JTD); NNN 400 Capitol Center 8, LLC, Case No. 17-11254 (JTD); NNN 400 Capitol Center 9, LLC, Case No. 16-12755 (JTD); NNN 400 Capitol Center 10, LLC, Case No. 16-12730 (JTD); NNN 400 Capitol Center 11, LLC, Case No. 16-12731 (JTD); NNN 400 Capitol Center 12, LLC, Case No. 16-12732 (JTD); NNN 400 Capitol Center 13, LLC, Case No. 16-12733 (JTD); NNN 400 Capitol Center 14, LLC, Case No. 16-12735 (JTD); NNN 400 Capitol Center 15, LLC, Case No. 16-12736 (JTD); NNN 400 Capitol Center 16, LLC, Case No. 16-12728 (JTD); NNN 400 Capitol Center 17, LLC, Case No. 16-12737 (JTD); NNN 400 Capitol Center 18, LLC, Case No. 16-12738 (JTD); NNN 400 Capitol Center 19, LLC, Case No. 16-12739 (JTD); NNN 400 Capitol Center 20, LLC, Case No. 16-12742 (JTD); NNN 400 Capitol Center 21, LLC, Case No. 16-12743 (JTD); NNN 400 Capitol Center 22, LLC, Case No. 16-12744 (JTD); NNN 400 Capitol Center 24, LLC, Case No. 16-12746 (JTD); NNN 400 Capitol Center 25, LLC, Case No. 17-11258 (JTD); NNN 400 Capitol Center 26, LLC, Case No. 16-12747 (JTD); NNN 400 Capitol Center 27, LLC, Case No. 16-12748 (JTD); NNN 400 Capitol Center 28, LLC, Case No. 16-12749 (JTD); NNN 400 Capitol Center 30, LLC, Case No. 17-11255 (JTD); NNN 400 Capitol Center 32, LLC, Case No. 16-12751 (JTD); NNN 400 Capitol Center 35, LLC, Case No. 17-11256 (JTD); and NNN 400 Capitol Center 36, LLC, Case No. 17-11257 (JTD).

## I.  **SUMMARY OF ARGUMENTS**

These administratively insolvent, single asset real estate Chapter 11 cases should be converted to Chapter 7 cases.  Conversion is appropriate because "cause" is demonstrated in many *separate and independent* ways pursuant to section 1112(b).

- **Section 1112(b)(1)**: Conversion is appropriate because of Debtors' administrative insolvency.  Specifically, Debtors are not paying their administrative claims as they become due, and there are no unencumbered assets from which to pay those claims.

- **Section 1112(b)(4)(A)**: Conversion is appropriate because Debtors' appeal of the judgment on their baseless Adversary Proceeding claims (collectively, the "Debtors' Baseless Claims") creates a substantial or continuing loss to, or diminution of, Debtors' estates (the "Estates").  Further, there is an absence of a reasonable likelihood of rehabilitation, which would still exist even if those claims had merit (which they do not).

- **Section 1112(b)(4)(B)**: Conversion is appropriate given Debtors' substantial gross mismanagement of the Estates by, among other ways, committing numerous substantial breaches of fiduciary duty.[2]  Debtors' fiduciary breaches include:

  - Debtors' initiation and continued prosecution of the Adversary Proceeding which Debtors knew to be baseless when it was filed;[3]

  - Debtors' willful and intentional misrepresentations to the Court about the supposed merit of Debtor's Baseless Claims, which substantially delayed and derailed the confirmation of Secured Creditor's Plan;[4] and

---

[2] Breach of a fiduciary duty is subsumed within the "gross mismanagement" factor in section 1112(b)(4)(B) of the Bankruptcy Code.  *See, e.g.*, *In re Builders Grp. & Dev. Corp.*, No. 13-04867 (ESL), 2014 Bankr. LEXIS 2092, at *19-20 (Bankr. D.P.R. May 8, 2014) (debtor's breach of fiduciary duties constituted "gross mismanagement" of the debtor's estate pursuant to ¶ 1112(b)(4)).

[3] *See The Lender Defendants' Motion for 28 U.S.C. § 1927 Sanctions Against Rubin & Rubin, P.A. And Its Attorneys Mark and Guy Rubin*, Docket No. 662 and *Lender Defendants' Opening Brief In Support Of Their Motion for 28 U.S.C. § 1927 Sanctions Against Rubin & Rubin, P.A. And Its Attorneys Mark and Guy Rubin*, Docket No. 663 (collectively, the "1927 Motion"), which are both incorporated in their entirety herein by reference.  Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the pleadings filed of record in this case.  *See* Fed. R. Evid. 201(b); *see also Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("[C]ourts may take judicial notice of filings or developments in related proceedings … A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute … [and] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.")

[4] Ironically, Secured Creditor's Plan would have paid all allowed claims in full while also permitting Debtors' Baseless Claims to be prosecuted after the sale of the Property. *See* Articles III and V of Secured Creditor's Plan.

- o Debtors' failure to investigate, preserve, protect and pursue the Estates' significant claims against third parties.

- **Section 1112(b)(4)(D)**: Conversion is appropriate because Debtors have engaged in the unlawful and unauthorized use of cash collateral to the detriment of Secured Creditor.

Alternatively, the Court should grant Secured Creditor relief from the automatic stay to allow it to foreclose on its Collateral pursuant to sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code for the following reasons:[5]

- Stay relief should be granted under section 362(d)(1) for "cause" for *all of the above reasons* because "cause" under 1112(b) also constitutes "cause" to grant relief from the automatic stay pursuant to section 362(d)(1);

- "Cause" also exists because the significant erosion of the "equity cushion" in the Property[6] has left Secured Creditor without adequate protection; and

- Stay relief should be granted under section 362(d)(2) because: i) there is no equity in the Property beyond Secured Creditor's fully secured claim; and ii) the Property is not necessary to Debtors' effective reorganization.

## II.   **JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this Motion pursuant to: i) 28 U.S.C. §§ 157 and 1334; and ii) the February 29, 2012 *Amended Standing Order of Reference from the United States District Court for the District of Delaware.*

2.      Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409 because this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).

---

[5] Unless otherwise noted herein, all statutory references are to specific sections of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

[6] An updated appraisal of the Property is attached hereto as **Exhibit C**. The appraised value of the Property is $31,460,000, *i.e.,* substantially less than the current value of Secured Creditor's $41,815,276.33 claim.

3.      Bankruptcy Code sections 105, 361, 362 and 1112 and Rules 1019 and 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") are the statutory and legal predicates for the relief requested herein.

4.      Pursuant to Local Rule 9013-1(f) of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Delaware, Secured Creditor consents to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment on this Motion consistent with Article III of the United States Constitution.

## III.      **RELEVANT FACTUAL BACKGROUND**

### A.      **The Loan And Secured Creditor's Collateral**

5.      Secured Creditor is the holder of a promissory note dated August 18, 2006 in the original amount of $32,000,000.00 (the "<u>Promissory Note</u>"). The promissory note evidences a $32 million loan (the "<u>Loan</u>") that matured on September 1, 2016. *See* Lender Defendants' Proposed Findings of Fact and Conclusions of Law filed in the Adversary Proceeding (as defined herein) at Docket No. 713 ("<u>Findings of Fact</u>"), ¶¶ 8, 22-24, inclusive, 36(a); 1927 Motion, ¶ 10.

6.      Each debtor is jointly and severally liable for the Loan obligation.  Findings of Fact, ¶ 8 and 36(b).[7]

7.      Debtors' Loan obligations are secured by the collateral pledged in an August 18, 2006 Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "<u>Mortgage</u>").  *See* Findings of Fact ¶ 34. The Mortgage was recorded in the real estate records of

---

[7] Debtors committed various other defaults under the Loan Documents.  Secured Creditor's reference to less than all of Debtors' defaults is not intended to be a waiver of any such defaults.

Pulaski County, Arkansas on December 1, 2006 as document number 2006093855.[8] *See id.* (citing J-1590 (the Mortgage)).

8.      The Mortgage encumbers, *inter alia*, a commercial office building known as the Regions Center located at 400 West Capitol Avenue, Little Rock, Arkansas 72201 (the "<u>Property</u>")[9] and *all cash related to and/or generated by the Property*, including, but not limited to, rents and other income generated by the Property (collectively, the "<u>Cash Collateral</u>" and together with the Property and all other collateral identified in the Loan Documents including the Mortgage, and UCC Financing Statements, the "<u>Collateral</u>").   *See* J-1590 (the Mortgage), § 1.1 ("Property Mortgaged").

**B.      The Chapter 11 Cases**

9.      On December 9, 2016 (the "<u>Petition Date</u>"), twenty-four (24) of Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.   *See* Findings of Fact at ¶ 151.

10.      On June 5, 2017, the remaining eight (8) Debtors filed voluntary petitions.   *See id.* at ¶ 154.

11.      Debtors' Chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") are jointly administered under Case No. 16-12728-JTD. *See* Docket Nos.[10] 38 and 183.

12.      No statutory committee has been appointed.   As of the date of this filing, Debtors are "debtors in possession" within the meaning of section 1107(a).

---

[8] The Mortgage and Promissory Note, together with any and all other agreements, documents or instruments executed at any time in connection with the Loan or any of the foregoing, as the same may have been amended, restated or otherwise modified from time to time, are referred to herein as the "<u>Loan Documents</u>."

[9] As noted herein, this is a single asset real estate case within the definition of 11 U.S.C. § 101(51)(B).

[10] Unless otherwise stated, references to docket numbers herein shall refer to docket numbers in the Chapter 11 Cases (filed in Case No. 16-12728-JTD).

1.      **Secured Creditor's Claim**

13.      On April 27, 2017, Wells Fargo Bank, N.A. as Trustee for the Registered Holders of COMM 2006-C8 Commercial Mortgage Pass-Through Certificates ("Prior Lender") filed a claim against each of the Debtors.  *See* Claims Register at Claim No. 5 (the "Claim").

14.      In the Claim, Prior Lender asserted a secured claim against each of the Debtors in the amount of approximately $32.2 million, exclusive of certain funds held either in escrow or reserve, with the sum of $30,060,292.79 being the unpaid principal balance due and owing under the Note.  *See id*.

15.      Secured Creditor subsequently purchased the Loan and Note from Prior Lender. *See* Docket No. 602 (the Court's August 10, 2020 Findings of Fact and Conclusions of Law (the "August 10 Findings of Fact")), at P. 4.

16.      On April 16, 2018, Debtors' filed their *Objection to Claim No. 5, asserted by Little Rock 400 West Capitol Trust, as Successor in Interest to Wells Fargo Bank, N.A., as Trustee.* Docket No. 278 (the "Claim Objection").

17.      Debtors' counsel and Secured Creditor's counsel agreed that the Claim Objection would be consolidated with the trial of Adversary Proceeding claims.  *See Stipulation Between Debtors and Little Rock-400 West Capitol Trust to Consolidate Adversary Proceeding and Debtors' Objection to Claim No. 5.*  Docket No. 354 (the "Consolidation Stipulation"); *see also* Docket No. 355 (Order approving the Consolidation Stipulation).

2.      **Cash Collateral Orders**

18.      Debtors have not obtained any debtor-in-possession financing during the pendency of the Chapter 11 Cases.  Instead, Debtors have funded their operations exclusively with Secured Creditor's Cash Collateral. *See* Docket Nos. 43, 120, 187, 211, 221, 223, 250, 267, and 289 (each an "Interim Cash Collateral Order" and, collectively, the "Prior Interim Cash Collateral Orders").

19.     Each Interim Cash Collateral Order expressly provided that Cash Collateral:

> shall not, directly or indirectly, be used to pay administrative expenses of the Debtors and or their estates except for those operating and other expenses . . . that are set forth in the Interim Budget or with the prior written consent of the Secured Creditor."

Prior Interim Cash Collateral Orders at ¶ 7.

20.     The Prior Interim Cash Collateral Orders also limited Debtors' ability to use Cash Collateral to fund any challenge to, or take any adverse action against, Secured Creditor's interests. *Id.* at ¶ 8.

21.     Debtors continue to use (and misuse) the Cash Collateral even though the most recent Interim Cash Collateral Order expired on September 30, 2018. *See* Docket No. 289 at ¶ 3.

22.     Moreover, Debtors violated the Prior Interim Cash Collateral Orders (and disregarded Debtors' own proposed budgets) by using at least $100,000 of Secured Creditor's Cash Collateral to pay Adversary Proceeding expenses. The improper Adversary Proceeding expense payments are identified on attached **Exhibit D**.[11]

23.     Notably, and as shown in Exhibit D, Debtors continued to use Cash Collateral to fund the improper Adversary Proceeding expense payments notwithstanding Secured Creditor's Counsels' written requests that Debtors refrain doing so.[12]

### 3.    Retention Applications

24.     On December 20, 2016, Debtors filed their *Application for Entry of an Order Authorizing the Retention and Employment of Whiteford, Taylor & Preston, LLC as Counsel to*

---

[11] The unauthorized expenses detailed in Exhibit D are those that are obvious from the monthly operating reports. There may well be other unauthorized expenses. Secured Creditor therefore reserves all rights with respect to same.

[12] True and correct copies of counsel's e-mails are attached hereto, collectively, as Exhibit E.

the Debtors, Nunc Pro Tunc, to the Petition Date at Docket No. 26 (the "Whiteford Taylor Retention Application").[13]

25.     On August 2, 2018, Debtors filed their *Application for Entry of an Order Authorizing the Retention and Employment of Cozen & O'Connor as Counsel to the Debtors, Nunc Pro Tunc, to July 9, 2018* at Docket No. 285 (the "Cozen Retention Application").[14]

26.     On September 28, 2020, Debtors filed their *Motion for Entry of an Order (I) Authorizing the Debtors to (A) Employ and Retain Force Ten Partners, LLC to Provide the Debtors with a Chief Restructuring Offer, and (B) Designate Jeremy Rosenthal as Chief Restructuring Officer, and (II) Granting Related Relief* at Docket No. 660 (the "CRO Motion"). The CRO Motion seeks, among other things, the authorization to employ Jeremy Rosenthal of Force 10 Partners, LLC, as Debtors' Chief Restructuring Officer.  In footnote 5 of the CRO Motion, Debtors confirm that Cozen and O'Connor agreed to subordinate a substantial portion of their pre-September 25, 2020 fees, and all of their post-September 25, 2020 fees, to any fees to be awarded to Force Ten Partners, LLC and/or Mr. Rosenthal.[15]

### 4.     The Plans

27.     On January 22, 2018, Debtors filed their Joint Plan of Reorganization (the "Debtors' Plan").  Docket No. 243.

28.     On March 16, 2018, Debtors filed their First Amended Joint Plan of Reorganization (the "First Amended Plan").  Docket No. 260.

---

[13]This Court approved the Whiteford Taylor Retention Application on March 11, 2017.  *See* Docket No. 117.

[14]This Court approved the Cozen Retention Application.  *See* Docket No. 285.

[15] Secured Creditor will file its objection to the CRO Motion pursuant to the briefing schedule agreed to by the parties.

29.     On September 7, 2018, Debtors filed their Second Amended Joint Plan of Reorganization (the "Second Amended Plan"). Docket No. 296.

30.     Debtors did not proceed to confirmation on any of these plans.

31.     All of Debtors' plans: i) were contingent on a future re-financing of the Property subject to the outcome of the Adversary Proceeding; and ii) required the Property to be sold if Debtors did not prevail on the Adversary Proceeding.  *See, e.g.*, Debtors' Plan, Art. V, First Amended Plan, Art. V., Second Amended Plan, Art. V.

32.     On December 20, 2018, Secured Creditor filed its First Plan of Reorganization for NNN Capital Center 16, LLC, et al. Proposed by Little Rock-400 West Capitol Trust (the "Secured Creditor's Plan"). Docket No. 343.

33.     The Property was to be sold under Secured Creditor's Plan.  *See id*.  Upon sale, the Plan Administrator (as defined in Secured Creditor's Plan) was to pay all allowed administrative claims, all allowed priority claims, all allowed non-priority claims and all allowed unsecured claims.  *See id*.

34.     Despite providing for full payment to all creditors holding allowed claims, Debtors obtained a stay of confirmation of Secured Creditor's Plan pending the outcome of the baseless Adversary Proceeding.  *See* Docket No. 375.

### C.     The Adversary Proceeding

35.     Debtors sought and obtained approval from this Court to have Rubin and Rubin, P.A. appointed as their Special Counsel.  *See* Docket No. 116.

36.     On April 13, 2018, Debtors initiated Adversary Proceeding No. 18-50384-JTD (the "Adversary Proceeding") against Secured Creditor and others.  *See* Adversary Proceeding Docket No. 1.

37.    As set forth more fully in the 1927 Motion, Debtors' original complaint asserted nine claims against Secured Creditor and other lender defendants (collectively the "Lender Defendants"). *See* 1927 Motion at ¶ 34.

38.    On June 25, 2018, Somera Road Inc. ("Somera"), one of the defendants named in the Adversary Proceeding, filed a motion to dismiss. *See* Adversary Proceeding Docket Nos. 17-18. The remaining defendants (the "Defendants") filed a motion to dismiss along with a brief in support thereof on June 29, 2018. *See* Adversary Proceeding Docket Nos. 20-21.

39.    Debtors subsequently filed a First Amended Complaint on July 20, 2018.[16] Adversary Proceeding Docket No. 24;[17] *see also* 1927 Motion at ¶¶ 37-38.

40.    Defendants moved to dismiss the First Amended Complaint.    Adversary Proceeding Docket Nos. 32-33 (collectively, the "Defendants' Motion to Dismiss").[18]  Defendants asserted that: i) there was a waiver provision contained in the Loan Documents which barred the assertion of virtually all of the claims brought in the Adversary Proceeding; ii)  Debtors/Plaintiffs failed to plead the requisite elements of each of the claims asserted in the Amended Complaint; and iii) Debtors/Plaintiffs failed to suffer any harm as a result of Defendants' actions or inactions.

---

[16] Debtors filed a Second Amended Complaint on September 5, 2019.  See Adversary Proceeding Docket No. 268.

[17] As set forth in ¶ 3 of the 1927 Motion, the core of the Adversary Proceeding was that Lender Defendants intentionally interfered with Debtors' ability to refinance the Property before and after the maturity date.  Specifically, Debtors alleged in Counts I, II, III, IV, and IX of the original complaint that Lender Defendants supposedly: (1) prevented Calmwater Capital ("Calmwater") from closing on a refinancing on the specific date of Friday, September 30, 2016 (J-906 ¶¶ 52-55); (2) prevented Debtors from refinancing their Loan with UBS before and after the Loan's maturity date (J-906 ¶¶ 44-52); (3) caused a potential Property tenant, the Mitchell Williams law firm ("Mitchell Williams") to terminate its lease (J-906, ¶ ¶ 53-55); and (4) caused Debtors harm in connection with various lease, property manager, and reimbursement approval requests (J-906 ¶¶ 32-43) (Counts I, II, III, IV, and IX collectively, the "Loan Claims").

[18] Somera also filed a motion to dismiss the First Amended Complaint.  *See* Adversary Proceeding Docket Nos. 34-35.

41.    By Memorandum and Opinion dated October 4, 2018, the Court denied Defendants' Motion to Dismiss and found that "[t]he allegations in the Amended Complaints are detailed and state claims. ***Plaintiffs will at some point have to prove their allegations by a preponderance of the evidence. Whether the facts alleged will lead to Plaintiffs' recovery is far from resolved on the occasion of a motion to dismiss."*** Adv. Docket No. 64, at P. 14 (emphasis added).

42.    Despite the Court's admonition, Debtors failed to prove the Loan Claims at trial. Moreover, Debtors' attorney Mark Rubin's *pre-lawsuit written admissions* and his trial testimony about the pre-lawsuit events prove that Mark Rubin knew the Loan Claims were baseless *before the Adversary Proceeding was filed*. *See* Findings of Fact at ¶¶ 49-238, 315, and 327.

43.    For example, Debtors knew at the time they filed the Adversary Proceeding that: (1) Calmwater never agreed to close any loan on September 30, 2016 and that no loan could possibly have closed on September 30, 2016 notwithstanding any alleged act or omission by any of the Lender Defendants (Findings of Fact at ¶¶ 94-96); (2) the UBS loan did not close for reasons that had absolutely nothing to do with the Lender Defendants (and in fact Debtors signed a stipulation to this effect just a few weeks before trial) (*see* Adversary Proceeding Docket No. 399; *see also* Findings of Fact at ¶¶ 84-87); (3) Mitchell Williams terminated its lease for reasons that had absolutely nothing to do with the Lender Defendants (Findings of Fact at ¶¶ 114-48); and (4) the requests at issue relating to leases and property manager and reimbursement approvals had no impact at all on Debtors' ability to refinance the loan or on the Mitchell Williams lease (Findings of Fact at ¶¶ 155-238).

44.    While the Adversary Proceeding was ongoing, Debtors sought (and obtained) a stay of confirmation of Secured Creditor's Plan pending the conclusion of the meritless Adversary

Proceeding. *See* February 28, 2019 Order at Docket No. 375 (the "Scheduling Order"). Debtors improperly obtained that stay by misrepresenting the supposed "strength" of the very claims that the Defendants knew to be baseless.[19]

45.   The Court held a six-day trial on liability in the Adversary Proceeding from December 9, 2019 through December 13, 2019, and on January 24, 2020 (the "Trial").[20]  *See* Adversary Proceeding Docket Nos. 513, 521, 526, 531, 535, 559.

46.   On August 10, 2020, the Court issued the August 10 Findings of Fact [Docket No. 602] and entered a Final Judgment (the "Final Judgment")[21] [Docket No. 603] in the Defendants' favor on every claim in the Second Amended Complaint other than Count V (which the Court found was moot and which addressed only the recoverability of a late fee and not any claim for damages against Lender Defendants).  (Adversary Proceeding Docket Nos. 785, 786.)

47.   Debtors appealed the entry of the Final Judgment to the United States District Court for the District of Delaware (the "District Court"), thereby commencing Civil Action Nos. 1:20-

---

[19] On February 27, 2019, Judge Gross asked Debtors' counsel why the Adversary Proceeding was not filed earlier. Debtors counsel explained that a lot of time was lost by the parties engaging in a mediation with then Judge Kevin Carey and that since the conclusion of the mediation, Debtors "learned a lot of things that [the named defendants in the Adversary Proceeding have] done that we allege were tortious to our clients."  Transcript of February 27, 2019 Status Conference, Docket No. 378 (the "February 27, 2019 Transcript"), at 27:19-21. In truth, at that time, Debtors knew: i) that there was no evidence to support their claims; and ii) that the actual evidence *affirmatively contradicted their claims*.  *See* Findings of Fact at ¶¶ 49-238, 315, and 327

[20] The parties agreed to bifurcate the Trial into liability and damages.  *See* Adversary Proceeding Docket No. 428 at ¶ 17.  Secured Creditor prevailed on liability thereby mooting a damages trial.

[21] Prior to the entry of the Final Judgment, the United States Trustee's Office filed a Motion to Revoke or Terminate the Retention of Rubin and Rubin, P.A. [Docket No. 446] (the "Disqualification Motion").  By Memorandum and Opinion dated September 4, 2020 [Docket No. 635] (the "Disqualification Order"), this Court granted the Disqualification Motion and, among other things, ordered the disqualification of Rubin and Rubin, P.A. ("Rubin and Rubin") from acting as Debtors' counsel; ordered the disgorgement of any fees previously paid by Debtors to Rubin and Rubin; and ordered Rubin and Rubin to reimburse the Estates for monies previously paid to a third party.  On September 18, 2020, Rubin and Rubin appealed the Disqualification Order. *See* Docket No. 644.  On information and belief, despite the express terms and conditions of the Disqualification Order, Rubin and Rubin have not yet disgorged any of the fees previously paid to them by Debtors.

cv-0180-CFC, 1:20-cv-0181-CFC, and 1:20-cv-0182-CFC (collectively, the "District Court Actions").

48.     On September 18, 2020, Secured Creditor filed its *Rule 54 Motion for Attorneys' Fees and Expenses Pursuant to the Loan Agreement and, in the Alternative, in Support of Taxable Costs* ("Rule 54 Motion") seeking, among other, things, an award of fees and costs incurred in connection with the Adversary Proceeding. Adversary Proceeding Docket No. 800.

49.     On October 1, 2020, the Lender Defendants filed the 1927 Motion.  Docket Nos. 662-663.

## IV.    ARGUMENT

### A.    Legal Authorities Relevant To *§ 1112(b)*

50.     A party in interest may seek the conversion or dismissal of a Chapter 11 case pursuant to section 1112(b).  "***The purpose of § 1112(b) [of the Bankruptcy Code] is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation***." *See Loop v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)) (emphasis added).

51.     In determining whether to convert a bankruptcy case, courts conduct a two-step analysis "in which the court first determines whether there is 'cause' to convert or dismiss, and next chooses between conversion or dismissal based on the 'best interest of creditors and the estate.'" *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (affirming conversion of Chapter 11 case where proposed plan was not feasible nor made in good faith); *see also In re Korn*, No. 14–13138, 2014 WL 7211293, at *7 (Bankr. E.D. Pa. Dec. 18, 2014) (finding that conversion was in the best interests of the creditors); *Nester v. Gateway Access Solutions, Inc. (In*

*re Gateway Access Solutions, Inc.*), 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007) (finding cause based on gross mismanagement of debtor).

52.     Section 1112(b) provides a non-exhaustive list of that which may constitute cause for conversion or dismissal.  *See* 11 U.S.C. section 1112(b)(4).[22]  Some of those examples are: i) the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; ii) the "gross mismanagement of the estate"; and iii) the unauthorized use of cash collateral substantially harmful to 1 or more creditors."  *See In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991); *see also NuGelt,* 142 B.R. at 665.  Importantly, *the satisfaction of any one of these factors "is sufficient to show cause."*  *See Loop*, 379 F.3d at 514, n.2 (emphasis in quotation added).

53.     Once the movant demonstrates by a preponderance of the evidence that even a single demonstration of "cause" exists for either conversion or dismissal of a Chapter 11 case, the burden shifts to the debtor to demonstrate why dismissal or conversion would not be in the best interests of the estate.  *See, e.g.*, *Korn*, 2014 WL 7211293, at *7.  Dismissal or conversion is mandatory (*i.e.*, not discretionary) absent a debtor's demonstration that dismissal or conversion is not in the best interests of the estate.  *See Gateway Access*, 374 B.R. at 560 (citations omitted).

**B.     Multiple Separate and Independent Demonstrations Of Cause Exist To Convert These Cases Pursuant To Section 1112(b)**

54.     Secured Creditor needs only to demonstrate one example of "cause" to warrant the conversion of these Chapter 11 Cases and to appoint a Chapter 7 trustee.  Nonetheless, and to

---

[22] *See Matter of NuGelt, Inc.*, 142 B.R. 661, 665 (Bankr. D. Del. 1992); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1112.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  A court may also convert a case for reasons that are not expressly enumerated in section 1112(b)(4). Secured Creditor is therefore seeking conversion under the expressly enumerated provisions in section 1112(b)(4), and also under the Court's power to convert for other reasons such as administrative insolvency.

underscore that conversion is more than appropriate in these circumstances, Secured Creditor can demonstrate numerous separate and independent examples of "cause."

### 1.    Debtors' Administrative Insolvency Supports Conversion Pursuant To 1112(b)

55.    Administrative insolvency is a basis for establishing "cause" under section 1112(b)(4). *See In re BHS&B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) (finding administrative insolvency constitutes "cause" to convert Chapter 11 cases); *In re JER/Jameson Mezz Borrower, II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) (finding it "inappropriate" to permit an administratively insolvent debtor to remain in Chapter 11); *See also Hassen Imps. P'ship v. City of W. Covina (In re Hassen Imps. P'ship)*, 13-1019, 2013 Bankr. LEXIS 3870, *40 (9th Cir. BAP June 20, 2013) (upholding bankruptcy court's finding that administrative insolvency constituted cause for dismissal pursuant to § 1112(b)).

56.    In *BHS&B Holdings*, *supra,* a secured creditor had a blanket lien on all of the debtors' assets and there were no unencumbered assets.  Further, the administrative claims were not being paid.  Based on these facts, the United States Trustee moved to convert the debtors' Chapter 11 bankruptcy cases to cases proceeding under Chapter 7.  The court granted that motion and in so doing noted that "if [the] cases were to proceed in chapter 11, there is no doubt that the amount of unpaid professional fees would continue to grow."  *BHS&B Holdings*, 439 B.R. at 349. Id.; *see also, Hassen Imps. P'ship,* 2013 Bankr. LEXIS 3870 *41 (finding cause existed to convert the case due to $2 million of unpaid administrative claims).

57.    As in *BHS&B Holdings,* Debtors are administratively insolvent because they are not paying their administrative claims as they become due.  *See supra*, §§ III.B.2 & III.B.3. Further, there are no additional assets which can be monetized to pay the ongoing administrative

expenses associated with these Chapter 11 Cases because all of Debtors' assets are part of Secured Creditor's Collateral.[23]

58.     For example, Debtors' former § 327(a) counsel, Whiteford Taylor and Preston, LLP, has obtained several interim fee orders from this Court[24] which still have not been paid in full.  Indeed, Whiteford Taylor and Preston is still owed in excess of $632,000.00. *See* Docket No. 237.

59.     Further, despite having been retained as of July 9, 2018, Debtors' current § 327(a) counsel, Cozen O'Connor, has only filed one fee application in which it sought $76,791.25 in fees and costs [Docket No. 321], and which was approved on an interim basis.  *See* Docket No. 339. Upon information and belief, the amount awarded based on the initial interim fee application remains outstanding, and Cozen O'Connor has subsequently spent hundreds, if not thousands, of hours on these Chapter 11 Cases (including, time incurred in serving as local counsel in the Adversary Proceeding).[25]

60.     Finally, Debtors' counsel has agreed to subordinate a substantial amount of its pre-September 25, 2020 fees and costs to the proposed CRO and all of its fees and costs incurred after September 25, 2020.   Simply put, this subordination is only necessary because Debtors are administratively insolvent.  *See supra* ¶ 26.

---

[23] *See, e.g.,* Paragraph 3 of the *December 22, 2016 Interim Order: (A) Authorizing Debtors Use Of Cash Collateral On An Interim Basis; (B) Granting Adequate Protection; (C) Modifying The Automatic Stay Pursuant to 11 U.S.C. § 362; and (D) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001* filed on December 22, 2016 at Docket No. 43.

[24] *See* Docket Nos. 200 and 237.

[25] Secured Creditor's reference to Cozen O'Connor's hours is not an admission that those hours were spent on appropriate activities, were otherwise proper, or conferred a benefit upon these Estates.  Accordingly, Secured Creditor reserves all of its rights with respect to those hours, including but not limited to its ability to object to any fee applications filed by Debtors' counsel.

61.     Given the unpaid administrative expense claims coupled with the lack of unencumbered assets, Debtors cannot reasonably dispute that they are administratively insolvent. This Court should therefore convert these cases for this reason alone.

> **2.     Debtors Have Caused Continuing Loss To Or Diminution Of The Estates**

>> **a.     Debtors' Track Record Of Suffering Losses Constitutes "Cause"**

62.     "Cause" can be demonstrated under 1112(b)(4)(A) by showing "continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *Gateway Access*, 374 B.R. at 562.  In evaluating these factors, courts "must [first] look at the track record of the Debtor to determine if it is suffering losses or making gains."[26]  *Id.*  The court then "must determine whether rehabilitation is likely given the evidence presented at the hearing."  *Id.*

63.     Here, the Property is Debtors' primary asset and its value has significantly declined. Thus, Debtors' "track record" during the course of these Chapter 11 Cases demonstrates that the Estates are suffering losses, and most certainly are not making gains. Conversion is therefore appropriate.

>> **b.     Debtors' Filing And Pursuit Of Baseless Claims Constitutes "Cause"**

64.     Debtors filed and prosecuted Debtors' Baseless Claims when they knew that they were not legally or factually warranted.  In so doing, the Estates incurred millions of dollars in fees and costs and otherwise engaged in a multi-year frolic that resulted in Debtors losing on every single count set forth in the Second Amended Complaint (other than Count V which the Court

---

[26] This "part of the analysis focuses on whether a debtor has suffered negative cash flows or declining asset values post-petition."  *See In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 713-14 (Bankr. D. Md. 2011).

found was moot and which addressed only the recoverability of a late fee and not any claim for damages against the Lender Defendants).[27]  *See supra* § III.C.

65.     Worse yet, Debtors have now continued that expensive, extended, four-year frolic by appealing the Final Judgment which will necessarily result in more extensive delays and costs. Those costs will include interest at the default rate which the Court awarded Secured Creditor in the Final Judgment which is accruing at over $3,500.00 per day.[28]  *See Final Judgment.*

66.     These facts demonstrate "cause" under section 1112(b)(4)(A).  *See Rand v. Porsche Fin. Servs. Inc.*, *(In re Rand)*, No. 10-1160, 2010 WL 6259960 (9th Cir. BAP Dec. 7, 2010) (finding "cause" where the debtor's estate incurred substantial delay and costs which it would not have otherwise incurred but for the pursuit of a meritless litigation).

67.     In *Rand*, the court found that "Debtors' estate [*sic*] was subject to continuing loss from their commitment to the pursuit of multiple state court claims, which provided no benefit to the estate."  *Id*. at *4.  The court held that "cause" was demonstrated and specifically found that "***because the chapter 11 proceedings have been delayed over two years to allow Debtors to unsuccessfully pursue state court litigation, significant administrative fees and costs have been expended that otherwise could have been utilized to satisfy Debtors' obligations to creditors***." *Id*. (emphasis added).  *See also In re FRGR Managing Member, LLC*, 419 B.R. 576, 580 (Bankr. S. D. N.Y. 2009).[29]

---

[27] *See Final Judgment; see also* 1927 Motion at ¶ 41.

[28] During the pendency of the Chapter 11 Cases, interest at the default rate has continued to accrue and Debtors currently owe Secured Creditor, among other amounts, in excess of $5 million in interest at the default rate.

[29] In *FRGR*, the United States Trustee filed a motion to convert or dismiss pursuant to section 1112(b).  As in these Chapter 11 cases, the *FRGR* Debtor: i) filed for bankruptcy to prevent a foreclosure sale of real property that secured the debtor's obligations to its lender; and ii) sued the lender during the course of the bankruptcy case. The court ordered conversion after finding that the "lynchpin" of the Debtor's reorganization plan was "highly speculative" litigation claims against the lender. *FRGR*, 419 B.R. at 579.  In reaching that ruling, the court confirmed that "[a]ll creditors are entitled to a fair opportunity to recover on their claims, but engaging in litigation in multiple forums—

68.     In this case, the Adversary Proceeding was not just "highly speculative," it was

frivolous.  *See supra* § III.C; *see also* 1927 Motion.  Thus, Debtors' pursuit of the Adversary

Proceeding: i) substantially delayed the progress of these Chapter 11 Cases; ii) substantially

increased the administrative costs incurred in these Chapter 11 Cases; iii) substantially increased

Secured Creditor's claim; and iv) substantially increased the loss or diminution of these Estates.[30]

All of this is to the significant detriment of the Estates and their creditors.  Thus, "cause" has been

demonstrated and these Chapter 11 Cases cry "out for an independent trustee to carefully evaluate

Debtor's claims or defenses."  *FRGR Managing Member*, 419 B.R. at 579-80.

### 3.     "Cause" Exists Because There Is An Absence Of A Reasonable Likelihood Of Rehabilitation

#### a.     Conversion Is Appropriate Because Debtors Cannot Reorganize

69.     Under section 1112(b)(4)(A), if a reorganization is no longer realistic, then there is

no reasonable likelihood of rehabilitation.  *See In re The AdBrite Corp*, 290 B.R. 209, 215 (Bankr.

S.D.N.Y. 2003); *Gateway Access,* 374 B.R. at 562-63; *In re Tolco Properties, Inc.*, 6 B.R. 482,

488 (Bankr. E.D. Va. 1980) (converting to Chapter 7 after finding no reasonable likelihood of

rehabilitation); *see also Matter of E. Paul Kovacs and Co., Inc.*, 16 B.R. 203, 205-06 (D. Conn.

1981) (converting case after finding "absence of a reasonable likelihood of rehabilitation").[31]

---

unreviewed by a fiduciary whose primary obligation is to the estate and its creditors—is not the best way to achieve and maximize creditor recoveries."  *FRGR Managing Member*, 419 B.R. at 579-80. Finally, the court noted that the case "crie[d] out for an independent trustee to carefully evaluate the Debtor's claims or defenses."  *Id.*

[30] Litigants typically have the right to appeal.  But Debtors are not typical litigants. Instead, as Chapter 11 debtors-in-possession, they owe a fiduciary duty to act in the best interests of these Estates, and cannot act in their own self-interest.  *See, e.g.*, *In re Builders Grp., supra.*  Pursuing an appeal of frivolous claims is not in the best interests of the Estates.  Moreover, even if Debtors' Baseless Claims had merit, which they do not, the appeal would nonetheless create an unjustified financial loss given the present status of the Estates and the significant fees and costs to pursue the appeal.

[31] The Bankruptcy Code was amended in 2005. Despite this amendment, the *Gateway Access* court found that the "new" section 1112(b)(4)(A) language was "almost identical to the pre-BAPCPA amendment § 1112(b)(1)'s provision of 'continuing loss to or diminution of the estate and absence of reasonable likelihood of rehabilitation.'"

70.     Courts typically find that a debtor has a likelihood of rehabilitation when the debtor's plan demonstrates its ability to be "put back in good condition [or] re-establish[ed] on a firm, sound basis." *See Tolco Properties*, 6 B.R. at 488 (*quoting Collier*, ¶ 1112.03[2]); *see also Mumma v. Vara (In re Mann Realty Assocs.)*, C.V. No. 1:18-CV-683, 2019 U.S. Dist. LEXIS 168132 (D. M.D. Pa., Sept. 30, 2019)); *In re Tricycle Enters.*, Case No. 04-65901, 2006 Bankr. LEXIS 4261, *18 (Bankr. N.D.N.Y. Mar. 29, 2006).

71.     Debtors' appeal and continued pursuit of Debtors' Baseless Claims to obtain a damage award that would make a refinance viable by reducing Secured Creditor's claim is a fantasy. *See supra* § III.C; *see also* 1927 Motion.  It is certainly not a basis upon which Debtors can successfully reorganize, and "cause" for conversion has therefore been demonstrated. *See Mann Realty Associates*, 2019 U.S. Dist. LEXIS 168132, *19 (citations omitted) (upholding bankruptcy court's conversion of Chapter 11 where the debtor could not confirm a plan within a reasonable time,[32] as a court "need not 'clog its docket with visionary or impracticable schemes for resuscitation' . . . and a debtor must do more than 'manifest unsubstantiated hopes for a

---

*See Gateway Access* 374 B.R. at 562, 566-67. Thus, the *Gateway Access* court held that "the former case law expounding on § 1112(b)(1) is equally applicable to new § 1112(b)(4)(A)." *Id*.

[32] Prior to the 2005 amendments to the Bankruptcy Code, section 1112(b)(2) provided that an "inability to effectuate a plan" constituted "cause" to convert a case. *See, e.g.*, *FRGR Managing Member*, 419 B.R. at 582.  "While this explicit ground for cause has been eliminated in the updated statute, Collier observes that it is still applicable where a party ostensibly filed a Chapter 11 case to reorganize 'but has no reasonable prospects of confirming a plan.'" *Id*. (citing 7 Collier on Bankruptcy ¶ 1112.04[5]).

successful reorganization.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d. Cir. 1991))[33]. *See also*, *In re Original IPFC Shareholders, Inc.*, 317 B.R. 738, 743 (N.D. Ill. 2004).[34]

72.    Importantly, Debtors themselves confirmed their position that there is no alternative other than a sale.  As Debtors' counsel represented to the Court at the February 27, 2019 Hearing:

> **[i]n fact, it's likely that if the Court were to find with the lender in the adversary, that we wouldn't have any dispute and even need anything more than a ceremonial confirmation hearing, if such a thing exists, *because if the Court rules with the lender in the adversary, the only logical result would be a sale.*** [35]

73.    Further, Debtors delayed these proceedings by misrepresenting to the Court that refinancing was "quite obtainable"[36] and "probable."[37]    Indeed, Debtors further suggested that

---

[33] Even if these claims were not meritless (which they are), there is still an "absence of a reasonable likelihood of rehabilitation," because plans premised on the outcome of litigation are entirely too speculative in nature and, thus, cannot be used to support confirmation of a plan.  This is particularly true where the claims "were 'substantial,' any success on the claims would likely be far away and [the litigation would be] hotly contested."  *See FRGR Managing Member*, 419 B.R. at 583 (citing *In re Edwards*, No. 95-18405, 1996 Bankr. LEXIS 847, *5-7 (E.D. Pa. June 9, 1995)).

[34] In *Original IPFC Shareholders, Inc.*, the court found that dismissal or conversion was warranted where the entire premise of the debtor's rehabilitation was based on the "anticipated future outcome of a single lawsuit" and, at least one tribunal had already "independently evaluated the debtor's claim on the merits and found its primary asset to be worth zero."  The court then concluded that "[w]hen visionary schemes for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order."  *In re Original IPFC Shareholders, Inc.*, 317 B.R. at 743.

[35] February 27, 2019 Transcript at 8:13-19 (emphasis added).

[36] At the February 27, 2019 Hearing, Debtors' counsel stated "***But in terms of the timing of confirmation versus the adversary proceeding, from the investors' perspective it really is critical to have the adversary proceeding go first because if the debtors prevail, refinancing the property should be quite obtainable***, and then the debtor can refinance and we don't have a disaster for all of the investors who have their retirement income invested in these debtors." February 27, 2019 Hearing Tr. at 11:2-9.

[37] *See also Debtors' Opposition to Secured Creditor's Motion for Entry of an Order Dismissing the Debtors' Chapter 11 Cases Pursuant to Section 1112(b) of the Bankruptcy Code, With Prejudice or, in the Alternative, Granting Relief From the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code*, Adversary Proceeding Docket No. 123, ¶ 13 ("Refinancing is not merely *possible* in these cases – it is *probable*.").  Debtors also represented to the Court that "[t]he Debtors are not proposing to affect [Prior Lender's] rights; the Debtors seek only the time and 'breathing space' necessary to obtain exit financing that will pay [Prior Lender] what it is actually owed." (*Id*. ¶ 20.)

their plan was superior because of the existence of that refinancing option.[38]  However, the truth is that Debtors knew at that time that refinancing was far from "quite obtainable" or even "probable" given their years of previous failed attempts to refinance.[39]

74.     Finally, Debtors cannot refinance given the size of Secured Creditor's claim when compared to the value of the Property.   As noted herein, Secured Creditor's unpaid principal balance is over $30 million, while the value of the Property is only $31.46 million.  The Property's loan to value ratio is therefore insufficient to warrant a refinancing as Debtors would need to borrow more than the value of the Property to repay their indebtedness.  *See, e.g., In re SM 104 Ltd.*, 160 B. R. 202, 233 (Bankr. S.D. Fl. 1993) (denying confirmation of the Debtor's plan which required the Debtor to obtain a new loan with a 100% loan to value ratio "finding that the Debtor has offered no evidence that an efficient market for loans that are 100% loan to value exists in the

---

[38] At the February 27, 2019 Hearing, Debtors' counsel also stated "I'm not sure if the Court wants to entertain pushing the confirmation hearing out [as far as the fall of 2019], but that's – we believe that that's the appropriate way to approach this because, as the Court may recall or may be aware, the two plans that have been offered by the – ours and the secured lenders' plan, they basically are the same except for in terms of a sale as an option or as an end result, but ours also has an option for us to refinance. And the reason we want that optionality is because depending upon how the Court rules in the adversary will have an impact on whether we can refinance or not." February 27, 2019 Hearing Tr. at 7:14-8:1.

[39] Debtors have been trying to refinance the loan since 2015. (*See, e.g.*, J-1226.)  During that time, multiple long-term and bridge lenders, including UBS, Calmwater, and Ladder Capital considered, but did not, refinance the loan. *See* Findings of Fact at ¶¶ 65-87 (regarding UBS), ¶¶ 88-113 (regarding Calmwater), and ¶¶ 309-313 (regarding Ladder Capital).  Debtors' internal communications also reflect that Debtors recognized that refinancing the loan would be difficult.  For example, on October 1, 2016, Mark Rubin stated on a call with FGG, Inc. and certain TIC Owners: "TIC Entity loans are more expensive, if you can find them, and generally in disfavor." J-545.  Similarly, on September 27, 2016, Mark Rubin, in an email to Bradley Ross and Seth Denison wrote: "[T]oday, the world is different post-recession, and it's highly unlikely and very difficult to get tenants-in-common financing for properties like ours." J-521 at 6:5-8.  Further, on December 16, 2015, Lorraine Bier, one of Debtors' TIC owners, when asked about Debtors' refinancing and sale efforts, stated: "Note that TIC members have periodically introduced potential buyers/re-fiers, but all deals have fallen through.  Basically, the property has two failings: longtime deferred maintenance & worn-out dated appearance. We should have been putting money back into the building but the original deal was predicated on continued appreciation then sale to the next fool." J-1226.

real world."); *In re Porter*, 371 B.R. 739, 750 (Bankr. E.D. Pa. 2007) (finding that the debtor's proposed plan which required a refinancing with a 95% loan to value ratio "is very unlikely.").[40]

75.     As there is insufficient loan to value ratio to refinance the Property, there is no other means of monetizing the Property absent a sale.  Indeed, Debtors have already conceded that in the event they lost the Adversary Proceeding, they would have no alternative but to sell the Property.[41]

76.     Moreover, upon a sale of the Property, these single asset cases would be liquidations and there would be no likelihood of rehabilitation.  *See, e.g.*, *Loop Corp.*, 379 F. 3d at 516 ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation."); *In re BHS&B Holdings,* 439 B.R. at 347. (confirming that liquidating Chapter 11 cases does not "rehabilitate the bankruptcy entity").

---

[40] *Compare, e.g.*, *In re Crosscreek Apartments*, 213 B.R. 521, 541 (Bankr. E.D. Tenn. 1997) (finding that a loan to value ratio of 64% was more than sufficient to obtain refinancing).  Applying a loan to value ratio of 64% with respect to the Property would require the Property value to be $46.875 million to obtain a refinancing.  But even if the Property was worth $46.875 million, it still could not be refinanced because Secured Creditor would be an over-secured creditor and would be entitled to reasonable attorneys' fees and default rate interest.  *See* 11 U.S.C. § 506(b).  Even Debtors conceded this principle in Paragraph 75 of their Claim Objection ("As an initial matter, the Debtors do recognize that Section 506(b) of the Bankruptcy Code does provide for attorneys' fees and costs for over-secured creditors…..").  Thus, if the value of the Property was worth $46.875 million, then Secured Creditor, as an oversecured creditor, would be entitled to the full amount of its $41,815,276.33 claim and a refinancing of that amount (again using a 64% loan to value ratio) would require the Property be worth more than $65.336 million.

[41] At the February 27, 2019 Hearing, Debtors' counsel said that if Debtors' lost the Adversary Proceeding, ***"our only alternative is to sell, which would be the same as what they're asking for [in Secured Creditor's Plan]*.***"  February 27, 2019 Transcript at 8:7-10 (emphasis added).

4.      **Debtors' Gross Mismanagement Of The Estates Constitutes Cause and Warrants Conversion Pursuant to Section 1112(b)(4)(B)**

a.      **Debtors' Filing And Continued Prosecution Of Debtors' Baseless Claims Constitute Gross Mismanagement Warranting Conversion Of These Chapter 11 Cases**

77.      To determine what constitutes "gross mismanagement of the estate," a court needs to examine a debtor's treatment of its creditors because "[a] debtor-in-possession is vested with significant powers under the provision of the Bankruptcy Code." *Builders Grp.*, 2014 Bankr. LEXIS 2092, *19-20 (quoting *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007)). Further, those "powers come with certain responsibilities" and "a debtor-in-possession owes a fiduciary duty to its creditors." *Id.*

78.      A finding that a debtor has committed gross mismanagement is "sufficient grounds for conversion from Chapter 11 to Chapter 7." *Gateway Access*, 374 B.R. at 566 (citing *In re Incredible Auto Sales, LLC*, 2007 Bankr. LEXIS 1305 (Bankr. D. Mont. 2007)); *see also In re Sillerman*, 605 B.R. 631, 657 (Bankr. S.D.N.Y. 2019) (finding "cause" based on gross mismanagement pursuant to § 1112(b)(4)(B) "after examining [the] totality of circumstances" which reflected multiple breaches of fiduciary duty by the debtor).

79.      In these Chapter 11 Cases, Debtors committed gross mismanagement when they filed and continued to pursue the baseless Adversary Proceeding. *See Maxon Eng'g. Servs. v. Mieses (In re Maxon Eng'g Servs.)*, No. 07-00227, 2010 Bankr. LEXIS 426, *15-16 (Bankr. D. P.R. Feb. 12, 2010) (finding Chapter 7 trustee[42] breached her fiduciary duties to the debtor's estate by "engaging in frivolous litigation").

---

[42] Although *Maxon Eng'g* involved a Chapter 7 Trustee breaching her fiduciary duties to an estate by engaging in frivolous litigation, pursuant to section 1107(a), a debtor in possession has the same duties as a trustee. *See* 11 U.S.C. § 1107(a).

      **b.**      **Debtors' Stay Of Secured Creditors' Plan So That Debtors Could Pursue Debtors' Baseless Claims Constitutes "Cause" and Warrants Conversion**

80.     Debtors' willful and intentional misrepresentation of the strengths of their claims to forestall and delay confirmation of Secured Creditor's Plan (which would have paid all allowed claims) is a breach of fiduciary duty and mismanagement of the Estates. *See In Re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995) (stating that a "debtor in possession does not act in its own interest but must act in the best interest of the creditors of the estate" and that "[t]he job of a debtor-in-possession is to make sure the creditors are paid") (citing *Grayson-Robinson Stores, Inc. v. SEC*, 320 F.2d 940 (2d Cir. 1963)).[43]

81.     Further, and as set forth in Paragraphs 72 and 73, *supra*, Debtors delayed these proceedings by i) misrepresenting to the Court that refinancing was "quite obtainable" or even "probable" and ii) suggesting that their plan was superior because of the existence of that refinancing option, when in truth, Debtors knew at that time that refinancing was far from "quite obtainable" or even "probable" given their years of previous failed attempts to refinance. *See supra* ¶¶ 72-73.

      **c.**      **Debtors' Failure To Investigate, Preserve, Protect and Pursue The Estates' Significant Claims Against Third Parties Constitute "Cause" and Warrant Conversion**

82.     Debtors' potential claims against third-parties include[44] legal malpractice claims against Debtors' attorneys in connection with the baseless Adversary Proceeding and the other

---

[43] At the very least, there should be an independent investigation of whether there are any potential claims against Debtors' counsel for misleading the Court in granting a stay of the confirmation hearing to consider Secured Creditor's Plan. *See FRGR Managing Member, LLC*, 419 B.R. at 580 (converting a case to appoint an independent fiduciary duty to investigate potential claims against Debtor's counsel).

[44] Additional claims against Rubin and Rubin concern their failure to disgorge the fees that were ordered to be disgorged by this Court in the Disqualification Order. As of the date hereof, the Disqualification Order has not been stayed. Notwithstanding the lack of stay, upon information and belief: i) Debtors have made no demand for the disgorgement of these fees and costs previously paid to Rubin and Rubin; ii) no fees and costs have been disgorged

conduct referenced in the 1927 and Disqualification Motion.[45] *See Sillerman*, 605 B.R. at 648

("The Debtor's failure to investigate and/or file avoidance and recovery actions manifestly could

cause the estate to forfeit proceeds to which it would otherwise be entitled.  Taken alone, Debtor's

failure to investigate avoidance actions signals a breach of fiduciary duty sufficient to just a finding

of cause pursuant to 1104(a)(1).").[46]

83.     Debtors do not appear to have preserved, protected or pursued any of the above

claims, whether by entering into tolling agreements, putting applicable insurance carriers on notice

of potential claims, or actually filing claims.  Thus, absent a conversion and the appointment of a

Chapter 7 trustee, these claims may well be lost thereby causing a loss of value to the detriment of

the Estates and their creditors.

### 5.     Debtors' Unlawful Use of Cash Collateral Since September 2018 Also Warrants Conversion Of These Chapter 11 Cases

84.     Debtors' use of Secured Creditor's Cash Collateral for "unauthorized" and

"unlawful" purposes also constitutes "cause for conversion pursuant to Section 1112(b)(4)(D) of

the Bankruptcy Code."  *See In re Fall*, 405 B.R. 863, 870 (Bankr. N.D. Ohio 2009) ("Pursuant to

---

by Rubin and Rubin despite this Court's express requirement to do so; and iii) no action to compel turnover of these funds pursuant to section 542, or any related action, has been instituted by Debtors according to the case docket.

[45] On February 25, 2020, the Lender Defendants filed a Joinder in Support of the Motion of the United States Trustee to Revoke or Terminate the Retention of Rubin and Rubin, P.A. and Disallow Fees and Expenses of Rubin and Rubin, P.A. and Seth Denison at Docket No. 460 (the "Joinder").  In Paragraphs 45-50, inclusive, of the Joinder (which are hereby incorporated herein by reference) Secured Creditor identified numerous payments from Debtors' monthly operating reports which appear to be improper and unauthorized. Secured Creditor is unaware of any Debtor investigation into these payment issues, or the repayment of any of the payments, despite that Debtors were on notice of these issues when Secured Creditor filed its Joinder more than seven months ago.  Secured Creditor believes that many of these post-petition transfer cases be avoided by a trustee pursuant to Section 549.

[46] The *Sillerman* court found that the Debtor's failure to investigate and pursue avoidance actions constituted "cause" under § 1104(a)(1) of the Bankruptcy Code.  However, the court determined that the elements for cause under § 1112(b) of the Bankruptcy Code "similarly constitute 'cause' for the appointment of a trustee under § 1104(a)(1)." *Sillerman*, 605 B.R. at 656.  Thus, *Sillerman* applies to these Chapter 11 Cases.

§ 1112(b)(4)(D), 'cause' to dismiss or convert will arise where there is 'unauthorized use of cash collateral substantially harmful to one or more creditors.'"); *see also supra* § III.A.2.

85.     In *Fall,* the debtor utilized cash collateral without any authorization from the Court. As a consequence, the *Fall* court found sufficient "cause" to convert or dismiss the case because the unauthorized use of cash collateral was substantially harmful to the secured creditor as the secured creditor "had no way of knowing the disposition of its assets." *Fall,* 405 B.R. at 870.

86.     As in the *Falls* case, in these Chapter 11 Cases, Debtors have been using Cash Collateral without a Court Order since September 2018.  *See supra* § III.A.2.

87.     Further, as set forth in attached Exhibit D, more than $100,000 in payments made in these Chapter 11 Cases were never authorized by, nor disclosed to, Secured Creditor.  *See id*. Indeed, Secured Creditor only discovered Debtors' misconduct through painstaking review and analysis of Debtors' MORs and, arguably, there could be more unauthorized transfers which Secured Creditor has yet to discover.

88.     Secured Creditor has repeatedly demanded that Debtors remedy their misconduct but they have failed to do so. *See* Exhibit E.

89.     As in the *Fall* case, *supra*, Secured Creditor "has no way of knowing the disposition of its assets" and, thus, has been and continues to be substantially harmed by Debtors' unauthorized use of Cash Collateral.

90.     In addition, given the unauthorized and improper uses of Secured Creditor's Cash Collateral, which have resulted in the dissipation of more than $100,000.00 "cause" exists to convert these Chapter 11 Cases.  *See Falls supra.*

**C.    The Best Interests Of The Creditors And The Estates Are Most Appropriately Served By Conversion, Not Dismissal**

91.    Because "cause" exists under section 1112(b) to convert or dismiss these Chapter 11 Cases, the Court must next decide whether a conversion or a dismissal is in the best interests of creditors and the estate.  See, § 1112(b).  Conversion is most appropriate for several reasons.

92.    First, Debtors' documented mismanagement, misconduct and other failings during these Chapter 11 Cases would likely continue after a dismissal.  *See Builders Grp.*, 2014 Bankr. LEXIS 2092, *24 (holding that conversion was in the best interests of the creditors because the "proven mismanagement of the Debtor would not benefit the creditors and the estate outside of bankruptcy."); *Cloisters of Brevard*, 117 B.R. at 723 (conversion appropriate where debtors "cannot be trusted to act as debtor[s]-in-possession."); *In re Grasso*, 497 B.R. 448, 462 (Bankr. E.D. Pa. 2013)("**Absent conversion, this Court envisioned no means to put an end to the Debtor's misconduct let alone minimize the further harm that was likely to result to his estate if his charade of a reorganization was allowed to continue**.") (emphasis added).

93.    Second, a conversion would ensure a more orderly liquidation of the Estates[47] and would "eliminate the expenses associated with confirmation of [an unconfirmable] Plan."  *See Loop*, 379 F.3d at 518.  A conversion would also eliminate the "continuing loss to or diminution of the Estates" by the pursuit of Debtors' Baseless Claims.

94.    Third, a conversion and the appointment of a Chapter 7 trustee benefits the Estates because the trustee could investigate, preserve and protect the potential avoidance and other claims

---

[47] *See Cloisters of Brevard*, 117 B.R. at 723. (finding that "conversion was in the best interests of the Debtor's estate and creditors because conversion would minimize the estate's expenses and would facilitate the orderly liquidation of its assets")(citations omitted).  Indeed, a trustee's "paramount duty" in a Chapter 7 bankruptcy is to marshal the estate's assets for a *pro rata* distribution to all creditors. *See Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987).  Upon a dismissal, the ability to marshal assets for a *pro rata* distribution to creditors would be lost.

and causes of action described herein. *See, FRGR supra*.  At the very least, an independent fiduciary could pursue the Court-ordered disgorgement of the fees and costs previously paid to Rubin and Rubin.  Further, the investigation, preservation and pursuit of all of the above claims is crucial because they may be the only unencumbered assets which could be used to fund a distribution to the creditors.  Conversely, Secured Creditor would foreclose on its Collateral upon a dismissal and as a fully (or, even, undersecured) creditor, there would be nothing remaining for the Estates or their creditors

95.     For all of these reasons, it is in the best interests of the Estates and their creditors if this Court converts these Chapter 11 Cases rather than dismiss them.

**D.     In the Alternative, Secured Creditor Is Entitled To Relief From The Automatic Stay Pursuant To Section 362(d) To Proceed With Its Contractual and State Law Remedies[48]**

**1.     Secured Creditor Is Entitled To Relief Under Section 362(d)(1) For "Cause"**

96.     Pursuant to section 362(d)(1), if "cause" exists, a bankruptcy court must grant a creditor relief from the automatic stay.  *See, e.g.*, 11 U.S.C. § 362(d)(1).

97.     The Bankruptcy Code does not define "cause" for purposes of section 362(d)(1).  Nonetheless, there is no difference between "the cause requirement for dismissal [or conversion] under section 1112(b), and the cause requirement for stay relief under section 362(d)(1)."  *In re Laguna Assocs., L.P.*, 30 F.3d 734, 737 (6th Cir. 1994).  Accordingly, for all of the reasons previously detailed herein, sufficient "cause" exists under section 362(d)(1) to grant Secured Creditor relief from the stay.

---

[48] Section 362(d) provides that "upon the request of a party in interest and after notice and a hearing, the Court shall grant relief from the [automatic] stay…" 11 U.S.C. § 362(d).

98.     Even if "cause" under section 1112(b) did not constitute "cause" under section 362(d)(1), cause still exists because administrative insolvency constitutes cause to grant stay relief pursuant to section 362(d)(1).  *See, e.g.*, *In re Advanced Med. Spa Inc.*, No. BAP EC-16-1087, 2016 WL 6958130, at *7 (B.A.P. 9th Cir. Nov. 28, 2016) (finding that "cause" exists to grant relief from stay when estate is administratively insolvent because "[p]ut bluntly, it is impossible to diminish an estate with no assets").

99.     Similarly, courts have also found "cause" to terminate the automatic stay pursuant to section 362(d)(1) due to Debtors' lack or inability to effectively reorganize. *See In re Brown*, No. 96-30290, 1998 WL 734701, at *5 (E.D. Pa. Oct. 15, 1998), *reh'g denied, In re Brown*, No. 97-5302, 1998 WL 848102 (E.D. Pa. Dec. 4, 1998) (affirming bankruptcy court's finding of "cause" for stay relief where debtor had "little or no income and assets" and "could not propose a feasible reorganization plan to the satisfaction of the Bankruptcy Court"). "Cause" therefore exists for all of the reasons set forth herein at Section IV.B, *supra*.

100.    Finally, courts have also found "cause" to terminate the automatic stay pursuant to section 362(d)(1) when a secured creditor is not "adequately protected."  *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

101.    Although the Bankruptcy Code does not expressly define "adequate protection," section 361 provides that adequate protection may be provided by: i) periodic cash payments; ii) additional or replacement liens; or iii) other relief resulting in the "indubitable equivalent" of Secured Creditor's interest.  *See* 11 U.S.C. § 361 and *Swedeland Dev. Grp., supra*.

102.    Exactly what constitutes adequate protection must be decided on a case-by-case basis, in light of the particular facts and circumstances presented. *See Swedeland*, 16 F.3d at 564.

103.    The "purpose of adequate protection is to guard the secured creditor's interest from a decline in the value of the collateralized property." *In re JCP Properties*, 540 B.R. 596, 613 (Bankr. S. D. Tex. 2015) (citing *In re Panther Mountain Land Development, LLC,* 438 B.R. 169, 189 (Bankr. E.D. Ark. 2010)).

104.    Debtors have asserted throughout these Chapter 11 Cases that the value of the Property greatly exceeded Secured Creditor's claims.[49]   Debtors therefore argued that this "equity cushion" (along with monthly interest payments to Secured Creditor) constituted sufficient adequate protection.

105.    While it is true that courts have determined that an "equity cushion" may provide adequate protection to a secured creditor, *see, e.g., In re Elmira Litho, Inc.*, 174 B.R., 892, 904 (Bankr. S.D.N.Y. 1994), there is no such equity cushion here.  Rather, the value of the Property has substantially decreased while Secured Creditor's claim has substantially increased. *See* ¶¶ 63-64, 67, 73 *supra*; *see also In re Shivshankar Partnership LLC,* 517 B.R. 812, 817 (Bankr. E.D. Tenn. 2014).

106.    In *Shivshankar,* the court found "cause" existed to grant the secured creditor relief from stay because the secured creditor was not adequately protected, despite receiving monthly adequate protection payments, due to declining value of the secured creditor's collateral.

107.    As in *Shivshankar*, the Property has lost value.  Further, Secured Creditors' claim has increased and, notwithstanding its receipt of monthly interest payments, Secured Creditor is not adequately protected.

---

[49] *See*, February 27, 2019 Transcript, P. 28:5-14 wherein Debtors' counsel states:

> I could tell you at the present time we've had an appraisal done third quarter of last year. As is it was almost 45 million and stabilized it was almost 50 million. The lenders are alleging that their maximum amount, if they hit it all the way out of the park right now, is like 39 and change, and that doesn't even give us credit. I take that back. I think it was like 40.3 million. Doesn't give us credit for all the interest, the almost $3 million we paid since we've been in bankruptcy.

108.    Thus, "cause" exists for this Court to grant Secured Creditor relief from the stay to exercise its rights and remedies under applicable law.  *See also In re Inwood Heights Housing, No.* 11-13322 MG, 2011 WL 3793324, *8 and *9 (Bankr. S.D.N.Y. August 25, 2011); *JCP Properties*, 540 B.R. at 613 (Stay relief is available to a creditor when its interest is not adequately protected, and a decline in collateralized property value evidences a lack of adequate protection).

### 2.    Secured Creditor Is Also Entitled To Relief From The Automatic Stay Under Section 362(d)(2)

109.    "Section 362(d)(2) provides for stay relief if (i) debtor does not have any equity in the property and (ii) "such property is not necessary to an effective reorganization." *See* 11 U.S.C. § 362(d)(2).

### a.    There Is No Equity In The Property Beyond Secured Creditor's Fully Secured Claim

110.    There is no equity in the Property beyond Secured Creditor's fully secured claim. *See* ¶¶ 63-64, 67, 73 *supra*.  Thus, Secured Creditor has met the first prong of section 362(d)(2). *See JCP Properties*, 540 B.R. at 616 (stating that the inquiry of whether a debtor has any equity in property under section 362(d)(2)(A) "relies on an assessment of the value of the property as compared to the amount of secured debt thereto").

### b.    The Property Is Not Necessary To Debtors' Effective Reorganization Because There Is No Reasonable Possibility Of A Successful Reorganization Within A Reasonable Time

111.    Given the absence of any equity in the Property, stay relief must be granted unless Debtors can prove that the Property is necessary to an effective reorganization.  *See United Sav. Ass'n. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 375-76 ("Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the debtor to establish that the collateral at issue is 'necessary to an effective reorganization.'").

112.     To satisfy its burden under 11 U.S.C. § 362(d)(2), Debtors must prove that there is "a reasonable possibility of a successful reorganization within a reasonable time." *JCP Properties,* 540 B.R. at 617 (quoting *United Sav. Ass'n. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365 (1988)).   Finding that there was no equity in the property and that there was no reasonable possibility of a successful reorganization within a reasonable time, the *JCP Properties* court concluded "that there [was] sufficient basis to lift the automatic stay pursuant to § 362(d)(2)." *Id.* at 619.   Similar to the debtor in *JCP,* Debtors cannot satisfy this heavy burden.

  **c.**  **There Is No Reasonable Possibility Of A Successful Reorganization Within A Reasonable Time Because Debtors Cannot Confirm A Plan Premised Upon A Refinancing**

113.     Debtors cannot meet their burden of showing "a reasonable possibility of a successful reorganization within a reasonable time" given the administrative insolvency of these Chapter 11 Cases, the size of Secured Creditor's claim, and the lack of equity in the Property.

114.     Moreover, and as stated *supra*, Debtors tried desperately but unsuccessfully for years to refinance the Property using long-term and even bridge loans, and that was when it had a significantly higher value. *See supra* FN 39.   Thus, a successful reorganization via a refinance or otherwise is simply not viable and any plan premised upon a re-financing will not be feasible, thereby, precluding confirmation pursuant to section 1129(a)(11).

  **d.**  **There Is No Reasonable Possibility Of A Successful Reorganization Within A Reasonable Time Because Debtors Cannot Propose a Confirmable Reorganization Plan**

   **i.**  ***Debtors Do Not Have the Votes To Confirm A Plan***

115.     If Debtors choose to pursue their plan, they will not be able to confirm it over Secured Creditor's objection because, in addition to the practical impossibility of obtaining sufficient refinancing (see above), Debtors also lack the necessary votes to confirm a plan.

116.    That is because, in addition to its secured claim, Secured Creditor has a separate and additional claim for its attorneys' fees and costs incurred in connection with the Adversary Proceeding.[50]

117.    Assuming Secured Creditor's Rule 54 Motion is granted, Secured Creditor's section 502 claim will be substantially higher than any of the other unsecured claims.  Indeed, Debtors' counsel confirmed at the February 27, 2019 status conference that the aggregate unsecured claims are only approximately $400,000.[51]

118.    Because Secured Creditor will: i) control the two likely impaired classes entitled to vote on such reorganization plan; and ii) will vote to reject such a plan, Debtors will not be able to propose a confirmable plan under section 1129.[52]  *See In re Boston Post Road Ltd. P'ship,* 21 F.3d 477, 483 (2d Cir. 1994) ("A key premise of the [Bankruptcy] Code is that creditors holding greater debt should have a comparably greater voice in reorganization.").

---

[50] In connection with the Adversary Proceeding, Secured Creditor filed its Rule 54 Motion seeking approximately $4.8 million in fees and costs.  If the Rule 54 Motion is granted, Secured Creditor will have a separate claim, apart from any claim under section 506(b), for these fees and costs.  *See, Wilmington Trust Co. v. Tribune Media Co. (In re Tribune Media Co.),* No. 15-CV-01116, 2018 WL 6167504, *2 (D. Del. Nov. 26, 2018) (finding that section 506(b) "does not limit the allowability of unsecured claims for contractual post-petition attorneys' fees….").

[51] According to Debtors' counsel:

> There's another issue I want to hit. Mr. Kotler kept hitting about the fact that there's $800,000 of unsecured debt here. Well, almost half of that is held by the TIC owners. So they were inter-TIC claims.  So they are really basically it's the debtor's entities that own those claims. So the actual real amount of unsecured claims here is just over $400,000, Your Honor.

February 27, 2019 Transcript at 29:15-22.

[52] Pursuant to section 1126(c), to obtain an "accepting" class, Debtors must receive at least one half in number and two-thirds in dollar amount vote in favor of the Plan.  Because Secured Creditor's deficiency claim will likely be more than one third of the size of the unsecured creditor class, Debtors will be unable to comply with section 1126(c) and, thus, will not have an impaired class of claims voting to accept the plan as is required by section 1129(a)(10).

### ii.     *Debtors Cannot Put Forth a Fair And Equitable Plan*

119.     Any plan proposed by Debtors would also fail for the separate and independent reason that Debtors will not be able to demonstrate that their proposed plan is "fair and equitable." Specifically, for Debtors to "cram down" a plan that Secured Creditor has rejected, Debtors must demonstrate that this "cram down" plan is "fair and equitable" with respect to each impaired class that has rejected the plan. *See* 11 U.S.C. § 1129(b)(1).

120.     To satisfy this requirement with respect to Creditor, the proposed plan would have to provide for: (i) Secured Creditor's retention of the liens securing its claim and receipt of deferred cash payments equal to the present value of its claim; (ii) the sale of the Collateral, with the underlying liens to attach to the sale proceeds; or (iii) Secured Creditor's realization of the "indubitable equivalent" of its claim (*e.g.*, by return of the Collateral).  *See* 11 U.S.C. § 1129(b)(2)(A).

121.     Given the size of Secured Creditor's claim when compared to the value of the Property, Secured Creditor is undersecured and, thus, Debtors will not be able to satisfy the "fair and equitable" component of these requirements. *See* 11 U.S.C. § 1129(b)(2)(A); *In Re River East Plaza,* 669 F.3d 826, 832 (7th Cir. 2012).

122.     Because Debtors cannot propose any plan that would satisfy the confirmation requirements of section 1129 of the Bankruptcy Code, it is impossible for Debtors to satisfy their burden of demonstrating the requisite "reasonable possibility of a successful reorganization within a reasonable time."

123.     For all of these reasons, Secured Creditor is entitled to relief from stay.

## V.    __CONCLUSION__

WHEREFORE, Secured Creditor respectfully requests that this Court enter an Order in substantially the form attached hereto as Exhibit A, converting this case to a case under Chapter 7; or, in the alternative, (ii) the entry of the order, in the substantially the form attached hereto as Exhibit B, granting Secured Creditor relief from the automatic stay to exercise its rights to its Collateral (as defined herein); and granting related relief.[53]

Dated:  October 13, 2020
      Wilmington, Delaware

DUANE MORRIS LLP

/s/ *Lawrence J. Kotler*
Lawrence J. Kotler (DE 4181)
Sommer L. Ross (DE 4598)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801-1659
Tel: 302-657-4900
Fax: 302-657-4901
Email: ljkotler@duanemorris.com
      slross@duanemorris.com

-and-

Paul E. Chronis (admitted *pro hac vice*)
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701
Email: pechronis@duanemorris.com

-and-

Meagen E. Leary (admitted *pro hac vice*)
Spear Tower One Market Plaza, Suite 2200
San Francisco, CA 94105
Telephone: (415) 957-5000
Facsimile: (415) 520-0291
E-mail: meleary@duanemorris.com
*Counsel to Little Rock-400 West Capitol Trust*

---

[53] Secured Creditor reserves all rights to amend its proof of claim to seek fees and expenses incurred in connection with these Chapter 11 Cases, including those fees and expenses incurred in connection with preparing this Motion.